**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

              v.

MICHELLE BOND,

              Defendant.

Docket No. 1:24-cr-000494-GBD

**Reply Memorandum of Law in Support of Defendant Michelle Bond's Motion to Dismiss,**
**to Suppress Evidence, for a Hearing, and for Dismissal of Count Four of the Indictment**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................................1

REPLY TO THE GOVERNMENT'S STATEMENT OF FACTS...................................4

ARGUMENT ......................................................................................................................7

I.    The "Integration Clause" in Mr. Salame's Plea Agreement Does Not
      Foreclose Ms. Bond's Motions. ...........................................................................7

II.   Ms. Bond has Standing as a Third-Party Beneficiary to Enforce the Plea
      Agreement ............................................................................................................11

III.  In the Alternative, Evidence Obtained by Deliberately Misleading Ms. Bond
      Should be Suppressed. ........................................................................................12

IV.   Scope of Requested Hearing ..............................................................................13

V.    Count IV Must Be Dismissed for Multiplicity ................................................15

CONCLUSION .................................................................................................................15

# **TABLE OF AUTHORITIES**

**Cases**

*In re Altro*, 180 F.3d 372 (2d Cir. 1999)..................................................................................8, 11

*Bayerische Landesbank, New York Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42 (2d
    Cir. 2012) ..........................................................................................................................11

*United States v. Feldman*, 939 F.3d 182 (2d Cir. 2019) ............................................................ 7-8

*United States v. Gotti*, 399 F. Supp. 2d 252 (S.D.N.Y. 2005) ........................................................8

*United States v. Heatley*, No. S11 96 CR 515, 1999 WL 61816 (S.D.N.Y. Jan 29, 1999) ..........10

*United States v. Miller*, 26 F. Supp. 2d 415 (N.D.N.Y. 1998)......................................................15

*United States v. Montes-Reyes*, 547 F. Supp. 2d 281 (S.D.N.Y. 2008)........................................13

*United States v. Ready*, 82 F.3d 551 (2d Cir. 1996) *superseded on other grounds as stated
    in United States v. Cook*, 722 F.3d 477 (2d Cir. 2013)........................................................7

*United States v. Salame*, No. 1:22-cr-00673-LAK ECF No. 283 ....................................................5

*Wright v. Po*, No. 10-CV-5127 (MKB), 2021 WL 2779451 (E.D.N.Y. Jul. 2, 2021)..................11

**Other Authorities**

United States Sentencing Guidelines § 3E1.1...................................................................................3

Lindsay Whitehurst, "American's trust in nation's court system hits record low, survey
    finds," Associated Press, Dec. 17, 2024 ............................................................................2

Hon. Jack Zouhary, "Jury Duty: A Founding Principle of American Democracy," Civil
    Jury Project, NYU School of Law (last visited June 18, 2025)............................................15

Ram Subramanian, Leon Digard, Melvin Washington II, and Stephanie Sorage, "In the
    Shadows: A Review of the Research on Plea Bargaining," Vera Institute for Justice,
    Sept. 2020 ...........................................................................................................................2

Plea Bargain Task Force Report, Am Bar Assoc., Criminal Justice Section, Feb. 2023...............3

Defendant Michelle Bond submits this Reply memorandum of law in further support of her motion to dismiss the indictment, to suppress evidence, to dismiss multiplicitous counts, or for a hearing.

## PRELIMINARY STATEMENT

The government struck an agreement with Ms. Bond's husband, Ryan Salame. It wanted a quick and easy plea with Mr. Salame to avoid a long, costly, difficult, and complicated trial. It exercised the leverage it knew would work best – the government threatened his wife. In opposition, the government offers no sworn declaration stating the dates of meetings. It relies, instead, on an internal email that purportedly memorializes a meeting from some unknown time, recounting a conversation of which defense counsel has no record. At a minimum, the government email suggests some representation or promise was made. That alone is sufficient to justify an evidentiary hearing.

