**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

v.

MICHELLE BOND,

　　　　　Defendant.

Docket No. 1:24-cr-000494-GBD

**Post Hearing Memorandum of Law in Further Support of Michelle Bond's Motion to
Dismiss the Indictment**

DUANE MORRIS LLP
Eric R. Breslin, Esq.
200 Campus Drive, Suite 300
Florham Park, NJ 07932
Tel: 973-424-2000
erbreslin@duanemorris.com

Stephen Holbrook Sutro
One Market, Spear Tower, 20th Floor
San Francisco, CA 94105
Tel: (415)-371-2200
shsutro@duanemorris.com

Melissa S. Geller, Esq.
22 Vanderbilt
335 Madison Ave., 23rd Floor
New York, New York 10017
Tel: 212-692-1000
msgeller@duanemorris.com

CAHILL GORDON & REINDEL LLP
Edward C. O'Callaghan
900 16th Street, N.W., Suite 500
Washington, D.C. 20006
Tel: 202-862-8970
eocallaghan@cahill.com

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND...................................................................3

I.      2022 – April 2023: The collapse at FTX and the Salame investigation. ............................3

II.     April 28, 2023: The government offers to drop the investigation into Bond if Salame pleads guilty. ...................................................................................................4

III.    May 2023: The government attempts to have its cake and eat it too.................................6

IV.     April 2024: The government resurfaces with a vengeance..................................................8

ARGUMENT ................................................................................................................................9

I.      The government induced a guilty plea by Salame. ...........................................................11

II.     The ambiguity in any purported retraction must be construed against the government because the government bears the burden of clearly communicating its intent..............................................................................................................................11

III.    The government made Bond a third-party beneficiary of the Salame plea agreement and she can enforce the terms made to her benefit. ........................................13

IV.     Dismissal of the Indictment (specific performance) is the appropriate remedy. ..............16

CONCLUSION.............................................................................................................................17

## TABLE OF AUTHORITIES

**Cases**

*Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009) ..................................................13

*Bordenkircher v. Hayes*, 434 U.S. 357 (1978)............................................................ 11-12

*Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660 (2d Cir. 1996) ........................15

*Santobello v. New York*, 404 U.S. 257 (1971) ........................................................11, 13

*United States v. Andreas*, 216 F.3d 645 (7th Cir. 2000)..................................................14

*United States v. Bankman-Fried*, No. 1:22-cr-00673-LAK, ECF 1 7, 9, 91 ..................................4

*United States v. Clements*, 992 F.2d 417 (2d Cir. 1993) ................................................13

*United States v. Feldman*, 939 F.3d 182 (2d Cir. 2019) ............................................. 10-15

*United States v. Graves*, 374 F.3d 80 (2d Cir. 2004).....................................................11

*United States v. Knights*, 968 F.2d 1483 (2d Cir. 1992)..................................................16

*United States v. Mozer*, 828 F. Supp. 208 (S.D.N.Y. 1993) ..............................................10

*United States v. Reyes-Arzate*, 91 F.4th 616 (2d Cir. 2024) ........................................10, 13

*United States v. Stolt-Nielsen S.A*, 524 F. Supp. 2d 609 (E.D. Pa. 2007)..................................14

*United States v. Vaval*, 404 F.3d 144 (2d Cir. 2005).................................................1, 14

*Wright v. UPO*, No. 10-CV-5127 (MKB), 2021 WL 2779451 (E.D.N.Y. July 2, 2021)........ 14-15

**Other Authorities**

Max Zahn, "A timeline of cryptocurrency exchange FTX's historic collapse,"
ABCNews.com, Mar. 28, 2024...............................................................................4

Robert H. Jackson, "The Federal Prosecutor," Apr. 1, 1940 ........................................9

Restatement (Second) of Contracts § 302 (1981)........................................................13

Defendant Michelle Bond submits this memorandum of law in further support of her motion to dismiss the Indictment.

## PRELIMINARY STATEMENT

Upon being sworn in, newly minted Assistant United States Attorneys in the Southern District of New York have been informed that their job "requires commitment to absolute integrity and fair play" along with "candor and fairness in dealing with adversaries[.]"  These obligations mirror "the highest standard of fairness'" the Second Circuit imposes on government conduct in plea negotiations.  *United States v. Vaval*, 404 F.3d 144, 152 (2d Cir. 2005).  Three days of testimony confirm that, in this instance, the government unfortunately did not live up to these benchmarks.  As such, this Court should grant Bond's motion to dismiss the indictment against her and order any additional relief the Court deems appropriate.

