UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

MICHELLE BOND,

              Defendant.

24 Cr. 494 (GBD)


**THE GOVERNMENT'S POST-HEARING MEMORANDUM OF LAW IN FURTHER OPPOSITION TO MICHELLE BOND'S MOTION TO DISMISS THE INDICTMENT**


                                       SEAN S. BUCKLEY
                                       Attorney for the United States, Acting Under
                                       Authority Conferred by 28 U.S.C. § 515


David R. Felton
Daniel C. Richenthal
Stephanie Simon
Assistant United States Attorneys
    -  *Of Counsel*  -

## TABLE OF CONTENTS

PRELMINARY STATEMENT.................................................................................................1

FACTUAL BACKGROUND.................................................................................................1

    A.    The Salame Plea Discussions..................................................................................1

          1.  April 2023 ...............................................................................................2

          2.  May 2023 ................................................................................................6

          3.  August and September 2023 ................................................................10

    B.    Salame's Written Plea Agreement .........................................................................11

    C.    Salame's Guilty Plea Proceeding...........................................................................12

    D.    January 2024 Mayer Brown Memorandum ...........................................................13

    E.    The Government Tells Mayer Brown About Its Ongoing Investigation of Bond .............13

    F.    Salame's Sentencing .............................................................................................14

    G.    Bond Defense Presentation and Indictment..........................................................15

    H.    Salame's *Coram Nobis* Petition and Hearing .....................................................16

DISCUSSION .......................................................................................................................17

    A.    Bond Lacks the Right to Enforce Salame's Plea Agreement ...............................17

    B.    The Government Never Promised That It Would Not Prosecute Bond..............................21

          1.  The Government Made No Promise About Bond in the April and May 2023 Statements.....................................................................................................21

          2.  The Government Made No Promise About Bond in the Plea Agreement or Change of Plea Proceeding.................................................................................25

          3.  The Parties' Post-Plea Conduct Confirms No Promise About Bond Was Made ..27

    C.    Specific Performance Is an Inappropriate Remedy ..............................................28

    D.    Nothing in the Record Implicates Any Cognizable Due Process Concern........................29

CONCLUSION.....................................................................................................................31

**PRELIMINARY STATEMENT**

The Government respectfully submits this memorandum of law in opposition to defendant Michelle Bond's post-hearing memorandum of law (Dkt. 97 ("Br.")). The record evidence is clear: Bond's motion to dismiss is factually and legally meritless. To receive the extraordinary relief she seeks, Bond must show both that the Government promised not to prosecute Bond in connection with Ryan Salame's guilty plea *and* that she has the right to enforce any such promise. Bond, who bears the burden on her motion, can do neither. For the reasons below, and those in the Government's pre-hearing memorandum of law (Dkt. 43 at 1-18), Bond's motion to dismiss the Indictment should be denied.

**FACTUAL BACKGROUND**

The hearing evidence—consisting of Government and Defense Exhibits (respectively, "GX" and "DX"), and the testimony of Bond on October 16, 2025 ("Bond Tr."), Danielle Sassoon on November 20, 2025 ("Sassoon Tr."), and Gina Parlovecchio on March 4, 2026 ("Parlovecchio Tr.")—established, among other things, the following facts.

**A. The Salame Plea Discussions**

As part of the Government's investigation into wrongdoing at FTX, Salame pleaded guilty before the Honorable Lewis A. Kaplan on September 7, 2023, pursuant to a written plea agreement (the "Plea Agreement"), to two conspiracies, one related to operating an unlicensed money transmission business and the other involving an illegal campaign finance scheme. (GX 4, 5). Salame's guilty plea was preceded by plea discussions between Salame's attorneys, Parlovecchio and Jason Linder at Mayer Brown LLP ("Mayer Brown"), and prosecutors at the U.S. Attorney's Office for the Southern District of New York ("USAO-SDNY") responsible for the FTX

1

investigation (the "FTX Team") on multiple occasions over the course of several months. (Sassoon Tr. 141:10-16; GX 1, 3, 16, 26; DX 28, 34).

### 1. April 2023

On April 28, 2023, the FTX Team, including then-Assistant U.S. Attorney Danielle Sassoon, had a video call with Salame's attorneys, who also represented Bond. (Sassoon Tr. 141:17-149:1; GX 1). Neither Bond nor Salame was on that call (or any call with the FTX Team).

The purpose of the April 28, 2023 call (the "April 2023 Call") was to discuss a potential pre-indictment guilty plea by Salame. (Sassoon Tr. 142:3-4). By the time of the April 2023 Call, the FTX Team had evidence that Salame had committed a number of serious federal crimes, and the FTX Team discussed during the call its ongoing investigation, that it was contemplating but had not yet received authorization to charge Salame, and the possibility of a pre-indictment guilty plea. (Sassoon Tr. 142:1-12, 187:15-23; GX 1).

Among the then-contemplated charges were: (1) bank fraud; (2) operating an unlicensed money transmission business; (3) conspiracy to violate campaign finance laws; and (4) engaging in monetary transactions in criminally derived property. (GX 1 at 1; Sassoon Tr. 172:15-173:14). Among Salame's additional areas of criminal exposure were: (1) a Foreign Corrupt Practices Act scheme; (2) drug trafficking; (3) paying for prostitutes, including for FTX VIP clients; (4) failure to pay taxes; and (5) arranging to obtain unauthorized preferential access to tokens on FTX. (GX 1 at 1; Sassoon Tr. 172:15-173:14, 189:11-13). In sum, as discussed during the call, the evidence showed that Salame was involved in at least nine different categories of criminal conduct, at least some of which the FTX Team was considering charging, and all of which the FTX Team was actively investigating. (GX 1 at 1). In its call with defense counsel, the FTX Team identified a

mutual interest in Salame pleading guilty prior to the filing of an indictment, including that such a plea would likely involve a lower statutory maximum than Salame might otherwise face if indicted. (GX 1 at 1).

On the April 2023 Call, Salame's attorneys—who, as noted above, also represented Bond—asked why, the day before, law enforcement had executed a warrant to seize Salame's and Bond's phones; the FTX Team responded that it was investigating new criminal activity. (Sassoon Tr. 146:2-3; GX 1 at 1-2). The FTX Team also explained that Bond's status in its investigation had shifted, "meaning to the extent before she was viewed more as a witness, at this point she was a subject of [the] investigation." (Sassoon Tr. 146:4-6; *see also id.* 190:5-10; GX 1 at 2). Given Bond's change in status, the FTX Team asked if Salame's lawyers were going to continue to represent Bond. (Sassoon Tr. 146:7-12; GX 1 at 2). The lawyers responded that they were "[s]till digesting" whether they would and asked to discuss Bond's case in the future. (Sassoon Tr. 146:13-15; GX 1 at 2).

