**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

        v.

MICHELLE BOND,

        Defendant.

Docket No. 1:24-cr-000494-GBD

**Post Hearing Reply Memorandum of Law in Further Support of Michelle Bond's Motion
to Dismiss the Indictment**

DUANE MORRIS LLP
Eric R. Breslin, Esq.
200 Campus Drive, Suite 300
Florham Park, NJ 07932
Tel: 973-424-2000
erbreslin@duanemorris.com

Stephen Holbrook Sutro
One Market, Spear Tower, 20th Floor
San Francisco, CA 94105
Tel: (415) 371-2200
shsutro@duanemorris.com
Melissa S. Geller, Esq.
22 Vanderbilt
335 Madison Ave., 23rd Floor
New York, New York 10017
Tel: 212-692-1000
msgeller@duanemorris.com

CAHILL GORDON & REINDEL LLP
Edward C. O'Callaghan
900 16th Street, N.W., Suite 500
Washington, D.C. 20006
Tel: 202-862-8970
eocallaghan@cahill.com

**Table of Contents**

PRELIMINARY STATEMENT ..................................................................................................1

I.     The government's inducement to Ms. Bond and Mr. Salame should be enforced because the government failed to make a clear and unambiguous retraction......................2

II.    Ms. Bond can enforce the plea agreement as a third party beneficiary. ..............................8

III.    Specific performance is the only remedy for the government's breach. ............................9

IV.    The government's due process argument. ..........................................................................10

V.    The government's *ad hominem* attacks and attempts to insert inadmissible character evidence into this proceeding should be rejected................................................11

CONCLUSION...............................................................................................................................12

**TABLE OF AUTHORITIES**

**Cases**

*Santobello v. New York*, 404 U.S. 257 (1971) ....................................................................1-3, 9-10

*United States v. El-Sadig,* 133 F. Supp. 2d 600 (N.D. Ohio 2001) ........................................... 9-10

*United States v. Feldman*, 939 F.3d 182 (2d Cir. 2019) .......................................................1-3, 7-8

*United States v. Florida West Int'l Airways, Inc.*, 853 F. Supp. 2d 1209 (S.D. Fla. 2012).......8, 10

*United States v. Hammerman*, 528 F.2d 326 (4th Cir. 1975) .......................................................2, 4

*United States v. Hughes*, 223 F. Supp. 477 (S.D.N.Y. 1963) .........................................................3

*United States v. Knights*, 968 F.2d 1483 (2d Cir. 1992)............................................................. 9-10

*United States v. Mozer*, 828 F. Supp. 208 (S.D.N.Y. 1993) ..........................................................10

*United States v. Reyes-Arzate*, 91 F.4th 616 (2d Cir. 2024) ..........................................................10

*United States v. Stolt-Nielsen S.A.*, 524 F. Supp. 2d 609 (E.D. Pa. 2007)................................. 9-10

## **PRELIMINARY STATEMENT**

The government knew exactly what it was doing, and exactly what it was conveying, when it tied Ms. Bond's fate to Mr. Salame's plea. The statement was not off the cuff. It was delivered from prepared talking points, by an experienced prosecutor, in direct response to a question about Ms. Bond. The government then accepted the benefit of that inducement and allowed Mr. Salame and Ms. Bond to act in reliance on it for nearly a year.

If the government later changed its mind, it was obligated to say so, clearly, unambiguously, and in writing. It did not. Principles of fairness and due process place the danger of misunderstanding or miscommunication on the government. The law does not permit the government to leverage its most coercive tactics without requiring it to be clear, honorable, and direct about its intentions.

The due process implications of this conduct are serious. If the government may dangle inducements in plea negotiations and then walk them back through silence, ambiguity, or passing asides, defendants and their counsel are at the government's mercy. The government can choose to honor or not honor inducements. Defendants desperate to protect loved ones will proceed anyway, but without the protection they believe the government had granted them. That is precisely the conduct the Supreme Court condemned in *Santobello v. New York*, 404 U.S. 257 (1971), and that the Second Circuit condemned in *United States v. Feldman*, 939 F.3d 182 (2d Cir. 2019).