The government used this promise to trick Ms. Bond into believing she could speak as surety for her husband and testify in her divorce proceedings. It offered her a fictive peace of mind that, at least for the moment, government investigators would not pursue their investigation into her. The government never disabused her of that notion, even while it took notes on calls and otherwise schemed away. The resulting indictment – overcharged and multiplicitous – means she is in danger of substantial prejudice. The Court should uphold the deal made between the prosecutors and Mr. Salame and Ms. Bond and enter a full dismissal of this case. At a bare minimum, the Court should suppress the improperly obtained evidence and dismiss the multiplicitous count (Count IV).

The corrosive effect to the fair administration of justice by such extortionate bargaining tactics in plea negotiations cannot be overstated. Americans' trust in their judicial system is now at an all-time low. Lindsay Whitehurst, "American's trust in nation's court system hits record

low, survey finds," Associated Press, Dec. 17, 2024.[1]  Partly fueling that lack of trust is the near

extinction of the criminal jury trial.  *See* Nat'l Assoc. of Criminal Defense Lawyers and the

Foundation for Criminal Justice, "The Trial Penalty: The Sixth Amendment Right to Trial on the

Verge of Extinction and How to Save It," Nat'l Assoc. of Criminal Defense Lawyers, 2018

("Trial Penalty") (noting that trial by jury has decreased to 3% of criminal cases).[2]

The decrease in the prevalence of criminal jury trial matches the increased leverage

enjoyed by the government in negotiating plea deals.  As the authors of one review observed:

> In last few decades, prosecutorial leverage in plea negotiations has
> increased exponentially as changes in substantive law have
> bolstered criminal penalties and given prosecutors a wider range of
> choices to use when filing charges (such as mandatory penalties,
> sentencing enhancements, and more serious yet duplicative crimes
> already well covered by existing law). But increased exposure to
> harsher penalties has not been matched with increased procedural
> protections for defendants. Prosecutors' wide powers in plea
> bargaining still go largely unchecked, and there are no meaningful
> oversight mechanisms or procedural safeguards to protect against
> unfair or coercive practices, raising fears about arbitrariness and
> inequality.

Ram Subramanian, Leon Digard, Melvin Washington II, and Stephanie Sorage, "In the Shadows:

A Review of the Research on Plea Bargaining," Vera Institute for Justice, Sept. 2020.[3]

Some inherent coercion exists in any plea deal.  Trials are expensive.  A criminal defense

in even a modestly complex case can easily exceeds $1 million and trials can run well into eight

---

[1] Available at https://apnews.com/article/donald-trump-joe-biden-courts-americans-trust-1d4d2e22e9699cc09b29ec6ac8f374e7.

[2] Available at https://www.nacdl.org/getattachment/95b7f0f5-90df-4f9f-9115-520b3f58036a/the-trial-penalty-the-sixth-amendment-right-to-trial-on-the-verge-of-extinction-and-how-to-save-it.pdf.

[3] Available at https://vera-institute.files.svdcdn.com/production/downloads/publications/in-the-shadows-plea-bargaining.pdf.

figures.[4]  Criminal defendants also face the so-called "trial penalty" – increased sentences if they lose at trial.  United States Sentencing Guidelines § 3E1.1, codifies the trial penalty, subtracting points from an offense level for "acceptance of responsibility."  Even a defendant that defends herself and succeeds likely faces near complete financial, social, and professional ruin.

Mr. Salame and Ms. Bond faced something different; they faced something more akin to extortion.  Extortionate plea bargaining takes place behind closed doors and the nature of the negotiation rarely sees the antiseptic light of public scrutiny.  Such practices do occur, and the existence of such tales in the case law suggests, while not a common practice, it is certainly not unheard of.  *See* Plea Bargain Task Force Report, Am. Bar Assoc., Criminal Justice Section, Feb. 2023, p. 15 (discussing examples of threats to prosecute family to coerce a plea deal).[5]

Reasonable people can disagree as to whether the trade-off between expediency and potential coercion in standard plea agreements strikes the right balance.  But the tactic of threatening a family member – a tactic that, if undertaken by a citizen might reasonably be compared to extortion – has no place in the fair administration of criminal justice.  At a minimum, the full scope of the promises made, and the government's promises intent to induce a plea should be heard and understood in court, subject to the sound judgment of the Court and visible to the public. Ms. Bond's motion should be granted, or a hearing ordered at a minimum. Only then can the public fulfill the oversight function envisioned by the framers.  *See The Trial Penalty*, p. 5 (noting "the public rarely exercises the oversight function envisioned by the Framers and inherent in jury service.").