First, testimony from Gina Parlovecchio, Ms. Bond's and Ryan Salame's former criminal-defense lawyers, made plain that AUSA Danielle Sassoon offered Mr. Salame an incredibly powerful inducement to plead guilty; namely that if he did so, the government's investigation into Ms. Bond (his then-partner, now wife, and mother to his child) would cease. Ms. Parlovecchio explained that such an express offer was highly atypical and that she had never seen such an offer in her many years of service as an AUSA.  The rarity of such offers was not surprising; after all, Ms. Parlovecchio had been instructed during her AUSA service to "not even indicate that [the government] would link [family members' cases] together because that can be considered an inappropriate inducement."  (Mar 4, 2026 Tr. 229:3-13 (Parlovecchio)).

Second, the evidence demonstrates that Mr. Salame pleaded guilty on the strength of the government's inducement.  Testimony from both Ms. Parlovecchio and Ms. Bond, as well as

contemporaneous evidence, demonstrate that Mr. Salame would not have pled guilty but for the belief that the government would cease its investigation into Ms. Bond if he did so.

Third, because the government chose an inducement of particularly coercive power, it was required to make any retraction of that inducement in a clear and unambiguous manner. The government put Mr. Salame in the position of sacrificing his rights to save his fiancée and the mother of his child from the stress and trauma of a criminal indictment and the possibility of jail time. The government's claimed attempt to retract that inducement made by a passing comment, and memorialized nowhere except the notes of the attorney who made the inducement in the first place, hardly nullifies the force of the initial inducement. In any event, as Ms. Parlovecchio's testimony demonstrates, the government's supposed retraction, in form and substance, resembled less a genuine retraction and more a wink and a nod to give itself cover for a situation exactly like this one. This kind of wink-and-nod negotiating tactic does not comport with the meticulous standards of fair play and justice that the government must observe. After all, it holds all the coercive power of the government over the life of an individual.

Fourth, the hearing confirmed that Ms. Bond is able to hold the government to its inducement. It is well-established black-letter law both that plea agreements are construed using principles of contract law and that deviations from those principles disfavor the government. As such, and as several courts have recognized, intended third-party beneficiaries of plea agreements are able to enforce those agreements against the government. Ms. Bond is such an intended third-party beneficiary. As her testimony powerfully recounted, *the* animating concern driving Mr. Salame to plead guilty was a desire to ensure that the couple's young children always have one parent out of prison. Had the government stayed true to what the government

represented, Ms. Bond—the parent who would remain un-incarcerated—was slated to be the principal beneficiary of that representation.

Testimony from three witnesses confirms what the documentary evidence already made clear:  The government offered the most powerful inducement it could have to Mr. Salame in order to entice him to plead guilty; relying on that inducement, Mr. Salame pled guilty; the government subsequently breached that inducement by further investigating and obtaining an indictment against Ms. Bond; and Ms. Bond is able to hold the government to account for that breach.  In the interests of due process and fundamental fairness, this Court should dismiss the indictment against Ms. Bond.

### FACTUAL AND PROCEDURAL BACKGROUND

Ms. Bond is a former well-respected cryptocurrency leader and advocate with an extensive background in financial policy and the digital-assets industry.[1]  She is a mother of three children: two from a prior marriage, and one child under three years old.  Ms. Bond met Mr. Salame in connection with her work with the cryptocurrency exchange FTX.  Mr. Salame was the CEO of the FTX Bahama-based subsidiary, FTX Digital Markets.  Ms. Bond and Mr. Salame have been in a committed relationship since 2022 and married in 2024.

**I.      2022 – April 2023: The collapse at FTX and the Salame investigation.**

In 2022, Ms. Bond ran for Congress in New York's First Congressional District.  It was her brief, unsuccessful campaign that forms the basis for the indictment now before the Court.  On November 2, 2022, FTX experienced a quick and very public collapse followed shortly

---

[1] Ms. Bond's pre-trial brief included an extensive discussion of her background, experience, and the history of the charges against her.  (Dkt. 39).  That background is summarized here for the Court's convenience, but not repeated in full for the sake of brevity.

thereafter by a series of indictments against FTX's top executives, including founder Samuel Bankman-Fried. *See* Max Zahn, "A timeline of cryptocurrency exchange FTX's historic collapse," ABCNews.com, Mar. 28, 2024;[2] *United States v. Bankman-Fried*, No. 1:22-cr-00673-LAK, ECF 1 7, 9, 91. Mr. Salame and Ms. Bond were aware that there was a government investigation into Mr. Salame, but not into Ms. Bond.