Once the Bond discussion concluded, Sassoon "moved on" and "returned to [the] central purpose" of the April 2023 Call, which had primarily focused on a potential Salame guilty plea, "and emphasized that [the Government] wanted to move forward to a plea" for Salame. (Sassoon Tr. 192:11-24; *see also* GX 1 at 2). Specifically, Sassoon noted: "Without making promises outside the four corners of the plea agreement, but as is often the practice here, if we do reach a resolution, we expect that we will conclude the aspects of our investigation that concern RS [*i.e.*, Salame] but not SBF [*i.e.*, Sam Bankman-Fried]." (GX 1 at 2; *see also* Sassoon Tr. 191:11-19, 192:11-24; Parlovecchio Tr. 140:15-141:2). In explaining her expectation as to whether the FTX Team would continue its investigation into Salame's criminal conduct, Sassoon did not reference

Bond at all, much less promise that the Government would conclude its investigation into Bond (or even Salame) if Salame pleaded guilty.  (GX 1 at 2; Sassoon Tr. 148:13-149:1, 191:19). Nobody on the call on behalf of the FTX Team said that they "expected to conclude [their] investigation into Michelle Bond if Mr. Salame pled guilty" or "promise[d] that the government would conclude its investigation as to Michelle Bond if Ryan Salame pled guilty."  (Sassoon Tr. 148:13-19-149:1).  Rather, as Sassoon explained:

> The overall conversation was about a potential preindictment resolution of the investigation into *Ryan Salame*.  So . . . I was explaining to him that if Ryan Salame pled guilty, that would likely mean that we would not continue investigating *his conduct that we had been discussing on the call*.  I also was very clear that this was not a promise, because we never make promises outside the four corners of the plea agreement, as our plea agreements always spell out.

(Sassoon Tr. 147:9-17 (emphases added); *see also id.* at 191:21-23, 192:11-15, 195:2-3).  Sassoon did not make any promise on the April 2023 Call.  She explained to this Court that she would *never* make such a promise because "[i]t's against the rules of how we operate.  It's against the plain terms of our plea agreement, which says there are no promises outside the four corners of the plea agreement.  Any agreement between the government and the defendant is going to be reflected in that document itself."  (Sassoon Tr. 147:23-148:2).

Parlovecchio's memory and understanding of the April 2023 Call was materially the same. As an initial matter, Parlovecchio explained that, during the April 2023 Call, the FTX Team did not extend a plea offer to Salame at all; indeed, this was the first call concerning potential plea parameters and Parlovecchio understood that the FTX Team did not even have authorization to extend a plea offer.  (Parlovecchio Tr. 202:7-205:9; GX 1).  Parlovecchio testified that sometimes the final plea "is different from how the conversations begin."  (Parlovecchio Tr. 205:10-13).

With respect to Bond, Parlovecchio generally understood Sassoon's statement to indicate that Sassoon was contemplating "that if Mr. Salame took a plea, [the Government] would cease investigating the part of the case that involved Ms. Bond . . . ." (Parlovecchio Tr. 141:4-6; *see also id.* 206:3-23).    Parlovecchio's understanding—that Sassoon's statements about her expectation as to the future of the FTX Team's investigation encompassed both the investigation into Salame's criminal conduct and Bond's criminal conduct—is at odds with both the FTX Team's and Mayer Brown's own contemporaneous notes of the April 2023 Call, each of which reference Salame but not Bond. (GX 1 ("we expect that we will conclude the aspects of our investigation that concern RS but not SBF"), 16 ("expect that we will conclude aspects of investigation that concern Ryan but don't concern preparation of trial against Sam")).

In any event, Parlovecchio testified that she took Sassoon's statement to be "an indication" and not a "promise[]" that  the Government would "consider" ceasing its investigation. (Parlovecchio Tr. 206:6-23).  In other words, even assuming Parlovecchio's understanding was well-founded, she understood Sassoon was *not* offering or making a "promise," "agreement," "side agreement," "binding side deal," or even a "side deal" at all and instead was merely relaying a "statement of then present expectation."  (Parlovecchio Tr. 206:6-23, 208:11-18, 233:8-18; *see also* Parlovecchio Tr. 174:8-10 (making clear that "it wasn't a promise"), 194:16-19 (agreeing that "whatever the government said" on the April 2023 Call, "it was not a promise" (citing GX 14 at 15)), 199:5-200:4 ("It was not promised[]"; Parlovecchio had no memory of "there being a promise at all"), 207:15-16 (not an "enforceable promise"), 227:11-13 ("[t]here was no promise, so no there was not a breach[]")).

Each of the Government's and Mayer Brown's contemporaneous notes of the April 2023 Call had the same fundamental point: both "use the word 'expect' in describing the then present expectation." (Parlovecchio Tr. 201:19-24; *see also* GX 1, 16). And, again, Parlovecchio further testified that sometimes the final plea "is different from how the conversations begin" and "to the extent these conversations contained statements about expectations in the future, sometimes those expectations turn out to be incorrect." (Parlovecchio Tr. 205:10-18).

Indeed, after the April 2023 Call, Parlovecchio told Bond herself that the Government "had been careful not to promise." (Parlovecchio Tr. 144:2-13). That was, of course, precisely right. There was no promise on the April 2023 Call—or ever.

### 2.  May 2023

The discussions between the FTX Team and Salame's counsel continued with two calls in May 2023, one on May 5 and one on May 25. (Parlovecchio Tr. 142:11-16; GX 3, 26).

About a week after the April 2023 Call, on May 5, Linder told the Government that they were going to continue representing both Bond and Salame. (Sassoon Tr. 149:17-18; GX 26 at 1). On the same May 5 call, when discussing a potential Salame plea, the FTX Team reiterated that it "ha[d] not received authorization for any type of offer." (Sassoon Tr. 152:7-8; GX 26 at 1-2).

Parlovecchio testified that she recalled an additional statement made on the May 5, 2023 call. (Parlovecchio Tr. 143:8-12). Sassoon likewise recalled the statement except, as discussed below, her memory was that the statement was made on May 25, 2023, not May 5 (which contemporaneous notes also reflect). (Parlovecchio Tr. 143:8-12; GX 3). But whether the statement was made on May 5 or May 25, the substance was the same.

Specifically, Parlovecchio testified that Sassoon or another prosecutor said, "just to clarify one thing, going forward, Ms. Bond will be treated separately from Mr. Salame." (Parlovecchio Tr. 143:9-11; *see also id.* 145:16-20, 161:5-7). Parlovecchio "took it to mean that they were reconsidering" what Parlovecchio described as "the dangle" a week earlier "of the possibility that they would discontinue the prosecution" of Bond, speculating that the Government's statement was "sort of a CYA [*i.e.*, cover your ass] comment that they were distancing themselves from that initial dangle . . . ." (Parlovecchio Tr. 145:21-146:2). In short, Parlovecchio believed that the Government "made the statement to distance themselves from the April 28 statement." (Parlovecchio Tr. 174:10-11). Regardless of her speculation as to the Government's motivation, Parlovecchio had "no doubt" that, in May 2023, the Government "decoupled the Bond matter and the Salame matter" and stated that "the two matters would proceed separately." (Parlovecchio Tr. 197:3-12; *see also id.* 206:24-207:3, 232:22-25). Parlovecchio also believed that what the Government said on May 5, 2023 was "appropriate" and "consistent with" its ethical obligations. (Parlovecchio Tr. 232:15-21). Within hours after the May 5 call, Parlovecchio spoke to Bond. (Parlovecchio Tr. 148:8-12).