When the government induces reliance, it must honor its commitments or clearly and unambiguously retract them. The government did neither here. Its response brief provides no basis for thinking otherwise. The indictment should be dismissed.

I.    **The government's inducement to Ms. Bond and Mr. Salame should be enforced because the government failed to make a clear and unambiguous retraction.**

Courts strictly construe plea agreements against the government and enforce government inducements for those pleas. *Santobello*, 404 U.S. at 262 ("[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled."). This enforcement applies to any statement or conduct "likely to inculcate belief and reliance" in the defendant. *United States v. Hammerman*, 528 F.2d 326, 330 (4th Cir. 1975). The existence of an integration clause is not dispositive, does not foreclose scrutiny of pre-plea negotiations, and does not obviate the requirement that such inducements be enforced. *Feldman*, 939 F.3d at 190 (holding that the parol evidence rule is relaxed in criminal cases and the failure of the government to negotiate in good faith may invalidate the merger clause). Once the government proffers an inducement, it bears the burden of "mak[ing] clear to the defendant that prior commitments have been withdrawn." *Id.*

The government's primary argument rests on a dogged insistence on a narrow legalistic definition of "promise." That is not a framework that adheres to the spirit or even the letter of the government's obligation to exercise the utmost good faith. Under this reasoning, the government can make sly inducements, irresistible to desperate defendants and their families, and break them at will, so long as it avoids the words "we promise."

Nor does the government's legalistic framework find support in the case law. For example, in *Hammerman*, the Fourth Circuit rejected a legalistic definition of promise, finding the prosecutor's "prediction" became an essential element of the plea because, under the circumstances of that case, it was "likely to inculcate belief and reliance" in the defendant. 528 F.2d at 330. Writing in this district in 1963, Judge Herlands similarly expressly rejected the

"technical concept of 'promise' as used in contract law" in favor of criteria centered on "fundamental decency of federal criminal justice" rooted in "good faith, fair play, ethical conduct and due procedural regard for the substantial rights of the defendant." *United States v. Hughes*, 223 F. Supp. 477, 480 (S.D.N.Y. 1963).

Courts require the government to honor its commitments, however obliquely proffered, when those commitments induce a defendant to plead guilty. *See Santobello*, 404 U.S. at 262; *Feldman*, 939 F.3d at 189-90 (same). To hold otherwise would give the government unfettered discretion to leverage vague assurances and later honor or discard them at will. The hapless defendant will still take that chance if it means protecting a child, a spouse, or someone close to them. The insidious corrosion of such coercive structures in plea negotiations cannot be overstated.

There can be little dispute here that the government made an inducement and knew it at the time. Otherwise, there would be no reason to make efforts to "clarify" or "withdraw" the statement later. Yet the government refuses to concede the point. It proffers Danielle Sassoon's self-serving testimony, in which she claims she only referred to Mr. Salame's plea and clearly stated that the office never makes promises outside the four corners of the plea agreement. (Opp. at p. 5). The testimony from other witnesses and documentary evidence contradicts Sassoon's testimony.

The government's own notes of that crucial April 28, 2023 call record the following statement:

> [Jason Linder]: Still digesting, but would like an opportunity to engage in a dialogue with SDNY about MB. Is it just the transactions in June? [Andrew Rohrbach]: Not just in June, but through the summer. [Danielle Sassoon]: Without making promises outside the four corners of the plea agreement, but as is often the practice here, if we do reach a resolution, we expect that we will

3

conclude the aspects of our investigation that concern RS but not
SBF.

[GX 1].