---

[4] Available at https://www.nacdl.org/getattachment/95b7f0f5-90df-4f9f-9115-520b3f58036a/the-trial-penalty-the-sixth-amendment-right-to-trial-on-the-verge-of-extinction-and-how-to-save-it.pdf.

[5] Available at https://www.americanbar.org/content/dam/aba/administrative/criminal_justice/reports/plea-bargain-tf-report.pdf15.

## REPLY TO THE GOVERNMENT'S STATEMENT OF FACTS

The government's poorly cited recitation of facts, unsupported by declarations or, in many cases, citations to any record, need not be addressed tit for tat here. Suffice to say, if the self-serving recitation lacks a citation, the Court should disregard it. Nevertheless, several of its representations must be addressed here:

First, Mr. Salame never admitted that no promise had been made to him by the government. (ECF 43, p. 1). This is a material misrepresentation of Mr. Salame's testimony. Following his coram nobis petition, he was brought before Judge Kaplan who questioned him rigorously on his plea hearing and less rigorously on the government's conduct. Mr. Salame testified that his lawyers were advised of the promise. (Declaration of Melissa S. Geller ("Geller Decl.,"), Ex. A, 5:2-5). Plea negotiations are very rarely held directly with a represented defendant present for the discussion. Mr. Salame stated over and over again that he believed this promise had been made because that is what his lawyers told him. (*See, e.g.*, *id.* at 16:14-18 ("I was told the inducement was so strong, it was the strongest inducement my lawyers had ever heard in their 20-plus years as both government prosecutors and on the defense. . .").[6]

---

[6] It is further worth noting that Mr. Salame's appearance before the court on the coram nobis petition was not a gentle or kindly inquiry into his claim. The court used the word perjury two times and subjected Mr. Salame to an aggressive cross examination about his plea colloquy. The exchange included the following:

> THE COURT: And you knew at the time you made [your guilty plea] that [your statement that there were no promises not set forth in the agreement] was untrue. Is that your testimony today?
>
> THE DEFENDANT: Yes, your Honor.
>
> THE COURT: And you did it to induce me to accept your plea of guilty, right?

Geller Decl, Ex. A, 10:7-19.

There was no discussion of improper coercion of a plea or the facts underlying the promise.

Second, Mr. Salame did not plead guilty to a conspiracy to commit campaign finance violations with Ms. Bond. The government references Mr. Salame's pre-sentence report. As the Court and government well know, offense conduct typically includes illegal or improper conduct, even that which is outside the four corners of the indictment and the plea. That is not evidence that Mr. Salame pleaded guilty to conspiring with Ms. Bond. Nor can the government cite to the plea colloquy or the plea agreement in support of this claim.

Third, the government refers throughout its Opposition to "contemporaneous" notes by government attorneys. (*See* ECF 43, p. 4). The government attaches no declaration by any attorney copied on those notes or by the author of those notes. Nothing in those notes identifies them as contemporaneous. Nor is there any information to suggest those notes are complete and accurate. In other words, the government has documents on which it offers speculation and (possibly, although there is no way to know) hearsay. This is not mere semantics. The government's representation of these notes as contemporaneous is unsupported and goes directly to their credibility and their completeness. Such hearsay and speculation cannot serve to defeat the clear factual issue raised in the documents submitted in Ms. Bond's motion.