## II.    April 28, 2023: The government offers to drop the investigation into Bond if Salame pleads guilty.

On April 27, 2023, the government executed a search warrant at Mr. Salame and Ms. Bond's home in Maryland. At the time, Ms. Bond and Mr. Salame were both represented by Gina Parlovecchio and Jason Linder, two experienced attorneys from Mayer Brown LLP. The next day, the government and Mr. Salame and Ms. Bond's attorneys, participated in a video call. (GX1; Bond Ex. 01). The call primarily concerned Mr. Salame, but, at the end of the call, counsel for Mr. Salame and Ms. Bond raised the issue of Ms. Bond's status. (*Id.*). Assistant United States Attorney Danielle Sassoon, lead prosecutor in the FTX cases, stated: "[w]ithout making promises outside the four corners of the plea agreement, but as is often the practice here, if we do reach a resolution, we expect that we will conclude the aspects of our investigation that concern [Ryan Salame] but not [Samuel Bankman-Fried]." (*Id.*). Both Mayer Brown and the government's contemporaneous notes reflect this statement, (GX1; Bond Ex. 31; GX16), and both Ms. Sassoon and Ms. Parlovecchio recalled the statement was delivered from written notes. As Ms. Parlovecchio explained, the use of written notes reflected a statement which "seemed

---

[2] Available at https://abcnews.go.com/Business/timeline-cryptocurrency-exchange-ftxs-historic-collapse/story?id=93337035

considered and thought through, not like an off-the-cuff comment." (Mar. 4, 2026 Tr. 229:18-20 (Parlovecchio); Nov. 20, 2025, Tr. 185:17–186:7 (Sassoon)).[3]

The context of the statement, memorialized in contemporaneous notes, clearly establishes that the government intended its statement to specifically apply to Ms. Bond.

> - JL: Still digesting, but would like an opportunity to engage in a dialogue with SDNY about MB. Is it just the transactions in June? AR: Not just in June, but through the summer. DS: Without making promises outside the four corners of the plea agreement, but as is often the practice here, if we do reach a resolution, we expect that we will conclude the aspects of our investigation that concern RS but not SBF.

(GX 1, at p. 2; Bond 1).

Ms. Parlovecchio and Mr. Linder are experienced criminal defense attorneys, each with extensive histories as federal prosecutors. (Mar. 4, 2026, Tr. 134:10-23; 144:15-20 (Parlovecchio)). These experienced attorneys understood the statement exactly as intended: "that if Mr. Salame took a plea, that [the government] would cease investigating the part of the case that involved Ms. Bond." (Mar. 4, 2026, Tr. 141:4-7 (Parlovecchio)). That was the only possible interpretation because, in addition to the context of the statement, "the only part of the investigation into Mr. Salame that didn't involve Sam Bankman-Fried was in fact this campaign finance area of conduct that related to Ms. Bond." (Mar. 4, 2026, Tr. 141:6-9 (Parlovecchio)).

So clear was the intent of the comment that Ms. Parlovecchio and Mr. Linder were surprised – "taken aback" as Ms. Parlovecchio later described. (Mar. 4. 2026, Tr. 205:22–25

---

[3] The government did not produce these talking points to the defense, but has now represented that the talking points were provided to the Court for *in camera* inspection. As such, the defense takes it that on its earlier review of the notes, the Court ruled that nothing in the notes provided for *in camera* inspection touched on the government's inducement. However, given the importance of these notes in establishing conclusive facts and completing the record, especially in light of Ms. Parolovecchio's and Ms. Sassoon's testimony that Ms. Sassoon could be seen on video reading off notes, we ask the Court to order their production now.

(Parlovecchio); Bond 15)).  As explained by Ms. Parlovecchio, her prosecutorial training taught her to "not even indicate that you would link [family members' cases] together because that can be considered an inappropriate inducement and that, you know, it could create a mess and potentially end up in [a] hearing."  (Mar. 4, 2026, Tr. 229:3–14 (Parlovecchio)).