About three weeks later, on May 25, 2023, the FTX Team had a follow-up conversation with defense counsel. (GX 3). Sassoon recalled that that is when she made the statement decoupling the Bond and Salame cases on this call (rather than on May 5 as Parlovecchio recalled). (Sasson Tr. 153:22-25, 154:19-157:7; GX 3). Regardless of the date, there is no dispute that, in May 2023, Sassoon told Salame and Bond's lawyers that a Salame guilty plea would *not* stop any ongoing investigation of Bond's conduct. (Sasson Tr. 153:22-25, 154:19-157:7; GX 3). Sassoon explained:

> [B]ecause Jason Linder and Gina Parlovecchio were going to continue representing two individuals in the same investigation, while we were in active plea discussions about one of them, that person being Ryan Salame, again, just to be extremely diligent, and out of an abundance of caution, I wanted to spell out in no uncertain terms that if we reached a resolution as to Ryan, that would not end the investigation into Michelle, even though they had some overlapping criminal conduct.

(Sassoon Tr. 155:1-9; *see also id.* at 200:18-23).

Contemporaneous notes taken by the FTX Team of the May 25, 2023 call are in accord. Sassoon "wanted to clarify that before [the FTX Team] continue[d] discussions about [a] potential disposition for Ryan [Salame]," it "view[ed] Ryan and Michelle as separate" and "resolution of his case will not bear on her case and investigation of her conduct." (GX 3; *see also* Sassoon Tr. 155:12-16). Linder responded that he "[u]nderstood" the FTX Team to have "said no promises outside plea agreement, but plea will generally resolve investigation into Ryan's conduct that doesn't involve Sam [Bankman-Fried]." (GX 3; *see also* Sassoon Tr. 155:18-23). Sassoon testified that this comment from Linder "appeared to be expressing some confusion or ambiguity" about when Sassoon had indicated on the April 2023 Call that if Salame pleaded guilty "it was likely to end an investigation into his conduct," suggesting that Linder "thought an implication of that might have been ending the investigation into Michelle," but then Linder "indicat[ed] that he understood [Sassoon's] clarification." (Sassoon Tr. 155:24-156:4).

Nevertheless, to ensure that there was no potential misunderstanding, in response to Linder's comment, Sassoon "further reiterated" that in light of the April 2023 Call, she "wanted to make very clear that [the Government] view[s] discussions of Michelle [Bond]/Ryan [Salame] as separate, a Ryan disposition will not resolve investigation of Michelle's conduct, and to extent anything previously said was understood otherwise, that is superseded by this call." (GX 3;

8

Sassoon Tr. 156:5-11; *see also id.* 169:12-14).  Linder responded, "got it."  (GX 3; Sassoon Tr. 156:13).  Sassoon testified that, "[a]rguably, none of this clarification was necessary, given that there had been no formal plea offer made at that point.  And because our plea agreement always includes an integration clause that says that the agreement supersedes any other prior representations or promises, there had been no promises."  (Sassoon Tr. 156:14-19; *see also id.* 157:5-7, 201:8-12).  Whether necessary or not, there is no dispute that the clarification was made.

As explained above, Parlovecchio recalled that the foregoing took place on May 5, not May 25, but agreed on the substance of the call.  As to May 25, she testified that she recalled it was a "quick call" that was "all in relation to Mr. Salame's plea negotiations," not Bond's investigation. (Parlovecchio Tr. 149:5-22).  Notably, Mayer Brown does not have any notes of the May 25, 2023 call.  (Parlovecchio Tr. 209:19-23).  The Government, by comparison, does have such notes.  (GX 3).   But again, regardless of whether the pertinent statements were made on May 5 or May 25, there is no material dispute as to what was said.  Specifically, Parlovecchio testified that the Government's notes of the May 25, 2023 call (GX 3)—*i.e.*, "before continuing discussions about potential disposition for Ryan, make clear that view Ryan and Michelle as separate, resolution of his case will not bear on her case and investigation of her conduct"—"align[]" with her recollection of the May 5 call where "the government advised" her in May 2023 "that the matters would be treated separately."  (Parlovecchio Tr. 210:2-211:1).

Consistent with the message conveyed during the May calls that the investigation of Bond was ongoing, Mayer Brown continued to work on Bond's case, including by reviewing Bond's emails, conducting financial analysis of the payments at issue, researching legal issues, and consulting a specialist in the area of the investigation.  (Parlovecchio Tr. 149:25-150:6).

### 3. August and September 2023

Before the FTX Team extended a formal plea offer to Salame, Linder explained to Bond that the Government would make no promises as to the status of the investigation into her criminal conduct in Salame's forthcoming plea agreement. (DX 28). Specifically, in August 2023, Linder messaged Bond that the plea agreement would not "give you [*i.e.*, Bond], personally, any coverage at all." (DX 28 at 1-3). Linder explained that while "[t]here will be language that says, in effect, 'the SDNY will not further prosecute Ryan for' and then can list and describe potential criminal activity with varying degrees of specificity," by contrast, "[n]o variation gives you [*i.e.*, Bond] any coverage." (DX 28 at 1-2). Notably, Bond did not mention in response any purported "promise not to prosecute" Bond. (Bond Tr. 96:19-25). Rather, Bond responded, "OK I understand. This is helpful. Thank you." (DX 28 at 3).

Thereafter, the Government transmitted the written Plea Agreement, dated September 5, 2023, to Salame's attorneys at Mayer Brown, who continued to represent Bond. (GX 4, 5; Sassoon Tr. 157:9-17). Salame ultimately pleaded guilty on September 7, 2023, pursuant to the Plea Agreement. (GX 4, 5). Prior to the transmittal of the Plea Agreement, the Mayer Brown attorneys never communicated to the FTX Team "that they understood that [the] investigation of Ms. Bond would cease if Mr. Salame pled guilty"; indeed, "[t]hat would have been contrary to [the parties'] explicit conversations." (Sassoon Tr. 158:13-17). Likewise, during that time, nobody on Bond's behalf mentioned to the FTX Team "that they understood that [the] investigation of Ms. Bond would cease if Mr. Salame pled guilty." (Sassoon Tr. 158:18-21). That is of course unsurprising, because as Parlovecchio testified, there "wasn't a promise." (Parlovecchio Tr. 174:8-10; *see also,*

10

*e.g.*, *id.* 227:11-13 ("[t]here was no promise, so no there was not a breach[]" of the Plea Agreement)).

### B. Salame's Written Plea Agreement

On September 7, 2023, Salame pleaded guilty, pursuant to the Plea Agreement, to Superseding Information S7 22 Cr. 673 (LAK), which was filed that same day. (GX 4, 5; *see United States v. Ryan Salame*, S7 22 Cr. 673 (LAK) ("Salame Dkt."), Salame Dkt. 262). In connection with Salame's plea proceeding, Salame, his attorneys, and the Government signed the Plea Agreement. (GX 4 at 7; Sassoon Tr. 161:10-15; Parlovecchio Tr. 216:15-217:17). The Plea Agreement listed the conduct for which Salame would not be further prosecuted criminally by the USAO-SDNY in consideration of his guilty plea, namely the offense conduct underlying Counts One and Two of an accompanying information, as well as four additional categories of offenses. (GX 4 at 2; Sassoon Tr. 159:3-160:9). There was nothing in Salame's Plea Agreement that suggested that the USAO-SDNY would not criminally prosecute any of Salame's criminal co-conspirators, including Bond, in consideration of his guilty plea. (GX 4 at 2; Sassoon Tr. 159:3-160:9). The Plea Agreement did not contain any promises involving an investigation of Bond and, indeed, Bond was not named or referenced in the Plea Agreement *at all*. (GX 4; Parlovecchio Tr. 217:18-24; Bond Tr. 112:15-16).