Ms. Sassoon made this statement in direct response to a question about the case against Ms. Bond. As Ms. Parlovecchio noted, "the only part of the investigation into Mr. Salame that didn't involve Sam Bankman-Fried was in fact this campaign finance area of conduct that related to Ms. Bond." (Mar. 4, 2026 Tr. 141:5-9 (Parlovecchio)). The notes do not reflect an unequivocal statement of ethical restraint. If Ms. Sassoon's statement ended with "outside the four corners of the plea agreement," there would be no issue in dispute. However, she did not. The key word in her statement is "but," which is followed by the kind of prediction of case-related events that the *Hammerman* court strictly construed against the government. Ms. Sassoon predicted that if Mr. Salame pleaded guilty in his case, SDNY would end their investigation as to matters involving Mr. Salame, which necessarily includes the facts under investigation regarding Ms. Bond. Extraneous promises in plea negotiations are far outside the norm. (*See* Mar. 4, 2026 Tr. 228:23-229:20 (Parlovecchio)). It makes no sense that a prosecutor would gratuitously clarify an office policy which follows the customary norm. The only reason to include the preamble was to frame the inducement that followed. Moreover, the government cannot claim the comment was inadvertent or misunderstood—Ms. Sassoon delivered the statement from prepared talking points. (Nov. 20, 2025 Tr. 185:21-186:5 (Sassoon)). This was a thoughtful, carefully considered statement that Ms. Bond and Mr. Salame relied upon in making the most important decision they jointly faced.

Ms. Bond's experienced counsel understood the government's statement exactly as intended: "I understood it to mean that if Mr. Salame took a plea, that they would cease investigating the part of the case that involved Ms. Bond." (Mar. 4, 2026 Tr. 141:4-6). She

4

testified:  "I took their statements to mean that an investigation into Ms. Bond would be concluded if Mr. Salame pled guilty" (Mar. 4, 2026 Tr. 229:15-20).  She later told the government that she and Mr. Linder were "taken aback" because they "had never seen an inducement like that dangled; and therefore, took it seriously."  (Bond 12).

The government also understood the import of its statement because, later, it felt the need to try to address it.  The evidence reveals a dispute as to when the government attempted to address the statement, its nature, and how seriously the government delivered it.  Ms. Sassoon testified that she clearly delivered a definitive statement, which she purports to have recorded in notes.  (Nov. 20, 2025 Tr. 154:15-156:19 (Sassoon)).  The cited notes do not support Ms. Sassoon's declaration of a definitive statement.  To the contrary, Ms. Parlovecchio testified that, at the end of a long call on May 5, the government delivered a "CYA" comment "in a passing manner" that Ms. Bond would be treated separately.  (Mar. 4, 2026 Tr. 145:24-146:2, 174:1-4 (Parlovecchio)).  Notably, despite the gravity of the alleged retraction, the government never memorialized it in any written communication to the defense.  Even if this statement about the cases being treated separately was said by the government on this call, this unremarkable statement does not live up to the purported definitive retraction that Ms. Sassoon claims to have made.

The government accuses Ms. Bond of lying by saying the walk back was made with a "wink and a nod."  (Opp. at 23).  But Ms. Bond's testimony substantively aligns with Ms. Parlovecchio's, which makes sense since Ms. Bond's information derives from what Ms. Parlovecchio conveyed.  The government's charge of dishonesty cannot be squared with the engagement letter sent by Mayer Brown on May 8, 2023, which discloses a conflict because "the federal prosecutors in the FTX matter have indicated that if Ryan accepts a plea agreement, they

will no longer have occasion to continue the portions of their investigation that might lead to federal criminal charges being brought against you." (Bond 3 at 1).

Regardless of what was said, by whom, and when, the government left Ms. Parlovecchio—an experienced former prosecutor and criminal defense attorney—with the distinct impression that it intended to honor its original inducement. The government invites the Court to ignore swaths of post-plea evidence and skews Ms. Bond's testimony by placing words in her mouth. [1] But these attempts at misdirection do not overcome the wealth of evidence documenting Ms. Parlovecchio's contemporaneous understanding.

Ms. Parlovecchio testified to being "surprised and upset" when the government resurfaced in April 2024. (Mar. 4, 2026 Tr. 155:22-156:7). She further testified that she and Mr. Linder thought the government was "going to honor the FTX team's indication that they were going to discontinue the investigation of her if he pled." (Mar. 4, 2026 Tr. 155:24-156:1). For nearly a year—from Mr. Salame's plea in September 2023 through April 2024—the government had allowed Ms. Bond and the defense to operate under the belief that the inducement remained in effect, never once taking any affirmative step to disabuse them of that understanding. On April 16, 2024, Ms. Parlovecchio reported to Ms. Bond on her call with the government, stating "we plan to raise the issue of the statements made by the FTX prosecutors that left us with the understanding that they were going to discontinue the part of their investigation relating to Ryan's payments to you during your congressional campaign if Ryan resolved his case through a plea." (Bond 10 at 1).