Fourth, the government presents a confusing timeline of events to suggest that Mr. Salame could have or should have known of the government's breach of the agreement by the time of his sentencing on May 28, 2024. That is incorrect. Mr. Salame pleaded guilty many months prior – on September 7, 2023 – induced to do so by a government promise. (*United States v. Salame*, No. 1:22-cr-00673-LAK ("Salame Dkt.") ECF No. 283). On April 15, 2024, the government reached out to Ms. Bond and Mr. Salame's attorneys and advised that the investigation into Ms. Bond remained active. (ECF No. 40-6). A back and forth ensued in

which Ms. Bond's attorneys protested that there was an agreement concerning the investigation into Ms. Bond.  (*See id.*).

On May 20, 2024, Ms. Bond's lawyers asked to be connected to a supervisor concerning the prosecution of Ms. Bond.  (*Id.*).  At some point, and the date is unclear, the government advised that there had been a May 25, 2023 call in which the government "walked back" the promise concerning Ms. Bond, but defense counsel has no record of this.  (*See id.*).[7]  On May 21, 2024, the government referenced the May 25, 2023 call but provided no notes and no explanation.  Mr. Salame pleaded guilty on May 28, 2024, as Ms. Bond's attorneys were still in discussions with the government about what they no doubt assumed was a misunderstanding. On June 12, 2024, Ms. Bond's attorneys informed the government that they had no record of any walk back by government lawyers.  Thus, the government did not, as it suggests in its Opposition, advise Ms. Bond's counsel of the ongoing investigation well in advance of Mr. Salame's sentencing.  It did so right on top of his sentencing knowing counsel would be busy preparing for his sentencing proceedings.  Why Mr. Salame's attorneys declined to address the issue in sentencing memoranda is an issue of fact that should be explored.

Finally, the government seeks to cast Mr. Salame's hearing on the coram nobis petition as a concession that he lied, or that his statements were inaccurate.  That is a false and misleading impression.  Mr. Salame admitted that the government made no promise directly to him but made one to his lawyers.  Mr. Salame was then questioned aggressively by the court as to

---

[7] The government dates this call as April 18, 2024.  This is speculation drawn from the lower email chain that discusses a call on April 18.  There is no way to know, short of eliciting competent evidence, whether the call in which the May 25, 2023, meeting was referenced occurred on April 18, 2024, or at a later date.  None of the government lawyers communicating with Ms. Bond's attorneys in April 2024 were on the May 25, 2023 notes.  If, as the government claims, the government advised Ms. Bond's attorneys of the notes the first time they spoke on April 18, 2024, then it follows that the government was aware this was a potential issue and was ready to address it on the first call.  This just undermines its argument that no promise was ever made.

making false statements in his plea colloquy as to any promises made outside the four corners of the plea agreement.  In the end, Mr. Salame stated that he did not seek to withdraw his guilty plea because the issue belonged in this proceeding, and not his.  Mr. Salame does not seek to withdraw his plea; he and Ms. Bond desire specific performance of the agreement they bargained for.  The government elected not to attach that transcript.  For the Court's convenience, the transcript is attached here at Exhibit A to the appended Declaration by Melissa S. Geller.

The undisputed facts demonstrate that the government made a promise to Ms. Bond and Mr. Salame. There is direct documentary evidence of this promise and a plethora of strong circumstantial evidence in the form of Ms. Bond's, Mr. Salame's, and their attorneys' reliance. Importantly, there is no reliable support for the government's supposed "walk back" on this promise. In fact, there is an abundance of evidence to the contrary. The totality of the evidence, which should be construed against the government under clearly established constitutional and contract law principles, is sufficient to dismiss the indictment. At the very least, however, there are significant factual disputes that require a hearing to properly decide Ms. Bond's motions.