Mayer Brown conveyed this to Mr. Salame and Ms. Bond, including the statement that the investigation into Ms. Bond would conclude if Mr. Salame pleaded guilty.  (Oct. 16, 2025, Tr. 39:5–8 (Bond); Mar. 4, 2026, Tr. 144:11–14 (Parlovecchio)).  Mayer Brown told Ms. Bond that this representation by the government was highly unusual, but that it was something on which she and Mr. Salame could and should rely.  (Oct. 16, 2025, Tr. 55:5–15 (Bond)).  Ms. Bond repeatedly sought reassurance and was consistently told the same.  (Oct. 16, 2025, Tr. 57:14–58:15 (Bond)).

### III.    May 2023: The government attempts to have its cake and eat it too.

The government cannot reasonably dispute that it made the powerful inducement because it clearly recognized it at the time.  The government would not have felt compelled to make any statement at all if it did not believe it previously delivered a powerful motivator to Mr. Salame. Nor can the government reasonably claim the statement to be inadvertent or a mis-statement – it was delivered from a written plan.

Having recognized that it delivered this potent inducement to Mr. Salame and Ms. Bond, the government sought to provide itself some cover.  It made an oral statement, without putting anything in writing, that was calculated to leave the inducement intact while simultaneously providing itself some plausible deniability.  Parlovecchio testified that, on May 5, during a brief call that focused almost entirely on Mr. Salame, the government stated, "in sort of a passing manner," as a "sort of CYA comment," that "Ms. Bond [would] be treated separately from "Mr.

Salame" before moving back to discussing Mr. Salame. (Mar. 4, 2026, Tr. 143:8-12; 174:1–13) (Parlovecchio)). This statement, unremarkable, vague, and casually tossed off, did not change Mayer Brown's assessment. (Mar. 4, 2026, Tr. 207:6–8 (Parlovecchio)). Notwithstanding any supposed retraction, Mayer Brown on May 8, 2023, only a few days later, issued new engagement letters to both Mr. Salame and Ms. Bond explaining the new potential conflict between the two of them, created by the government's inducement:

> into the collapse of FTX. Although your and Ryan's interests have previously been generally aligned in the FTX investigations, recent developments have arguably created a divergence of interests. As I have informed you, the federal prosecutors in the FTX matter have indicated that if Ryan accepts a plea agreement, they will no longer have occasion to continue the portions of their investigation that might lead to federal criminal charges being brought against you. The prosecutors have said they will not put this position in writing, including in any plea agreement for Ryan.
>
> This aspect of the prosecutors' offer creates a tension in our representation of both you and Ryan regarding the FTX investigation, and creates a potential conflict. It is, of course, in

(Bond 3, p. 1; *see also* Bond 2, p. 1).

Mr. Linder further reported to Ms. Bond on May 5, 2023, about the call with the government. (Bond 25). Consistent with the notion that any attempt at retracting the inducement was, at most, minimal and unclear, Mr. Linder referred to the May 5 conversation with the government as a "non-call" and "unilluminating." (*Id.*) No attorney, let alone an experienced one such as Mr. Linder, would have referred to a conversation retracting the representation the government put forward on April 28 in such a manner.

The government argues that it made a clear retraction on May 25, 2023, relying on self-serving notes Ms. Sassoon sent to herself, copying other members of the prosecution team. (GX 3). But Ms. Parlovecchio clearly recalled that the May 25 call was "exclusively about Mr. Salame and it was literally like a check-in call. . .and nothing about Ms. Bond." (Mar. 4, 2026,

7

Tr. 230:11-14 (Parlovecchio)).  Far from a formal call intended to convey crucial information, it was a "quick call" initiated by the government that was focused entirely on Mr. Salame and was simply to say that the government had not forgotten about Mr. Salame matter and was continuing to work on his case.  (Mar. 4, 2026, Tr. 149:16-21).  The call was so inconsequential, it does not appear that Mayer Brown even made notes of the call.

Whenever the government's supposed statement was made, the government intentionally did not put its "CYA" comment in writing making it unclear and ambiguous.  Other than Ms. Sassoon's notes, the government presented no memorialization of this statement or any witnesses to corroborate this statement.  Ms. Parlovecchio testified that she has no recollection of the government conveying such words (Mar. 4, 2026, Tr. 230:11–24 (Mar. 4, 2026)) and that the government's actual language was more casual and much less "extensive and formalistic" than was actually conveyed.  (Mar. 4, 2026, Tr. 174:14–16 (Parlovecchio)).  The paucity of documentation around what was purportedly said on the May 25 call bolsters Ms. Parlovecchio's account.  After all, it defies reason that two experienced prosecutors would simply fail to notice a clear and unambiguous retraction of such a monumental inducement.