The final paragraph of the Plea Agreement contained a standard integration clause:

> Apart from any written Proffer Agreement(s) that may have been entered into between this Office and defendant, this Agreement supersedes any prior understandings, promises, or conditions between this Office and the defendant. No additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

11

(GX 4 at 7; *see also* Sassoon Tr. 160:13-161:9; Parlovecchio Tr. 218:4-219:25).  Sassoon and Parlovecchio each testified that, consistent with the integration clause, "[n]o additional understandings, promises, or conditions have been entered into other than those set forth in this [A]greement, and none will be entered into unless in writing and signed by all parties."  (Sassoon Tr. 161:7-9; Parlovecchio Tr. 220:1-8; GX 4 at 7).  Salame's lawyers reviewed the entire Plea Agreement with him.  (Parlovecchio Tr. 219).

### C.  Salame's Guilty Plea Proceeding

On September 7, 2023, Salame appeared before Judge Kaplan for his plea hearing at which he continued to be represented by the attorneys from Mayer Brown.  (GX 5; Bond Tr. 40:4-10, 70:5-7).  Salame was placed under oath.  (GX 5 at 4).  Salame confirmed that he signed the Plea Agreement and entered into the Plea Agreement "only after reading it and consulting fully with [his] attorneys."  (GX 5 at 19). Asked by Judge Kaplan whether "anyone offered you any inducements or threatened you or anyone else, or forced you in any way to plead guilty," Salame answered: "No, your Honor."  (GX 5 at 18-19).  Judge Kaplan also asked: "Has anyone made any promises other than whatever is set forth in the plea agreement that induced you to plead guilty?"  (GX 5 at 19).  Again, Salame answered: "No, your Honor."  (GX 5 at 19).  Salame's attorneys did not seek to modify any of Salame's responses or to assert that any other inducements or promises had been made.  (GX 5; Sassoon Tr. 163:24-164:1).  Had Salame said something Sassoon knew to be false, Sasson would have sought to correct it "[b]ecause of a duty of candor to the [c]ourt."  (Sassoon Tr. 164:20-25).  Sassoon and Parlovecchio confirmed to this Court that Salame's sworn answers at his plea hearing were "accurate."  (Sassoon Tr. 163:24-164:1, 164:10-19; *see also id.*

195:20-23; Parlovecchio Tr. 221:8-16, 233:5-18).[1]

After the plea, between fall 2023 and spring 2024, Mayer Brown continued to represent Salame and Bond and spoke with each of them about their cases. (Parlovecchio Tr. 211:4-213:2).

### D. January 2024 Mayer Brown Memorandum

On January 29, 2024, approximately four months before Salame's sentencing, and before Bond was charged, Mayer Brown authored a memorandum to Salame regarding a potential motion by Salame to withdraw his guilty plea (the "January 2024 Memo"). (GX 15). Parlovecchio assisted in its preparation. (Parlovecchio Tr. 213:3-12). The January 2024 Memo states that, "[s]everal days" after the April 2023 Call, the FTX Team "retreated from th[e April 2023] statement and clarified their position that the two matters—*i.e.*, your potential guilty plea and their investigation of events involving Ms. Bond's campaign—were not connected." (GX 15 at 2; *see also* Parlovecchio Tr. 215:1-14). Parlovecchio testified that this portion of the January 2024 Memo was accurate and referred to statements that she recalled having been made by a member of the FTX Team on the May 5 call. (Parlovecchio Tr. 215:12-19). The January 2024 Memo is thus consistent with Parlovecchio's recollection of the substance of the May 5 call and Sassoon's recollection of the May 25 call and the FTX Team's notes of the same (although Parlovecchio's and Sassoon's recollections differ as to when precisely the statement was made).

### E. The Government Tells Mayer Brown About Its Ongoing Investigation of Bond

---

[1] During the pending hearing before this Court, Bond was asked repeatedly whether the following statement in the Plea Agreement was a lie or false: "[n]o additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties." Bond was evasive and never gave a direct answer. (Bond Tr. 113:5-117:13).

The Government continued to investigate Bond after Salame's guilty plea, which the Government expressly alerted Parlovecchio and Linder to before Salame's May 28, 2024 sentencing. On April 15, 2024—more than a month before Salame's sentencing—USAO-SDNY prosecutors who were investigating Bond (the "Bond Team") emailed Parlovecchio and Linder seeking to set up a call to discuss the status of the Bond investigation. (DX 10; Parlovecchio Tr. 154:19-156:4).

Shortly thereafter, after Bond asked Linder whether anything could be done to stop the USAO-SDNY's investigation of her, he responded that the "goal will be to use whatever we can" to "persuade them not to charge you." (GX 13 at 4; Bond Tr. 99:1-100:14). Linder explained that "they were careful not to promise, there is integration clause in the plea agreement, Ryan testified under oath that there was no other promise, inducement, etc. that led him to plead guilty" and, "even if none of that was true, there would be nothing anyone could do to stop an investigation." (GX 13 at 4). Parlovecchio wrote to Bond the next day that she planned to use the FTX Team's statements during Salame's plea negotiations "strategically at points" and that, "as a legal matter, the case law we found indicates that this may not be our strongest argument, but as a matter of equity, we feel strongly that we should press this issue." (DX 10 at 1; Bond Tr. 103:11-104:5). On April 18, 2024, the Bond Team spoke with Parlovecchio and Linder by phone, informing Parlovecchio and Linder that the Bond Team has "continued the investigation" into "issues surrounding [Bond's] campaign" and "how it was funded." (DX 12 at 1).

**F. Salame's Sentencing**

Over a month later, Salame appeared for sentencing on May 28, 2024, at which he continued to be represented by the attorneys from Mayer Brown. (GX 25; Bond Tr. 40:11-18).

At no point before or during the sentencing proceeding did Salame or his attorneys seek to withdraw his plea.  Nor did they allege any purported breach of any promise made by the Government not to prosecute Bond, despite their awareness (from discussions recounted above) that Bond remained under investigation after Salame's guilty plea.  (Sassoon Tr. 165:16-166:20; Parlovecchio Tr. 222:5-19; GX 25).  As Sassoon explained, this was

> notable because in that intervening time they were still representing Michelle Bond as well, and my colleagues were in touch with them about the ongoing investigation into Michelle Bond, so they were well aware that after Ryan Salame pled guilty, the investigation into Michelle Bond was ongoing.  And at no point prior to the sentencing did they express shock about that or seek to withdraw the plea or raise concerns in advance of sentencing.

(Sassoon Tr. 165:23-166:1-5; *see also id.* 196:10-24).  At Salame's sentencing, after hearing from the parties and from Salame himself, Judge Kaplan sentenced Salame principally to 90 months' imprisonment, which left Salame "unhappy."  (GX 25 at 24; Parlovecchio Tr. 222:22-224:23).