---

[1] [1] In its brief, the government employed the sleight of hand drafting technique of quoting itself and attributing those quotes to Ms. Parlovecchio. In some places, it "quotes" Ms. Parlovecchio, but the quotes are actually the government's own language from its questions on cross-examination. (*See, e.g.,* Opp. at 9). This sleight of hand creates the misleading impression that Ms. Parlovecchio said things and chose language that she did not. It is especially misleading in a case like this, where the language employed by the witness is of crucial importance.

On April 18, 2024, Ms. Parlovecchio and Mr. Linder told the government they were "alarmed" to hear the investigation remained ongoing and believed the government to be acting in bad faith. (Bond 12 at 1). In July 2024, they gave a proffer to supervisors at the United States Attorney's Office recounting the inducement and their belief that it remained in effect. (Bond 15 at 25-26). Ms. Parlovecchio later edited Mr. Salame's declaration for his coram nobis petition, confirming her understanding that the government intended to honor the inducement "without regard to whether it was aired in open court." (GX 14 at 16-17 (at ¶ 11 of the draft declaration and comment on the following page)).

There can be little serious dispute that the government made a deliberate, pre-planned statement tying Ms. Bond's treatment to Mr. Salame's plea. Having made that connection, the government bore the burden of clearly and unambiguously retracting it. *See Feldman*, 939 F.3d at 190 (observing that the government "may need to make clear" that prior commitments have been withdrawn and "may not be able to rely exclusively on omissions of prior undertakings and representations from the four corners of the written agreement as effective nullification of them.")

The government did not do so here. The lack of any written retraction, by way of e-mail or any correspondence with the defense, suggests the government never truly intended to convey a full retraction, thereby negating Ms. Bond's and her lawyers' continued reasonable reliance on the original inducement. Either way, the government's conduct left the defense—the lawyers, not just the defendant—with the clear impression that, if Mr. Salame pleaded guilty, the government would not pursue Ms. Bond. An inducement was made and not retracted. The government's undertaking must be enforced.

7

The government cannot rely on the boilerplate integration clause in Mr. Salame's plea agreement to excuse its failure to perform as to Ms. Bond because an integration clause is not dispositive of the question of whether an inducement was made nor a bar to its enforcement. A court's review of a plea agreement is not limited to the four corners of the written plea agreement and government inducements will be strictly construed against the government. *Feldman*, 939 F.3d at 189.

**II.    Ms. Bond can enforce the plea agreement as a third party beneficiary.**

The thrust of the government's argument is that because no court in this Circuit has ruled squarely on third-party beneficiaries, they must not be permissible.  This is a fallacy.  A lack of case law does not equate to a definitive rule.  And the government should question its own premise here, as the dearth of case law deciding the issue is likely driven by the government's tradition of standing by its inducements in plea negotiations, and approaching their obligations of good faith and fair dealing with the utmost seriousness and candor.  In all events, at least one court in this circuit recognizes possible third party standing.  The court in *Wright v. U. PO*, observed that only a defendant has a due process right to enforce a plea agreement, "with a possible exception in which a defendant enters into a plea agreement with the intent to benefit another (for instance, an agreement to plead guilty in exchange for a commitment to spare a spouse from prosecution)."  No. 10-CV-5127 (MKB), 2021 WL 2779451, at *18 (E.D.N.Y. July 2, 2021).