## **ARGUMENT**

## I.  **The "Integration Clause" in Mr. Salame's Plea Agreement Does Not Foreclose Ms. Bond's Motions**

The government cannot rely on the integration clause to obviate its obligation to keep the promises that it made.  A promise in a plea agreement is subject to contract principles tempered with "special due process concerns for fairness and the adequacy of procedural safeguards. . ." *United States v. Ready*, 82 F.3d 551, 558 (2d Cir. 1996) (quotation omitted) *superseded on other grounds as stated in United States v. Cook*, 722 F.3d 477, 481 (2d Cir. 2013).  In the Second Circuit, the Court's "review of a plea agreement is not limited to its four corners. . ."  *United States v. Feldman*, 939 F.3d 182, 189 (2d Cir. 2019).  "'When a plea rests in any significant

7

degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.'" *Id.* (quoting *Santobello v. New York*, 404 U.S. 257, 262 (1971)). In this Circuit, "[n]otwithstanding the generic integration clause, if there was [] a promise [not reflected in the plea agreement], due process would require the Government to abide by it, provided that the promise in fact induced the waiver of the defendant's constitutional right to a trial." *United States v. Gotti*, 399 F. Supp. 2d 252, 258 (S.D.N.Y. 2005).

*United States v. Feldman* suggests that, where there is doubt as to the nature of an inducement to a guilty plea or a question as to whether a government representation was misleading, the Court should hold a hearing. *See id.* at 190 (remanding because the lower court did not allow discovery or conduct a hearing on whether the government fulfilled its promises, whether it made misleading representations, and whether the defendant was entitled to relief.).

The government's reliance in *In re Altro* is inapposite. In *In re Altro*, the defendant argued that the government violated the "spirit" of the agreement and a promise that was "implicit" to the course of dealing. 180 F.3d 372, 374, 376 (2d Cir. 1999). The defendant did not claim that the government made any promise. *Id.* at 376. Thus, the court held that there was no promise to enforce. But, the government does not cite the rest of the court's discussion. The court went on to observe that the parol evidence rule might be relaxed in appropriate circumstances in order to "hold the Government 'to the most meticulous standards of . . . promise.'" *Id.* (quoting *United States v. Lawlor*, 168 F.3d 633, 636 (2d Cir. 1999)). Ms. Bond does not argue that there was an "implicit" promise; she argues instead that there was an explicit one, bargained for and then snatched away by the government, after Mr. Salame upheld his end.

The limited correspondence currently in her possession further demonstrates the existence of such a promise.  The government's claim that no promise was made or suggested is belied by the purported notes of Danielle Sassoon, dated May 25, 2023, which states:

> In light of that conversation wanted to make very clear that we view discussions of Michelle/Ryan as separate, a Ryan disposition will not resolve investigation of Michelle's conduct, and to extent anything previously said was understood otherwise, that is superseded by this call[.]

(ECF 40-5 (Declaration of Eric R. Breslin (Breslin Decl.), Ex. E).

If no promise or discussion was had about Ms. Bond, there would have been no reason to proffer this statement.  Furthermore, on April 16, 2024, counsel for Mr. Salame and Ms. Bond advised the government: "We are surprised to hear from you given our course of dealing with the FTX prosecution team, which led us to believe that this matter was not going to be pursued." (ECF 40-6).  Further, the government's claim that these are "contemporaneous notes" of a conversation with defense counsel is hearsay at best and speculation at worst.  (ECF 43, p. 17). The document says nothing about the notes being "contemporaneous" – the date of the supposed call is not identified in the email.  The government submitted no declaration attesting that they were contemporaneous or how they were transcribed into email.  The government is either relying on information obtained from someone else about the email or they are speculating.

Ms. Bond's attorneys, on the other hand, clearly wrote to the government that they had no notes of the government's supposed limitation or walk back of the promise.[8]

---

[8] The government suggests that Ms. Bond's attorneys only said their "notes did not match the government's notes." This is a weird argument, focused on semantics instead of substance.  In any event, it is not a fair or true representation of the documents.  Ms. Bond's attorneys stated that they were surprised to hear from the government because they understood the issue was resolved.  When the government attorney advised that he had reviewed notes of other attorneys reflecting a purported May 25, 2025 call, Ms. Bond's attorneys checked their notes and advised that they had no record of the purported walk back or any limitation on the prior promise to drop the investigation into Ms. Bond.  *See* (ECF 40-6, at pp. 2-3).