IV.     **April 2024: The government resurfaces with a vengeance.**

For several months after the conversations in April and May 2023, Ms. Bond and Mr. Salame worked towards finalizing Mr. Salame's guilty plea.  Mr. Salame very much did not want to plead guilty.  (Oct. 16, 2025, Tr. 69:8-9 (Bond)).  His decision was driven by the fear that Ms. Bond would face a criminal charge and possible incarceration, leaving Ms. Bond's three children without their mother, and her youngest without any parents at all.  (*Id.* at 41:15 – 42:3).

Mr. Salame entered his guilty plea on September 7, 2023.  (GX 4).  The government resurfaced on April 15, 2024, reaching out to counsel at Mayer Brown and stating that it had

nearly completed its investigation into Ms. Bond.  (Bond 10).  Ms. Parlovecchio and Mr. Linder's reaction was immediate.  On April 16, 2024, Ms. Parlovecchio advised Ms. Bond that she and Mr. Linder intended to "raise the issue of the statements made by the FTX prosecutors that left us with the understanding that they were going to discontinue the part of their investigation relating to Ryan's payments to you during your congressional campaign if Ryan resolved his case through a plea."  (Bond 10).

Mayer Brown did as promised.  On April 18, 2024, Ms. Parlovecchio told the government they were "surprised and alarmed" to hear about a continued investigation into Ms. Bond.  (Bond 12).  Mayer Brown felt strongly that the government appeared not to be acting in good faith.  (*Id.*).  It escalated the issue to supervisors at the United States Attorneys' Office, attending a proffer in summer 2024 with the aim of convincing the government to respect its prior representations.  (Bond 15, pp. 25-31).  These experienced lawyers, who value their reputations in the legal community, would not attempt to mislead the government or lie about what they knew and were told.  These lawyers sought to hold the government to its representations and to the inducement that was conveyed to them.

## ARGUMENT

In 1940, in an address at the Second Annual Conference of United States Attorneys, Justice Robert H. Jackson, then Attorney General, observed that "the prosecutor has more control over life, liberty, and reputation than any other person in America."  Robert H. Jackson, "The Federal Prosecutor," Apr. 1, 1940.[4]  Jackson cautioned: "Only by extreme care can we protect the spirit as well as the letter of civil liberties[.]"  *Id.* at p. 6.

---

[4] Available at https://www.justice.gov/sites/default/files/ag/legacy/2011/09/16/04-01-1940.pdf

Justice Jackson was addressing a roomful of prosecutors and speaking to the exercise of prosecutorial discretion, but the caution has broader significance.  Prosecutors are advocates with as much a drive to win as any other advocate, but with power incomprehensible to any private litigant.  The nation's founders recognized the potential for such abuse and sought to guard against it in the Constitution.

Yet, for all the centuries of jurisprudence that confine governmental abuses, the plea process remains both the most potentially coercive and the one most lacking in public and judicial oversight.  Prosecutors have almost unbounded and unfettered authority to charge, threaten to charge, and impose conditions on a plea.  Defendants have little to no bargaining power.  The issue is acute as it is estimated that more than 95% of criminal cases resolve by plea agreement.  Nat'l Judicial College, "Judges overwhelmingly approve of plea bargaining, largely for practical reasons," Jun. 14, 2021.[5]

Courts are not blind to these issues.  The Second Circuit regularly emphasizes that prosecutors must act with the utmost good faith in plea negotiations, *United States v. Feldman*, 939 F.3d 182, 189 (2d Cir. 2019), and "the supervisory power of the court is designed to insure that such standards are observed," *United States v. Mozer*, 828 F. Supp. 208, 215 (S.D.N.Y. 1993).  Thus, while plea agreements are evaluated on principles of contract, the analysis must be "'tempered with an awareness of due process concerns for fairness,'" in light of the government's "'overwhelmingly superior bargaining position.'" *United States v. Reyes-Arzate*, 91 F.4th 616, 622 (2d Cir. 2024) (quoting *United States v. Gottesman*, 122 F.3d 150, 152 (2d Cir. 1997)).  Promises made in the course of plea negotiations must be "strictly construed against the

---

[5] Available at https://judges.org/news-and-info/judges-overwhelmingly-approve-of-plea-bargaining-largely-for-practical-reasons/.

government." *Feldman*, 939 F.3d at 189–90; *Bordenkircher v. Hayes*, 434 U.S. 357, 362 (1978) (holding promises made in the course of plea negotiations must be kept).