### G.  Bond Defense Presentation and Indictment

Two months later, on July 30, 2024, the Mayer Brown attorneys made a presentation to the Bond Team and USAO-SDNY supervisors.   (DX 15; Bond Tr. 66:19-68:22, 107:3-110:8). Parlovecchio testified that her presentation talking points, which were designed to help Bond "avoid prosecution," did not reference the statements that the Government made in May 2023 explicitly decoupling the Salame and Bond investigations because, "as an advocate, [Parlovecchio] did not believe it was in [her] client's interest to raise those statements with the government." (Parlovecchio Tr. 196:7-23).  But Parlovecchio made clear that that omission was not because the May 2023 statements were not made.  They were made, and Parlovecchio understood them; the

defense team simply did not think it was in their client's interest at the time to re-raise them. (Parlovecchio Tr. 196:7-197:12, 232:22-233:18).

On August 19, 2024, a grand jury returned Indictment 22 Cr. 494 (GBD) (the "Indictment") charging Bond in four campaign finance counts.  (*See* Dkt. 1).

### H.  Salame's *Coram Nobis* Petition and Hearing

On August 21, 2024, Salame, represented by new counsel, filed a petition for *coram nobis*, seeking to dismiss the Bond Indictment with prejudice or alternatively to vacate his conviction based on his claim that the Government had supposedly induced him to plead guilty by promising that Bond would not be prosecuted.  (Salame Dkt. 470 at 26).  Salame filed a sworn declaration in support of his petition, which did not mention the call in May 2023 in which the Government clarified that the resolution of Salame's case had no bearing on the status of any investigation of Bond.  (GX 6).  Parlovecchio testified that Salame's *coram nobis* allegation that the Government breached a promise to him was not true since "[t]here was no promise" and thus no "breach." (Parlovecchio Tr. 227:11-13).

On September 12, 2024, the parties in Salame's case appeared before Judge Kaplan.  (GX 7; Sassoon Tr. 167:23-168:17).  Salame claimed that he was not truthful at his change of plea proceeding when he said, under oath, that no one had "made any promises, other than whatever is set forth in the plea agreement" in order to induce him to plead guilty.  (GX 7 at 10).  Salame nonetheless admitted that he understood that there was only a "likelihood" that the Government would stop investigating Bond if he pleaded guilty, which was not the same as a *promise* not to prosecute her, although he preferred the word "assurance."  (GX 7 at 8-9, 15-16).  Salame further stated that, following the April 2023 Call, the Government "walk[ed] back" any supposed promise

not to prosecute Bond.  (GX 7 at 16-17).  Salame was then forced to admit before Judge Kaplan that he failed to mention the statements made to his attorneys in May 2023 in his declaration, creating "a misleading impression."  (GX 7 at 16-17).  At the proceeding's conclusion, Salame requested "to withdraw the petition with prejudice," meaning that he "would not assert these allegations or seek relief based upon them in any court."  (GX 7 at 17, 20).  In other words, Salame "agreed to not pursue this claim further."  (Sassoon Tr. 171:2-3).

## DISCUSSION

Bond bears the burden of proof on her motion to dismiss.  *United States v. Byrd*, 413 F.3d 249, 251 (2d Cir. 2005); *United States v. Alexander*, 901 F.2d 272, 273 (2d Cir. 1990) (per curiam). Following a three-day hearing, the record overwhelmingly shows that Bond's motion to dismiss— which simply repackages the same inflammatory and dishonest claims Salame made in his withdrawn *coram nobis* petition—is utterly devoid of merit.  Indeed, it is both legally groundless and factually baseless.

### A.  Bond Lacks the Right to Enforce Salame's Plea Agreement

At the outset, as previously set forth in the Government's pre-hearing memorandum of law, (Dkt. 43 at 11-14), Bond has no legal right to invoke any purported promise made to Salame in connection with his guilty plea, as Bond is not a signatory to Salame's Plea Agreement.  *See Wright v. U. PO*, No. 10 Civ. 5127 (MKB), 2021 WL 2779451, at *18 (E.D.N.Y. July 2, 2021) ("Non-parties to [a plea] agreement suffer no due process deprivation as a result of a breach of another defendant's plea agreement. . . .  Under general contract law principles, a contract typically vests only its signatories with rights, and non-parties usually have no substantive interest in seeing the

17

contract enforced.").[2]  Bond thus lacks standing to enforce any purported promise made to Salame that induced his guilty plea.

Bond cannot escape that conclusion by invoking the third-party beneficiary doctrine from the commercial contract setting.  (Br. 13-16).  Bond cites no cases from this circuit in which a third-party beneficiary (even assuming she were such a person) may enforce another's plea agreement, and in fact courts in this circuit have noted that the third-party beneficiary doctrine's application to plea agreements lacks support in the case law.  *See Santobello v. United States*, No. 94 Cr. 119 (RPP), 1998 WL 113950, at *3 (S.D.N.Y. Mar. 12, 1998) (noting that "there is little known authority that would allow [a defendant] to enforce [his codefendants' plea] agreements as a third party beneficiary"); *United States v. Lopez*, 944 F.2d 33, 37 (1st Cir. 1991) (observing that "we are unaware of authority" supporting application of "third party beneficiary principles . . . to a plea agreement in a criminal case"); *United States v. Viju*, No. 3:15 Cr. 0240-B (JJB), 2016 WL 107841, at *4 (N.D. Tex. Jan. 11, 2016) (explaining that "[t]he right to enforce a plea deal does not exist for its own sake;" "it is a means to achieve fairness in plea bargaining," and "enforcement by third parties adds nothing to protecting the defendant's right").

The only in-circuit case Bond cites, *Wright* (Br. 14-15), is deeply unpersuasive.  There, the district court described the third-party beneficiary doctrine as only a "*possible* exception" to the general principle that "a contract typically vests only its signatories with rights," citing only *Santobello* for that proposition.  *Wright*, 2021 WL 2779451, at *18 (emphasis added).  But *Santobello* does not say that the doctrine represented a "possible exception"; to the contrary, the

---

[2] Unless otherwise noted, quotations omit internal quotation marks, citations, footnotes, and previous alterations.

district judge there found that the third-party beneficiary doctrine's application to plea agreements *lacked* support in the case law.  1998 WL 113950, at *3.

The other cases Bond cites (Br. 14-15) are factually distinguishable and similarly unpersuasive.  In *United States v. Andreas*, the Seventh Circuit expressly disclaimed that it was "deciding whether third parties can ever be immunized" by another party's immunity agreement and described such arguments as "truly remarkable" and "too clever."  216 F.3d 645, 662-63 (7th Cir. 2000).  In *United States v. Florida West International Airways, Inc.*, the district court analyzed whether an executive or a purported subsidiary were immunized under a plea agreement that (unlike Salame's) expressly promised that the government would "not bring further criminal charges" and "not bring criminal charges" against designated categories of entities and individuals (*i.e.*, "subsidiaries" or "any current or former director, officer, or employee").  853 F. Supp. 2d 1209, 1214-16 (S.D. Fla. 2012).  Likewise, in *United States v. Stolt-Nielsen S.A.*, prosecutors promised in a written leniency agreement "not to bring any criminal prosecution against" an entity and designated certain categories of individuals that "shall not be prosecuted" for certain conduct, and so the court analyzed whether certain parties were immunized under the agreement's language. 524 F. Supp. 2d 609, 613-14 (E.D. Pa. 2007).  As for *United States v. El-Sadig*, the district court permitted a third party to invoke an oral non-prosecution agreement negotiated between the Prince of Saudi Arabia and the Deputy Chief at the Saudi Arabian Embassy where the latter individual promised that "the matter would be closed" or "end" and there was no subsequent clarification of the meaning of the statement and no subsequent written, non-prosecution agreement with an integration clause discussed during a sworn plea allocution in court.  133 F. Supp. 2d 600, 604-10 (N.D. Ohio 2001).