The government attempts to distinguish *Wright* and the other cases finding third party beneficiary status.  But distinguishing these cases on the facts misses the point.  Whatever the facts of those cases, they find that the government must honor its promises concerning third parties when it elects to tie the fate of that third party to a defendant's plea.  *See, e.g., United*

8

*States v. Florida West Int'l Airways, Inc.*, 853 F. Supp. 2d 1209, 1228-32 (S.D. Fla. 2012) (dismissing indictment where plea agreement conferred immunity on definable class of third parties); *United States v. El-Sadig*, 133 F. Supp. 2d 600, 609 (N.D. Ohio 2001) (dismissing indictment where defendant was third-party beneficiary of non-prosecution agreement); *United States v. Stolt-Nielsen S.A.*, 524 F. Supp. 2d 609 (E.D. Pa. 2007) (dismissing indictment against corporate officers where company's leniency agreement contained agreement not to prosecute directors, officers, and employees).

These cases have the better of the argument. If the government is permitted to leverage such coercive bargaining chips, it must be held to both the letter and spirit of such inducements. Such a rule further maintains and supports the government's obligation to be clear and unambiguous in its dealings with defendants. It was the government, not the defense, that chose to link Ms. Bond's fate to Mr. Salame's plea; having voluntarily drawn that connection as a bargaining tool, it cannot now disclaim the obligations that flow from it.

The government usually holds all the power in a plea negotiation. It has an obligation to be clear, unambiguous, and direct in its communications. The same holds true when it leverages a plea by making promises and inducements that impact a third party, especially in a case where the third party was integral to the negotiations in the first place. Ms. Bond has standing to enforce the plea agreement as a third party beneficiary.

**III.**     <u>Specific performance is the only remedy for the government's breach.</u>

Contrary to the government's claims, specific performance is not "unprecedented." (Opp. at 29). *See, e.g., Santobello*, 404 U.S. at 262-63 (recognizing specific performance as an available remedy for prosecutor's breach); *United States v. Knights*, 968 F.2d 1483, 1486 (2d Cir. 1992) ("Specific performance is an appropriate remedy for a prosecutor's breach of a plea

agreement."). The government contradicts itself in the very next sentence by observing that the appropriate remedy is to "enforce the bargain." (*Id.*). Exactly. The Court should enforce the bargain and dismiss the indictment, which is precisely the remedy ordered by other courts confronted with this same issue. *See, e.g., Stolt-Nielsen*, 524 F. Supp. 2d 609 (dismissing indictment where government breached immunity agreement); *El-Sadig*, 133 F. Supp. 2d 600 (dismissing indictment based on enforcement of non-prosecution agreement); *Florida West*, 853 F. Supp. 2d 1209 (dismissing indictment against third-party beneficiary of plea agreement). It is, in fact, the only remedy available to Ms. Bond.

IV.    **The government's due process argument**.

The government also weirdly argues against Ms. Bond's "standalone due process claims." (Opp. at 29). Ms. Bond does not make a "standalone due process claim," whatever that means. She does make a claim to vindicate her due process interests in enforcing the government's representation that it would not prosecute her if Mr. Salame pleaded guilty. *See Wright*, 2021 WL 2779451, at *21 (identifying third-party beneficiary rights to enforce a plea agreement as a "due process interest"). Further, "due process" is how the Supreme Court, this Circuit, and courts everywhere frame the relationship between prosecutors and defendants, particularly in plea negotiations. *See, e.g., Santobello*, 404 U.S. at 266-67 (Douglas, J., concurring) (framing the question of specific performance of a plea as an issue of due process); *United States v. Reyes-Arzate*, 91 F.4th 616, 622 (2d Cir. 2024) (construing plea agreements as contracts must be tempered by considerations of due process).

The government's failure to conduct plea negotiations in good faith is a violation of due process subject to redress by the Court. *United States v. Mozer*, 828 F. Supp. 208, 215 (S.D.N.Y. 1993) (emphasizing that the court's supervisory powers are designed to ensure that the

government observes the highest standards of integrity and honorable conduct in pleas).  Ms.

Bond's interest in and ability to enforce such an agreement is often framed as a "due process

interest."  *Wright*, 2021 WL 2779451, at *21.  Whatever other argument the government is

attempting to make is not grounded in any dispute between the parties.

V.    **The government's *ad hominem* attacks and attempts to insert inadmissible character
      evidence into this proceeding should be rejected**.