This is not an "implicit" promise that was misunderstood – it was not a unilateral belief by a defendant.  This was an express and explicit promise, clearly understood to be such by defense counsel.  The government has only one purported internal note reflecting a call, the date of which is speculative, that seems to concede some promise was made.[9]

Nor can the government rely on Mr. Salame's attestation at the plea hearing or the coram nobis hearing.  The entire purpose of a promise outside the four corners of the plea agreement is to keep the coercive and seedier nature of the bargain out of the eye of the Court and the public. A defendant is no less coerced to take the plea than he is to attest no such promise exists.  If he were to state the full promise, which the government advised cannot be and would not be included in the plea agreement, he runs the risk of losing the plea and the benefit of his bargain entirely.  Thus, in circular fashion, the concern that the government may escape its promises by including a generic integration clause in every plea agreement is made live.  *See United States v. Heatley*, No. S11 96 CR. 515 (SS), 1999 WL 61816, at \*9 n.7 (S.D.N.Y. Jan. 29, 1999) ("The Court finds it at least a difficult question whether it would offend the fundamental notions of fairness inherent in due process to allow the government to induce waivers of constitutional rights via promises, then escape those promises by use of a general disclaimer in a standard-form proffer agreement, at least without evidence that the clause and its effects were specifically discussed and understood by the defendant.")

There is a clear factual dispute as to whether that promise was walked back or limited in any way and the government has produced no competent evidence to refute it.

---

[9] It should be noted that, if the government was seeking to induce a plea and it knew it was on shaky ground legally and ethically, the government would be unlikely to include a fulsome discussion of such a promise in its internal notes.

**II.     Ms. Bond Has Standing as a Third-Party Beneficiary to Enforce the Plea Agreement**

Second Circuit has not ruled that a third-party beneficiary of a plea agreement cannot

enforce a plea agreement.  The government cites to *Wright v. Po*, No. 10-CV-5127 (MKB), 2021

WL 2779451, at *48-51 (E.D.N.Y. Jul. 2, 2021), for the proposition that Ms. Bond lacks

standing.  It neglects to include the court's observation:

> Therefore, only the pleading defendant possesses a due process interest in
> prosecutors' adherence to the plea agreement, *with a possible exception in which
> a defendant enters into a plea agreement with the intent to benefit another (for
> instance, an agreement to plead guilty in exchange for a commitment to spare a
> spouse from prosecution).*

*Id.* (emphasis added).

The Second Circuit has not ruled on this issue, but it espouses the maxim that courts must

"hold the government 'to the most meticulous standards of both promise and performance." *In

re Altro*, 180 F.3d at 375.  In this vein, other courts have permitted third-party beneficiaries to

enforce plea agreements made for the third-party's express benefit, as discussed in Ms. Bond's

opening brief.

Nor can the government evade the promise it made by claiming that Ms. Bond was not

the clear, intended beneficiary.  *Bayerische Landesbank, New York Branch v. Aladdin Cap.

Mgmt. LLC*, 692 F.3d 42, 52 (2d Cir. 2012) (interpreting New York third-party beneficiary law

as "recognition of a right to performance in the beneficiary is appropriate to effectuate the

intention of the parties and… the circumstances indicate that the promisee intends to give the

beneficiary the benefit of the promised performance.").  The promise was explicit – plead guilty

and Ms. Bond will not be prosecuted – a promise made more enticing because Ms. Bond and Mr.

Salame's toddler would be left without any parents were they both to go to jail, and her two older

(but still young) children would be left in the care of an abusive father.  The government's sole

response is to fall back on the integration clause, which, as described above, does not prevent the Court from examining all circumstances of the promise and the plea.