### I.      The government induced a guilty plea by Mr. Salame.

There can be little dispute that the government offered Mr. Salame a potent inducement, a fact it recognized at the time.  At the evidentiary hearings, the government focused heavily on the word "promise," suggesting that it will argue only a contractually enforceable promise can bind parties in criminal plea negotiations.  This formulaic argument vastly understates the government's obligation to act in good faith.  *Feldman*, 939 F.3d at 189 (rejecting formulaic arguments and observing that prosecutors are held to "meticulous standards of performance").  As the Supreme Court ruled, any "part of the inducement or consideration" motivating a defendant to plead guilty "must be fulfilled."  *Santobello v. New York*, 404 U.S. 257, 262 (1971).  The prospect of any investigation into Ms. Bond ceasing undoubtedly drove Mr. Salame's guilty plea.  (Oct. 16, 2025, Tr. 41:15 – 42:3, 69:8-9 (Bond)).  Courts are thus empowered to look beyond the four corners of the plea agreement to enforce any promise made by the government in exchange for a plea, regardless of whether the plea agreement has a merger clause.  *Feldman*, 939 F.3d at 190; *United States v. Graves*, 374 F.3d 80, 85 (2d Cir. 2004).

### II.     The ambiguity in any purported retraction must be construed against the government because the government bears the burden of clearly communicating its intent.

It is indisputable that the government made a powerful inducement that triggered justifiable reliance by Mr. Salame and Ms. Bond.  The government clearly recognized as much, otherwise it would not have taken pains to retract the inducement, as it now argues it did.  The government not only concedes, but relies on, its purported retraction, thereby conceding the

11

inducement was made. Having given an inducement, the Second Circuit places the burden on the government to make a clear and unambiguous retraction:

> However, unlike civil commercial negotiations among private persons, the government may need to make clear to the defendant that prior commitments have been withdrawn. Depending on the circumstances, the government may not be able to rely exclusively on omissions of prior undertakings and representations from the four corners of the written agreement as effective nullification of them.

*Feldman*, 939 F.3d at 190.

Thus, the government must bear the burden of establishing a clear, unambiguous, and definitively conveyed retraction of a prior inducement. If the government elects to make such retraction ambiguous, unclear, or in a manner not afterwards provable, the government must bear the risk of the ambiguity. Finding otherwise would create the most perverse of incentives. Inducements can be made to desperate and scared defendants and mild retractions made with a wink and a nod, leaving defendants at the mercy of the whims of the government. The Supreme Court has recognized that plea agreements involving the fate of people besides the defendant "might pose a greater danger of inducing a false guilty plea by skewing the assessment of the risks a defendant must consider." *Bordenkircher*, 434 U.S. at 364 n.8. Reflecting a similar understanding, Ms. Parlovecchio testified that offering leniency to one family member in order to secure the guilty plea of another, and even more so under circumstances of a husband and wife with young children, is inducement of paramount magnitude that, in her experience, AUSAs were trained not to do. (Mar. 4, 2026, Tr. 229:3–14 (Parlovecchio)). It is hard to imagine a more corrosive solvent to due process and the fair administration of justice.

That is precisely what happened here. The government, seeking a plea, dangled a powerful inducement before Salame. Perhaps thinking of the optics or perhaps concerned with future proceedings on the record, the government made a half-hearted attempt to cover its tracks. So vague was its supposed retraction that it hardly registered at all with Mr. Salame and Ms.

12

Bond's attorneys.   If there was a retraction of the inducement, these experienced attorneys would have questioned the government about its change in posture, informed Ms. Bond in a timely manner, taken notes regarding the call, and (as discussed below) not been surprised almost a year later when the government resurfaced.  None of this happened because the retractions did not happen.  Instead, these two experienced attorneys, former prosecutors both, believed the government intended to honor the inducement—so much so that they charged the government with acting in bad faith a year later when the government resurfaced on Bond's case. There can be no real dispute that any retraction, to the extent one was conveyed, was ambiguous and unclear.  The principles of *Feldman*, *Santobello*, due process, and basic fairness require the consequence of the government's deliberate vagueness rest with the government and only the government.