Those cases are inapposite.  Unlike the written agreements in *Florida West International Airways, Inc.* and *Stolt-Nielsen S.A.*, there was *nothing* in Salame's Plea Agreement that suggested that the USAO-SDNY would not criminally prosecute Bond (or any of Salame's criminal co-conspirators) in consideration of his guilty plea.  (GX 4 at 2; Sassoon Tr. 159:3-160:9).  In fact, the Plea Agreement did not even name or refer to Bond or any other co-conspirators at all.  (GX 4; Parlovecchio Tr. 217:18-24).

Similarly, the facts in *El-Sadig* do not at all resemble the facts here.  First, unlike the promise there, Sassoon's statement on the April 2023 Call was not a promise.  Second, unlike the *El-Sadig* promise, where nothing later clarified or shed light on the applicability or meaning of the promise, here, as detailed in the January 2024 Memo authored by Bond's own counsel, the April 2023 statement *undisputedly* was "clarified" the next month, prior to Salame's guilty plea (and indeed, prior to the communication of the written Plea Agreement).  (GX 15 at 2; Parlovecchio Tr. 215:1-14).[3]  Third, and in any event, unlike the oral promise in *El-Sadig*, here there was a written Plea Agreement with an integration clause and Salame swore at his plea hearing that there were no promises or inducements outside the Plea Agreement that led him to plead guilty.  (GX 5 at 18-19).

Quite simply, the third-party beneficiary law on which Bond relies (Br. 13-16) is of no help to her.  To prevail under that doctrine, Bond must show that "the original parties intended the [agreement] to directly benefit [her] as [a] third part[y]."  *Andreas*, 216 F.3d at 663 (assuming without deciding that third party could enforce immunity agreement); *see also Fla. W. Int'l*

---

[3] No witness or contemporaneous record disputes that the May 2023 "clarification" occurred (GX 15 at 2); it is thus immaterial whether it occurred on or about May 5, as Parlovecchio recalled, or May 25, as Sassoon testified and the contemporaneous notes reflect.

*Airways, Inc.*, 853 F. Supp. 2d at 1228 (third party must show that "a direct and primary object of the contracting parties was to confer a benefit on the third party"). Bond cannot make such a showing: she is not named in Salame's Plea Agreement, and the record lacks any credible evidence that the parties to Salame's Plea Agreement intended to confer a benefit on her. Indeed, the record is to the contrary. The Plea Agreement's integration clause, which disclaims any promises outside the Plea Agreement, shows that the parties did not intend to confer benefits on anyone other than Salame, and only intended to confer upon him the specific benefits outlined in the Plea Agreement; that understanding is confirmed by Salame's sworn statement at his plea hearing that there were no inducements or promises made to him outside the Plea Agreement that caused him to plead guilty, and he similarly walked away from any contrary interpretation of the plea negotiations by withdrawing his *coram nobis* petition. (GX 5 at 18-19, GX 7 at 17, 20). Further, Bond is asking this Court to extend the third-party beneficiary doctrine to permit her to enforce a purported oral promise not contained (but rather expressly disclaimed) in the Plea Agreement. Nothing in law or logic permits her to do so.

**B. The Government Never Promised That It Would Not Prosecute Bond**

Even if Bond had the right to enforce a supposed oral promise made prior to the execution of Salame's Plea Agreement (and she does not), she would still not be entitled to relief, because the Government did not make *any* promise to Salame, much less to Bond, about the investigation and prosecution of Bond if he pleaded guilty.

**1. The Government Made No Promise About Bond in the April and May 2023 Statements**

As an initial matter, the statement on the April 2023 Call was not a promise. Sassoon referred to an *expectation* ("we expect"), not a promise, to conclude the investigation of *Salame*

("RS"), not Bond. (GX 1 at 2). In fact, Sassoon did not even reference Bond: "Without making promises outside the four corners of the plea agreement, but as is often the practice here, if we do reach a resolution, we expect that we will conclude the aspects of our investigation that concern RS [*i.e.*, Salame] but not SBF [*i.e.*, Sam Bankman-Fried]." (GX 1 at 2).[4] Indeed, Bond's own lawyer was adamant that Sasson did not make a "promise," "agreement," "side agreement," "binding side deal," or even a "side deal" at all and instead simply made a "statement of then present expectation" about "something the [Government] would consider doing." (Parlovecchio Tr. 206:6-23, 208:11-18, 233:8-18).[5] Both the Government's and the defense's contemporaneous notes of the April 2023 Call similarly "use the word 'expect' in describing the then present expectation" (Parlovecchio Tr. 201:19-24; GX 1, 16), reinforcing Parlovecchio's testimony that the statement was not a promise but instead merely an "indication" of something the Government would "consider" doing (Parlovecchio Tr. 206:7-8). As Parlovecchio explained, moreover, she understood the discussion to be preliminary: this was the first call concerning a potential plea; no

---

[4] Even though Bond was not referenced in the statement, Bond asserts that "[t]he context of the statement—its placement in the conversation and the lack of any other possible charges to be considered—demonstrate that it referred to Ms. Bond." (Br. 15). Not so. First, the placement of the statement at the end of the April 2023 Call—which had primarily focused on a potential pre-indictment guilty plea by Salame and after a brief discussion related to Bond concluded—was unremarkable. (GX 1 at 2, GX 16 at 2; Sassoon Tr. 192:11-24). Second, the record is clear that the Government was considering numerous other serious charges against Salame, not just the campaign finance scheme with Bond, including bank fraud, engaging in monetary transactions in criminally derived property, a foreign corruption scheme, drug trafficking, and failure to pay taxes. (GX 1 at 1; Sassoon Tr. 172:15-173:14).

[5] Parlovecchio's testimony that it was not a "side deal" refutes Bond's baseless assertion that the statement on the April 2023 Call "demonstrat[es] the intent to create a side deal of which Bond was the primary and intended beneficiary." (Br. 15).

offer or specific parameters had been reduced to writing; it was not final; and the FTX Team was not authorized to extend a plea offer at all.  (Parlovecchio Tr. 202:7-205:9; GX 1).