It is unfortunate that the government chose to resort to written name-calling rather than

litigating the issues before this Court fairly and professionally.  It repeatedly accuses Ms. Bond

of lying or fabricating evidence, calling her motion "inflammatory and dishonest."  It verges on

accusing her former and current counsel of lying or fabricating claims.  The Office doth protest

too much.  Their assertions are directly contradicted by the record, which shows Ms. Bond's

former counsel conveyed to her that the government made a critical representation that counsel

expected the Office would honor, consistent with its obligations.

In yet another desperate measure to distract rather than litigate fairly the issues presented

to the Court during extensive evidentiary hearing testimony and brief writing, on April 29, the

government filed a letter attempting to place into the record here comments by Judge Kaplan on

Mr. Salame's credibility in connection with a motion by Mr. Salame's co-defendant, Sam

Bankman-Fried.  In a laughable game of six degrees of separation completely inappropriate for

the serious context of a federal criminal case, and devoid of any basis in the Federal Rules of

Evidence or any norm known to current defense counsel, the government suggests this Court

should consider Judge Kaplan's evaluation of Mr. Salame's credibility as evidentiary or even

dispositive of Ms. Bond's motion.  The government's letter, packed with *ad hominem* claims of

fabrication and dishonesty, is the height of impropriety.  It is an obvious attempt to influence the

Court's assessment of the evidence and arguments based on findings by another judge on another

matter, only tangentially related to this one. Mr. Salame's credibility—good, bad, or indifferent—is not at issue before this Court. Ms. Bond does not substantively rest her case on any statement by Mr. Salame. To the contrary, the Court has access to hundreds of pages of documents and testimony from lawyers on both sides of the caption as well as Ms. Bond herself. Even if Mr. Salame's credibility were important, Judge Kaplan's opinion, expressed in passing as to a third defendant whose case is not before the Court, has no relevance and would never be admissible under the Rules of Evidence. The government's attempt to enlist Judge Kaplan as an out of court character witness is deeply improper and should be rejected by the Court. The defendant respectfully asks this Court to affirmatively rule it will not consider the government's April 29 letter in its assessment of this motion to dismiss and order the letter stricken from the case docket.

## CONCLUSION

The government obtained a guilty plea from a reluctant defendant by dangling the greatest of all inducements—safety for a loved one. The government delivered that inducement deliberately; it knew the import of those statements. If that were not the case, it would not have attempted to address the statements later. Had the government truly desired to retract those statements then it had an obligation to do so clearly, unambiguously, and without prevarication. It clearly failed. Whatever oral statement the government made, it was neither clear nor unambiguous because experienced counsel retained the distinct impression that the government intended to honor the inducement. It certainly never made any attempt to convey its intentions in writing. The government bears the obligation to be clear and shoulders the risk of ambiguity. The government deliberately tied Ms. Bond to Mr. Salame's plea, conferring on her third-party beneficiary status but failed to follow through. It failed to act with the utmost good faith

12

required of the government in plea negotiations.  The indictment against Ms. Bond should be dismissed.

Dated: May 1, 2026
       New York, New York

                          **DUANE MORRIS LLP**

                          ____/s/ *Melissa S. Geller*_____

                          Eric R. Breslin, Esq.
                          200 Campus Drive, Suite 300
                          Florham Park, NJ 07932
                          Tel: (973) 424-2000
                          erbreslin@duanemorris.com

                          Stephen Holbrook Sutro
                          One Market, Spear Tower, 20th Floor
                          San Francisco, CA 94105
                          Tel: (415) 371-2200
                          shsutro@duanemorris.com

                          Melissa S. Geller
                          22 Vanderbilt
                          335 Madison Avenue, 23rd Floor
                          New York, New York 10017
                          Tel: (212) 692-1000
                          msgeller@duanemorris.com

                          CAHILL GORDON & REINDEL LLP
                          Edward C. O'Callaghan
                          900 16th Street, N.W., Suite 500
                          Washington, D.C. 20006
                          Tel: (202) 862-8970
                          eocallaghan@cahill.com

13