The explicit language of the available correspondence demonstrates the specific intent that a guilty plea by Mr. Salame would result in the government ceasing its investigation of Ms. Bond. That was the inducement to get Mr. Salame to plead guilty, and, according to Mr. Salame, it was the reason he did so. There is a colorable claim of a promise made outside the four corners of the plea agreement, intended to benefit Ms. Bond, on which the government has now reneged. Basic principles of fairness and the integrity of the justice system require that the government be held to its promises or that a full record of the course of dealings be developed.

## III.    In the Alternative, Evidence Obtained by Deliberately Misleading Ms. Bond Should be Suppressed

First, in opposition to Ms. Bond's motion, the government argues the semantics of the language used in the emails she submitted in support. As the government concedes, any agreement is strictly construed against the government. If the government's statements were misleading, then the benefit of the doubt runs to the defendant who lacks any power in the exchange. In any event, the government's too literal reading of one piece of an email chain is not relevant. Additional correspondence between the government and Ms. Bond's and Mr. Salame's attorneys clearly shows that there were promises made that concerned *Ms. Bond* and the investigation of *Ms. Bond* as concerns Mr. Salame's plea.[10]

Second, the government is not required to tell the truth to a defendant, but it is also not permitted to lie about a defendant's status. The government cannot knowingly tell a defendant

---

[10] Again, the government provides no competent evidence that the documents it relies upon are complete, contemporaneous, or accurate reflections of communications with counsel. At best, we are left with speculation that the government attorneys included all aspects of calls with counsel in these emails. This is a dubious proposition, since the government's own notes in an email on May 25, 2024 clearly refer to an earlier conversation concerning Ms. Bond and the government's investigation into her. (ECF No. 5).

that they are not being investigated and then use that lie to gather evidence. *See, e.g., United States v. Montes-Reyes*, 547 F. Supp. 2d 281, 294 (S.D.N.Y. 2008) (suppressing search and subsequent statement to search because agents obtained entry to the home and the statements by lying about the nature of their investigation).

Third, even if the government were correct that its deceitful conduct could not bar its use of her testimony at the divorce trial, which is not conceded, statements made to FBI agents in a surety hearing surely are statements made to law enforcement.

Again, the government falls back on its argument no promise was made concerning the investigation into Ms. Bond. As previously described, at length, this is, at best, an open issue of fact. At worst, the documents demonstrate a clear discussion of Ms. Bond in connection with Mr. Salame's plea, and a promise to cease its investigation into her in exchange for an easy resolution of Mr. Salame's case. The government primarily makes factual claims, unsupported by any declaration or competent evidence, as to what government lawyers may have promised, what Ms. Bond's lawyers were told, what Ms. Bond could reasonably believe, and the scope of what was clearly some discussion about her case in connection with Mr. Salame. *See* ECF 43 pp. 19-22). Most of this is speculation, much of it based on hearsay, and none of it supported by competent evidence. An evidentiary hearing is required before Ms. Bond's Fifth Amendment rights can be said to be vindicated.

## IV.     Scope of Requested Hearing

Ms. Bond submits that the following factual questions musts be answered, at a minimum, for the Court to ensure due process is protected here:

- What did the government convey to Mr. Salame and Ms. Bond concerning any intent not to investigate or prosecute Ms. Bond if Mr. Salame were to plead guilty?

- If and when was any attempt to withdraw such an inducement and what was conveyed to counsel in an attempt to do so?

- Was an attempt made to induce a guilty plea from Mr. Salame by making promises as to the treatment of Ms. Bond?

- If such an inducement was offered, did the government, at the time, have the intention of honoring that inducement?

- Did the government knowingly take advantage of Ms. Bond's belief that the investigation into her was closed to obtain statements such that the deception overbore her willing waiver of her Fifth Amendment right?

In aid of these questions, only limited discovery would be necessary:

- Government correspondence concerning any inducement contemplated or made to Mr. Salame to plead guilty, or Ms. Bond concerning her status.

- Correspondence from Mr. Salame and Ms. Bond's attorneys concerning their understanding of any such inducement, how it was conveyed, and what they were led to believe.