**III.    The government made Bond a third-party beneficiary of the Salame plea agreement and she can enforce the terms made to her benefit.**

As noted above, the Court should evaluate a plea agreement on contract principles, with a particular eye towards fairness and good faith.  *Reyes-Arzate*, 91 F.4th at 622.  It is also settled law that the government may premise the treatment of one defendant on the plea of another. *United States v. Clements*, 992 F.2d 417, 419 (2d Cir. 1993).  It follows, therefore, that a third-party beneficiary of a plea agreement should have standing to enforce the agreement.

Third-party beneficiary status is a long-recognized "traditional principle" of contract law. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009); Restatement (Second) of Contracts § 302 (1981).  There can be no doctrinal or logical basis to exclude third-party beneficiaries to plea agreements.  To the contrary, to the extent courts deviate from ordinary contract-law principles when interpreting plea agreements, those deviations disadvantage the government. *See, e.g., Feldman*, 939 F.3d at 189 (relaxing the parol evidence rule and holding merger clauses

13

do not foreclose considerations of extracontractual agreements in criminal plea negotiations); *Vaval*, 404 F.3d at 152 (noting that plea agreements are strictly construed against the government).

Many courts across the country have found that a third-party beneficiary can enforce the terms of the plea agreement. For example, in *United States v. Florida West International Airways, Inc.*, the Southern District of Florida dismissed an indictment against a company employee because the plea agreement "demonstrated an intent to extend [immunity]" to a definable class of third parties under which the employee fell. 853 F. Supp. 2d 1209, 1228-32 (S.D. Fla. 2012). The court in *United States v. El-Sadig* dismissed a complaint where a prior, oral non-prosecution agreement with another potential defendant was intended to benefit all individuals involved in the underlying conduct. 133 F. Supp. 2d 600, 609 (N.D. Ohio 2001). The court there reasoned that the oral non-prosecution agreement with another potential defendant was intended to benefit all individuals involved in the underlying conduct. 133 F. Supp. 2d 600 (N.D. Ohio 2001). The court held that the oral non-prosecution agreement conferred third-party beneficiary status on the defendant who could enforce the non-prosecution agreement. *Id.*; *see also United States v. Stolt-Nielsen S.A*, 524 F. Supp. 2d 609 (E.D. Pa. 2007) (dismissing the indictment against corporate officers and directors where the company's leniency agreement contained an agreement not to prosecute directors, officers, and employees). Even cases finding that the defendant is not a third-party beneficiary on a particular set of facts have recognized that, under certain circumstances, third-party beneficiaries of plea agreements can enforce those agreements. *United States v. Andreas*, 216 F.3d 645, 663 (7th Cir. 2000) (recognizing the possibility of third-party beneficiaries in plea agreements where the original parties intended the contract to directly benefit the third party); *Wright v. UPO*, No. 10-CV-5127

14

(MKB), 2021 WL 2779451, at *18 (E.D.N.Y. July 2, 2021) (recognizing that a third party may enforce a plea agreement when the plea agreement is executed for the third party's benefit, such as an agreement to plead guilty to spare a spouse).

There can be no serious dispute that Ms. Bond was an intended beneficiary of Mr. Salame's plea. The government previously argued that Ms. Bond cannot be a third-party beneficiary because she was not specifically named in the plea agreement. Such a reading conflicts with Second Circuit precedent that requires courts to look beyond the four corners of the plea agreement to strictly enforce government promises in plea negotiations. *Feldman*, 939 F.3d at 189-90. This must hold special weight where, as here, the government attorney expressly stated at the outset that the inducement would not be contained within the four corners of the plea agreement. (GX 1).

The government's argument also lacks any basis in civil law. "A party need not necessarily be specifically mentioned in a contract to be considered a third-party beneficiary." *Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 663 (2d Cir. 1996) (considering New York law). Here, the inducement was expressly made and never clearly and unambiguously retracted. The context of the statement – its placement in the conversation and the lack of any other possible charges to be considered – demonstrate that it referred to Ms. Bond. It could only have referred to Ms. Bond. The government stated that the inducement would not be included within the four corners of the plea agreement, demonstrating the intent to create a side deal of which Bond was the primary and intended beneficiary. Ms. Bond's testimony confirmed that Mr. Salame pleaded guilty primarily to insulate Ms. Bond from further prosecution so one of them would be free for their three young children. (Oct. 16, 2025, Tr. 41:15–24 (Bond)).