In any event, the next month, in May 2023, the Government expressly decoupled its investigations of Salame and Bond and made crystal clear that any disposition as to Salame would not conclude its investigation of Bond.  (GX 3; Sassoon Tr. 155:12-16, 156:5-11; 169:11-14; Parlovecchio Tr. 143:9-11, 145:16-20, 174:10-11).  Contrary to Bond's false (and contradictory) assertions that the retractions "did not happen" (Br. 13), or, alternatively, that they did happen but were "half-hearted" or made with "a wink and a nod" (Br. 12), Bond's own lawyer testified that she had "no doubt" that in May 2023, the Government "decoupled the Bond matter and the Salame matter" and stated that "the two matters would proceed separately," (Parlovecchio Tr. 197:3-12; *see also id.* 206:24-207:3, 232:22-25).  Parlovecchio also agreed that the Government's notes of the call—*i.e.*, "before continu[ing] discussions about [a] potential disposition for Ryan, make clear that [the Government] view[s] Ryan and Michelle as separate, resolution of his case will not bear on her case and investigation of her conduct" (GX 3)—"align[] with [her] memory that the government advised [her] in May 2023 that the matters would be treated separately," (Parlovecchio Tr. 210:2-211:1).  Nothing in the record is to the contrary.  In fact, the January 2024 Memo written by Mayer Brown makes clear that in May 2023, the Government "clarified their position that the two matters—*i.e.*, [Salame's] potential guilty plea and [the Government's] investigation of events involving Ms. Bond's campaign—were not connected."  (GX 15 at 2; *see also* Parlovecchio Tr. 215:1-14).

Bond makes the unsupported claim that, by virtue of having made the statements in May, the Government somehow "conced[es]" that an "inducement was made" in April and "clearly

recognized" that its statement during the April 2023 Call was a "powerful inducement that triggered justifiable reliance" by Salame and Bond. (Br. 11-12). That claim is both wrong (for the reasons recounted above) and irrelevant. Sassoon testified that because Mayer Brown was "going to continue representing two individuals in the same investigation," Sassoon made the comments in May "just to be extremely diligent, and out of an abundance of caution," and "to spell out in no uncertain terms that if we reached a resolution as to Ryan, that would not end the investigation into Michelle, even though they had some overlapping criminal conduct." (Sassoon Tr. 155:1-9). Regardless of the reason for the May statements, there is no dispute that they were made—and those statements, made well before Salame pleaded guilty and acknowledged under oath the simple fact that he was not induced to plead guilty through any side-deal, foreclose Bond's motion.

On this record, the cases cited by Bond are of no help whatsoever to her. In the face of undisputed evidence that the Government never promised anyone that it would not prosecute Bond (much less made an enforceable promise), Bond attempts to shift the inquiry, claiming that the Government's focus on "the word 'promise'" is "formulaic," and instead, citing a single case, repeatedly refers to a purported Government "inducement" motivating Salame's plea. (Br. 11 (citing *Santobello v. New York*, 404 U.S. 257, 262 (1971)); *see generally* Br. (18-page brief using the word "inducement" over 40 times)). But *Santobello* does not bear the weight that Bond assigns it. The full sentence in *Santobello* which Bond excerpts simply notes that "when a plea rests in any significant degree *on a promise or agreement of the prosecutor*, so that it can be said to be part of the inducement or consideration, such *promise* must be fulfilled." *Santobello*, 404 U.S. at 262 (emphasis added). In other words, whether Bond semantically uses the word "inducement,"

24

"promise," or "agreement," the legal inquiry is the same under *Santobello*: if a prosecutor makes a *promise* that induces a guilty plea—as opposed to, under even Bond's own lawyer's interpretation, an "indication" of something the Government would "consider" doing (Parlovecchio Tr. 206:7-8)—the prosecutor must fulfill that promise.  *See also United States v. Carbone*, 739 F.2d 45, 46 (2d Cir. 1984) ("[O]nce a plea actually is entered, and was induced by a prosecutor's promise . . . that promise must be fulfilled.").  But here, the record is plain that there was no such promise ever, much less after May 2023, well before Salame pleaded guilty, and long before Bond was charged.

### 2. The Government Made No Promise About Bond in the Plea Agreement or Change of Plea Proceeding

The Plea Agreement unambiguously did not contain any promise to or about Bond.  The Plea Agreement contained no promises as to Bond, explicitly superseded any prior discussions, and made crystal clear that there were no additional agreements between the parties.  Indeed, the Plea Agreement specified that "[n]o additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties."  (GX 4 at 7).  Salame, under oath and with his (and Bond's) counsel at his side, confirmed at his change of plea proceeding that *no* promises or inducements had been made to him other than what was contained in the Plea Agreement.  (GX 5 at 18-19 (The Court: "Has anyone offered you any inducements or threatened you or anyone else, or forced you in any way to plead guilty?"  Salame: "No, your Honor."), (The Court: "Has anyone made any promises other than whatever is set forth in the plea agreement that induced you to plead guilty?"  Salame: "No, your Honor.")).  Both parties confirmed that Salame's sworn answers at his plea

hearing were "accurate."    (Sassoon Tr. 163:24-164:1, 164:10-19; *see also id.* 195:20-23; Parlovecchio Tr. 221:8-16, 233:5-18).

Given Salame's "emphatic statement" that he understood the Plea Agreement and that no other promises led him to plead guilty, "it [is] not reasonable to infer that somehow" he "was still relying" on conflicting prior representations by counsel. *Ventura v. Meachum*, 957 F.2d 1048, 1056 (2d Cir. 1992).

In short, even if the Government had suggested during the April 2023 Call that it would cease investigating Bond if Salame pleaded guilty (and it did not), and even if the Government had never clarified that the two matters were separate (and it did so clarify, within weeks, in a manner that Bond's own attorney testified she well understood), Bond still would not be entitled to what she seeks—because the Plea Agreement itself expressly "supersede[d] any prior understandings, promises, or conditions between this Office and the defendant." (GX 4 at 7). It is well settled that a defendant "may not rely on a purported implicit understanding in order to demonstrate that the Government is in breach," where, as here, "the Government incorporates into the plea agreement an integration clause expressly disavowing the existence of any understandings other than those set forth in the plea agreement." *In re Altro*, 180 F.3d 372, 376 (2d Cir. 1999); *see also id.* (A "unilateral understanding [is] insufficient to supplement the terms of the written plea agreement."); *United States v. Lenoci*, 377 F.3d 246, 258 (2d Cir. 2004) (same). Indeed, Salame and Bond's own attorney sent Bond a text message stating that the Government was "careful not to promise, there is an integration clause in the plea agreement, [and] Ryan testified under oath that there was no other promise, inducement, etc. that led him to plead guilty." (GX 13 at 4). That is plainly correct.

Bond cites two cases to try to get around the Plea Agreement's integration or merger clause (Br. 1 (citing *United States v. Graves*, 374 F.3d 80, 85 (2d Cir. 2004) and *United States v. Feldman*, 939 F.3d 182, 190 (2d Cir. 2019))), but those cases turn on a prosecutor having made a *promise* that induces a guilty plea. *See Graves*, 374 F.3d at 81 (remanding for a hearing because of the possibility that a prosecutor "made a *promise* that the prosecutor did not intend to keep and this *promise* induced the plea agreement" (emphasis added)); *Feldman*, 939 F.3d at 189-90 (citing *Santobello*, *Graves*, and *Carbone*, and also referring to "promises" and "commitments"). Here, since the Government never promised not to prosecute Bond, *Santobello*, *Feldman*, and *Graves* cannot be used to circumvent the Plea Agreement's integration clause. And, in any event, these cases do not help *Bond* (as opposed to Salame) because they do not concern third-party beneficiaries.