- Correspondence from Mr. Salame and Ms. Bond's attorneys concerning any attempt to walk back such an inducement, including any information recording such a walk back.

To establish and develop the necessary facts, a limited hearing may be required at which the Court may need to hear from (assuming no other relevant people are identified in correspondence):

- Danielle Sassoon, the government lawyer primarily responsible for negotiating Mr. Salame's plea.

- Mr. Salame and Ms. Bond's attorneys, including Gina Parlovecchio.

- Mr. Salame.

We offer this not as an exhaustive list, but as a template for what may be necessary to establish the factual predicates necessary to determine Ms. Bond's motion.

**V.    Count IV Must Be Dismissed for Multiplicity**

The Court absolutely should dismiss a charge in an indictment that is multiplicitous on its face. *United States v. Miller*, 26 F. Supp. 2d 415, 422 (N.D.N.Y. 1998) (citing *United States v. Reed*, 639 F.2d 896 (2d Cir. 1981) ("On the one hand, if an indictment is multiplicitous on its face, then the multiplicitous count(s) should be dismissed pre-trial."). Here, the counts are multiplicitous on their face.

Count Two alleges that Ms. Bond caused and accepted contributions from a third-party, which she falsely reported to the FEC as personal loans. (ECF 2, p. 11). Count Three alleges that Ms. Bond caused a corporation to make a contribution, which she received and then falsely reported to the FEC as personal contributions and loans from her to her campaign. (*Id.*, p. 12). Count Four, exactly the same as either Count Two (individual straw donor) or Count Three (corporate straw donor), alleges that Ms. Bond caused contributions to be made, which she accepted, and then falsely reported that those contributions were made by her to her campaign. The government offers no conceivable difference between Count Four and Counts Two and Three. Count Four alleges the exact same conduct as either or both of Counts Two and Three.

Count Four is multiplicitous and therefore prejudicial and should be dismissed.

## <u>CONCLUSION</u>

The architects of our Republic enshrined the jury trial in the Constitution. As John Adams said, "representative government and trial by jury are the heart and lungs of liberty." Hon. Jack Zouhary, "Jury Duty: A Founding Principle of American Democracy," Civil Jury Project, NYU School of Law (last visited June 18, 2025).[11] While plea bargains are a common and even necessary aspect of criminal justice, they must be fair and scrupulously applied to avoid

---

[11] Available at https://civiljuryproject.law.nyu.edu/jury-duty-a-founding-principal-of-american-democracy/.

imposing any more coercion already inherent in the process. Leveraging a person's love and fear for a spouse, a child, or any family member is not the sort of coercion inherent in the system. It is extra-judicial. There can be no dispute that such tactics are practically guaranteed to induce guilty pleas by innocent people. Yet government tactics in obtaining pleas mostly go unseen by both the courts and the public. Where government conduct crosses the line from fair dealing to unfair and unreasonable coercion, that conduct must be brought to light or risk undermining the entire system of justice. As Justice Louis Brandeis famously said: "Sunlight is the best disinfectant." Sunlight is required here. Ms. Bond's applications should be granted.


Dated: June 19, 2025                          **DUANE MORRIS LLP**
      New York, New York

                                             */s/  Eric R. Breslin*
                                             Eric R. Breslin, Esq.
                                             Melissa S. Geller, Esq.
      22 Vanderbilt
      335 Madison Ave, 23rd Floor
      New York, New York 10017
      Tel: 212-692-1000
      Email: erbreslin@duanemorris.com
      Email: msgeller@duanemorris.com

      Stephen H. Sutro, Esq. (admitted *pro hac vice*)
      Spear Tower
      One Market Plaza, Suite 2200
      San Francisco, CA 94105-1127
      Tel: 415-957-3008
      Email: shsutro@duanemorris.com

      Joseph R. Welsh (admitted *pro hac vice*)
      30 South 17th Street
      Philadelphia, PA 19103-4196
      Tel: 215-979-1000
      Email: JRWelsh@duanemorris.com

      *Attorneys for Defendant Michelle Bond*

16