The powerful inducement conveyed by prosecutors here is not one to be treated lightly, and reliance on such a representation was both reasonable and expected. Ms. Bond and Mr. Salame

15

did rely on the government's word, both in handling their legal cases and in making critical life decisions. Mayer Brown ceased investigating Ms. Bond's case. (Mar. 4, 2026, Tr. 150:10–18 (Parlovecchio); Oct. 16, 2025, Tr. 54:20 (Bond)). Ms. Bond and Mr. Salame proceeded to have a child together, not suspecting that their newborn son may be temporarily orphaned by the incarceration of both parents. Bond both talked to the government and testified in custody proceedings concerning her two older children. All these actions and nonactions were taken because the government gave Ms. Bond and her lawyers reason to conclude they could safely do so. The detriments inflicted directly on Ms. Bond as a result of the inducement—an inducement relating to her very fate—underscore why Ms. Bond should be able to hold the government to account for contravening that inducement.

**IV.    Dismissal of the indictment (specific performance) is the appropriate remedy.**

The government, either deliberately or carelessly, conveyed a potent inducement to Mr. Salame and Ms. Bond that Mr. Salame's plea would result in Ms. Bond's freedom from investigation and prosecution which it then failed to fulfill. "Specific performance is an appropriate remedy for a prosecutor's breach of a plea agreement." *United States v. Knights*, 968 F.2d 1483, 1486 (2d Cir. 1992). Mr. Salame and Ms. Bond have already lost a significant portion of the benefit of their bargain. Mr. Salame pleaded guilty and is serving a seven plus year prison sentence. The reliance by this family on the government's inducements, and the government's abandonment of the benefit of that bargain to Ms. Bond, has led to years of anguish, expense, reputational damage and tearing of familial bonds that were not part of the calculations this family made when agreeing to accept a guilty plea by Mr. Salame. This Court now has the record and justification to dismiss the charges against Ms. Bond, thereby holding the government to its word

that a guilty plea by Mr. Salame would result in no criminal case against Ms. Bond. In this case, justice delayed is still very much justice obtained for Ms. Bond.

The proper remedy is to dismiss the indictment.

## CONCLUSION

On the April 28, 2023 call with Mr. Salame's and Ms. Bond's counsel, the government intended to—and did—convey to Mr. Salame and Ms. Bond that if Mr. Salame pleaded guilty, Ms. Bond would be spared. The government wanted that guilty plea – Mr. Salame was the final defendant other than Mr. Bankman-Fried, and his prosecution would be both a distraction and work-intensive case. But the government lawyers were also aware coercive plea negotiations could create trouble later. Instead of clearly and firmly retracting its powerful inducement, it made vague and passing statements to afford it plausible deniability while still leaving defendants with the distinct impression that it would honor its inducement. This was not the post-hoc impression of desperate defendants – this was the recollection of experienced and respected members of the criminal defense bar, both former federal prosecutors. The government created the impression deliberately and with the intention to induce reliance. If its intention was to retract the inducement, it chose to do so ambiguously and in a medium that carried the risk of misunderstanding and miscommunication. It could have conveyed a clear, written retraction, as this circuit requires for it to be effective; it chose not to. The government must bear the burden of its failure to clearly convey its intention. Specific performance is

17

appropriate.  The indictment must be dismissed, and the Court should order any further relief it

finds appropriate.

Dated:  March 27, 2026          **DUANE MORRIS LLP**
        New York, New York


        /s/  Eric R. Breslin
        Eric R. Breslin, Esq.
        200 Campus Drive, Suite 300
        Florham Park, NJ 07932
        Tel: 973-424-2000
        erbreslin@duanemorris.com

        Stephen H. Sutro, Esq. (admitted *pro hac vice*)
        Spear Tower
        One Market Plaza, Suite 2200
        San Francisco, CA 94105-1127
        Tel: 415-957-3008
        Email: shsutro@duanemorris.com

        Melissa S. Geller, Esq.
        22 Vanderbilt
        335 Madison Ave, 23rd Floor
        New York, New York 10017
        Tel: 212-692-1000
        Email: msgeller@duanemorris.com

        CAHILL GORDON & REINDEL LLP
        Edward C. O'Callaghan
        900 16th Street, N.W., Suite 500 Washington,
        D.C. 20006
        Tel: 202-862-8970
        Email: eocallaghan@cahill.com

18