### 3. The Parties' Post-Plea Conduct Confirms No Promise About Bond Was Made

The parties' conduct after Salame's September 2023 guilty plea reinforces the lack of any improper inducement of Salame through a promise about Bond. As noted above, the January 2024 Memo authored by Salame and Bond's attorneys further eliminates any conceivable question that, as of May 2023 (Parlovecchio Tr. 215:12-19), the Government induced Salame to plead guilty by promising not to further investigate or prosecute Bond. The January 2024 Memo unequivocally states that in May 2023, the Government "clarified their position that the two matters—*i.e.*, [Salame's] potential guilty plea and [the Government's] investigation of events involving Ms. Bond's campaign—were not connected." (GX 15 at 2; *see also* Parlovecchio Tr. 215:1-14).[6]

---

[6] After the May calls, contrary to Bond's false statement that "Mayer Brown ceased investigating Ms. Bond's case," (Br. 16), Mayer Brown continued to work on Bond's case, reviewing Bond's

Likewise, Salame's statements before Judge Kaplan when Salame withdrew his *coram nobis* petition confirm the lack of any improper inducement of Salame through a promise about Bond. In that proceeding, Salame conceded that well before his change of plea, in May 2023, the Government "walk[ed] back the language" regarding its supposed April promise. (GX 7 at 16). Moreover, after Salame's guilty plea, but before his sentencing, the Government confirmed that its investigation of Bond was ongoing, and Salame and his attorneys did not "express shock about that or seek to withdraw the plea or raise concerns." (Sassoon Tr. 166:3-4; *see also id.* 196:10-24).

Salame's behavior likewise confirms that, even from his perspective, there was no ambiguity in the Plea Agreement, and that he understood it contained no promises as to Bond. *See, e.g.*, *United States v. Helm*, 58 F.4th 75, 83 (2d Cir. 2023) (Second Circuit looks to the "precise terms of the plea agreements and to the parties' behavior" to determine the parties' reasonable understanding of the terms of the agreement). On top of telling Judge Kaplan that no inducements or promises had been made to him outside the terms of the Plea Agreement (GX 5 at 18-19), Salame did not seek to withdraw his plea prior to sentencing. And despite confirmation before his sentencing that the investigation of Bond was ongoing, at sentencing, when he was given an opportunity to speak, he did not accuse the Government of misconduct, a breach, or bad faith. (GX 25 at 15-17).

### C. Specific Performance Is an Inappropriate Remedy

---

emails, conducting financial analysis of the payments at issue, researching legal issues, and consulting a specialist in the area of the investigation. (Parlovecchio Tr. 149:25-150:6).

While Bond fails to meet her burden for all of the reasons set forth above, Bond's motion independently fails because her request to dismiss the Indictment is unprecedented and entirely inappropriate even if her motion's version of the facts had a basis in reality.  (Br. 16-17).  In the event of a breach of a plea agreement, the appropriate remedy is either to enforce the bargain or to allow a defendant to withdraw his plea, and the choice of remedy is generally within the district court's discretion.  *Spence v. Superintendent, Great Meadow Corr. Facility*, 219 F.3d 162, 174 (2d Cir. 2000).  But the lone case cited by Bond to support her request for specific performance (*i.e.*, dismissal), *United States v. Knights*, involved an allegation of breach of a written plea agreement with a different remedy altogether—specifically, vacatur of a sentence and a remand for further proceedings to determine whether a breach in fact had occurred.  968 F.2d 1483, 1485-86, 1488-89 (2d Cir. 1992).  Here, because Bond cannot identify (and has not identified) any promise about her in Salame's Plea Agreement, this Court lacks any promise to enforce in this case.  And she cites no case where the specific performance discretionary remedy involved dismissing charges against a third party when, as here, no promises about—or, indeed, any reference at all to—a third party were contained in a plea agreement and the plea agreement contained an integration clause.

In sum, specific performance would be unprecedented and wholly inappropriate.  If Salame intends to claim, contrary to his representation to Judge Kaplan and the record, (GX 7 at 17, 20), that somehow the Government breached his Plea Agreement or his plea was not knowing and voluntary, Salame may attempt to do so in an appropriate forum.  But Bond, who never had a right not to be prosecuted, is not entitled to the windfall she seeks.

### D.  Nothing in the Record Implicates Any Cognizable Due Process Concern

To the extent Bond's scattered references to due process in her brief (Br. 3, 10, 12, 13)

could be construed as raising a due process claim, the Court should reject that claim.  To prevail on such a claim, a defendant must prove that the government's misconduct was "so outrageous that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction." *United States v. Al-Kassar*, 660 F.3d 108, 121 (2d Cir. 2011).  This burden is not met when the challenged conduct "is simply illegal; rather, it must be egregious."  *United States v. Getto*, 729 F.3d 221, 228 (2d Cir. 2013); *cf. Rochin v. California*, 342 U.S. 165, 172 (1952) (breaking into suspect's bedroom, forcibly attempting to pull capsules from his throat, and pumping his stomach for evidence without his consent).  The moving party's burden is "very heavy." *United States v. Rahman*, 189 F.3d 88, 131 (2d Cir. 1999) (per curiam).  There also "must be a causal connection between the violation and the deprivation of the defendant's life or liberty threatened by the prosecution." *United States v. Ghailani*, 751 F. Supp. 2d 502, 505 (S.D.N.Y. 2010).  "That is to say, relief against the government in a criminal case is appropriate if, and only if, a conviction otherwise would be a product of the government misconduct that violated the Due Process Clause." *Id.*

Any standalone due process argument by Bond cannot succeed for three reasons.  First, this undeveloped argument should be denied as waived.  "It is well established that," as here, "issues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Lima v. Hatsuhana of USA, Inc.*, No. 13 Civ. 3389 (JMF), 2014 WL 177412, at *1 (S.D.N.Y. Jan. 16, 2014); *cf. United States v. Botti*, 711 F.3d 299, 313 (2d Cir. 2013) (similar rule on appeal).  Second, any such claim would fail on the merits, because the Government's conduct was not wrong at all, much less "egregious," "outrageous," or conscience shocking, as required.  *Pena*, 432 F.3d at 112.  Third, even if there were a purported due process

30

violation (again, there was none), there is no causal connection between that violation and Bond's

prosecution (as opposed to *Salame's* decision to plead guilty), as it is clear that Bond would have

been prosecuted anyway regardless of whether Salame pleaded guilty.  Thus, any conviction here

plainly would not be "a product" of the alleged promise.  *Ghailani*, 751 F. Supp. 2d at 505.   In

sum, any due process claim fails.

## CONCLUSION

For the foregoing reasons, and those in the Government's pre-hearing memorandum of

law, (Dkt. 43 at 1-18), Bond's motion to dismiss the Indictment should be denied.

Dated:        New York, New York
              April 21, 2026

                                        Respectfully submitted,

                                        SEAN S. BUCKLEY
                                        Attorney for the United States, Acting Under
                                        Authority Conferred by 28 U.S.C. § 515

                              By:       /s/ David R. Felton
                                        David R. Felton
                                        Daniel C. Richenthal
                                        Stephanie Simon
                                        Assistant United States Attorneys
                                        (212) 637-2299/-2109/-2581

31