**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

             -against-

MICHELLE BOND

                   Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

         MEMORANDUM DECISION AND

                 ORDER

             24 Cr. 494 (GBD)

**GEORGE B. DANIELS, United States District Judge:**

Defendant Michelle Bond is charged with (1) one count of conspiracy to cause unlawful political contributions, (2) one count of causing and accepting excessive campaign contributions; (3) one count of causing and receiving an unlawful corporate contribution; and (4) one count of causing and receiving a conduit contribution. (Indictment ("Ind."), ECF No. 1.) Before this Court is Bond's motion to dismiss the Indictment.[1] (Def.'s Motion to Dismiss, "Mot.", ECF No. 38; Mem. in Supp. of Mot., ECF No. 39, "Mem."; Mem. in Supp. Of Mot., ECF No. 97, "Updated Mot.".) Bond's motion to dismiss the Indictment is DENIED.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Bond's pending motion to dismiss involves two separate but overlapping criminal investigations into Defendant Michelle Bond and related Defendant Ryan Salame. (*See United States v. Bankman-Fried*, 22 Cr. 673 (LAK), "Salame Dkt.".)

This Court held three evidentiary hearings in this case for the purposes of resolving Bond's motion to dismiss. Bond testified on October 16, 2025, the Government called former United

---

[1] This is Bond's second round of briefing for the motion to dismiss the Indictment. Bond's original motion asked this Court to: (1) suppress certain evidence; (2) conduct a hearing; and (3) dismiss Count Four of the Indictment. (*See* ECF No. 38.) At this stage, however, Bond moves to dismiss the Indictment in its entirety and abandons all other arguments. (*See* ECF Nos. 97, 105.) All of Bond's pending motions are denied in their entirety.

States Attorney Danielle Sassoon on November 20, 2025, and Bond called her former defense counsel, Gina Parlovecchio, on March 4, 2026. (10/16/2025 ECF Entry; 11/20/2025 ECF Entry; 03/04/2026 ECF Entry.) Salame did not testify. The following factual findings, compiled from the docket and evidentiary hearings, detail the relevant chronological events in both investigations.[2]

Bond is an attorney and former consultant for the cryptocurrency exchange FTX (the "Exchange"). (Eric Breslin Decl. in Supp. of Bond's Mot., ECF No. 40, Ex. A, "Breslin Decl." ¶ 10.) Salame was a former high-level executive of the Exchange, and the CEO of a subsidiary of the Exchange based in the Bahamas, FTX Digital Asset Markets (the "Subsidiary"). (Mem. at 4.) Bond met Salame through consulting for FTX in 2021. (Breslin Decl., Ex. A, ¶ 11.) Bond and Salame became involved romantically, purchasing a home together in 2022, and marrying in 2024. (Mem at 4; Breslin Decl., Ex. A, ¶¶ 1,13.)

In the summer of 2022, Bond entered the Republican primary election for New York's First Congressional District. (Id. at ¶ 14.) Bond's campaign was less than eight weeks long. (Mem. at 5.) Bond received campaign contributions, including a $400,000 wire transfer, from Salame through an agreement to have Bond on the Subsidiary's payroll. (Ind. ¶¶ 1, 10, 13.)

In 2023, Salame became a subject in the highly publicized prosecution against the Exchange and its founder Sam Bankman-Fried. (See generally Salame Dkt.) The U.S. Attorneys involved in the FTX prosecution (the "FTX Team") included Danielle Sassoon, Andrew Rohrbach, Danielle Kudla, Nathan Rehn, Nicholas Roos, and Samuel Raymond. (Sassoon November 20, 2025 Evidentiary Hearing Tr., ECF No. 85, "Sassoon Tr." at 179:22–25, 185:11.)

---

[2] See United States v. Ventura, 96 F.4th 496, 502 (2d Cir. 2024) ("Where a criminal defendant moves to dismiss an indictment due to alleged government misconduct, 'conducting a hearing is the preferred course of action' if 'disputed factual issues exist.'") (citations omitted). Moreover, "[i]n considering a motion to dismiss, the Court relies on the Indictment and accepts the allegations of the Indictment as true." United States v. Heicklen, 858 F. Supp. 2d 256, 261 (S.D.N.Y. 2012).

At the time, Salame and Bond were represented by the same lawyers: Jason Linder and Gina Parlovecchio from Mayer Brown LLP (together, the "Joint Defense Attorneys"). (Supplement to Engagement Letter for Salame, Def. Ex. 2, "Salame Supp. Ltr."; Supplement to Engagement Letter for Bond, Def. Ex. 3, "Bond Supp. Ltr.".)

### 1) The April 28, 2023 Meeting

On April 28, 2023, the FTX Team initiated a video conference with the Joint Defense Attorneys (the "April 2023 Meeting"), shortly after the Federal Bureau of Investigation ("FBI") executed judicially-authorized search warrants at Bond and Salame's joint residence in Maryland. (Sassoon Tr. at 175:23–176:12; Parlovecchio March 4, 2026 Evidentiary Hearing Tr., ECF No. 95, "Parlovecchio Tr.", at 139:15–140:10.)   Both parties memorialized the meeting with contemporaneous notes.   (Gov. Ex. 1, "2023.04.28 Gov. Meeting Notes"; Gov. Ex. 16, "2023.04.28 Def. Meeting Notes".)  The purpose of this call was to identify areas of exposure or where the FTX Team had uncovered criminal conduct.  (2023.04.28 Def. Meeting Notes at 1.) The FTX Team informed the Joint Defense Attorneys that Salame was the subject of an active and ongoing investigation, and that they expected to seek authorization to indict Salame and wanted to suggest a potential pre-indictment guilty plea.  (Id.)  The Joint Defense Attorneys agreed to discuss it with Salame.  (2023.04.28 Gov. Meeting Notes at 2.)

The FTX team also informed the Joint Defense Attorneys that Bond's status in the investigation had "shifted," "meaning to the extent before she was viewed more as a witness, at this point she was a subject of [the] investigation."  (Id.; Sassoon Tr. at 146:4–6.)  The FTX Team asked Defense Attorney Linder if he was going to continue to represent both Bond and Salame. (2023.04.28 Def. Meeting Notes at 2.)  Linder replied that he was "still digesting" and "[didn't] know."  (2023.04.28 Gov. Meeting Notes at 2; 2023.04.28 Def. Meeting Notes at 2.)  At the culmination of the call, then-U.S. Attorney Sassoon told Linder the following: "Without making

promises outside the four corners of the plea agreement, but as is often the practice here, if we do reach a resolution, we expect that we will conclude the aspects of our investigation that concern RS (Ryan Salame), but not SBF (Sam Bankman-Fried)." (2023.04.28 Gov. Meeting Notes at 2.)

Gina Parlovecchio testified at the evidentiary hearing that Sassoon appeared to be "reading from a set of written talking points throughout the call" and that "it seemed considered and thought through, not like an off-the-cuff-comment." (Parlovecchio Tr. at 140:16–20, 229:15–20.) Parlovecchio was "taken by surprise" at the statement, (*id.* at 229:15–20), and took the statement to mean the following:

> that if Mr. Salame took a plea, that they would cease investigating the part of the case that involved Ms. Bond because the only part of the investigation into Mr. Salame that didn't involve Sam Bankman-Fried was in fact this campaign finance area of conduct that related to Ms. Bond.

(*Id.* at 141:4–9.)

On cross examination, however, Parlovecchio testified that she did not believe Sassoon's statement was a promise — "by using the word 'offer,' it was not promised, it was an indication that [this] is something they would consider doing." (*Id.* at 206:6–8; *see also id.* at 227:13 ("There was no promise, so no there was not a breach.").)

After the call, the Joint Defense Attorneys informed Bond that the FTX team "had been careful not to promise but they did convey that if Ryan pled guilty, that they would conclude the aspect of the investigation that concerned her." (*Id.* at 144:11–15.) The Joint Defense attorneys "also conveyed that [they] were surprised that [the FTX Team] made that comment because it was unusual." (*Id.*) This was the first time that Bond "heard of the existence of an investigation into [Bond] personally, as opposed to Mr. Salame." (Bond 10/16/2025 Evidentiary Hearing Tr., ECF No. 82, "Bond Tr." at 39:14–17.)

4

### 2) The May 5, 2023 Meeting

The parties had a second meeting on May 5, 2023, memorialized by both parties' contemporaneous notes. (Gov. Ex. 26, "2023.05.25 Gov. Meeting Notes"; Def. Ex. 34, "2023.05.25 Def. Meeting Notes".) In this meeting, the Joint Defense Attorneys informed the FTX Team that they would continue to represent both Bond and Salame. (2023.05.25 Def. Meeting Notes at 1.) Sassoon clarified that she "had not received authorization to give any type of offer, meaning in this case[,] charges had to be approved by supervisors, and [they] had not received approval from any supervisor to make any specific plea offer." (Sassoon Tr. at 152:12–19.) Sassoon made this statement "out of an abundance of caution, for clarity." (*Id.*) The rest of the meeting, about "95% of the conversation," pertained to a potential resolution in Salame's case. (Parlovecchio Tr. at 142:17–143:12.)

That same day, Bond texted Linder asking for an update. (Def. Ex. 25, "2023.05.25 Bond Status Inquiry".) She asked if the Government would be "rescinding on their offer" of a potential plea for Salame and to end her investigation if Salame pled guilty. (*Id.*) Linder, however, responded, "I don't think their stance has changed, but I also don't know for sure." (*Id.*)

On May 8, 2023, the Joint Defense Attorneys gave Bond and Salame supplemental engagement letters to "make sure that they were apprised of the potential conflict that could arise from that scenario" and "understood the potential conflict and were making a full and knowing waiver." (Parlovecchio Tr. at 146:8–147:9.) Both letters noted that if Salame accepted a plea agreement, the Government would no longer have occasion to continue the portions of their investigation that might lead to federal criminal charges against Bond. (Salame Supp. Ltr.; Bond Supp. Ltr.) The letters also noted that the "prosecutors have said they will not put this position in writing, including in any plea agreement" with Salame. (*Id.*) Both Bond and Salame signed their respective engagement letters. (*Id.*)

### 3) The May 25, 2023 Meeting

On May 25, 2023, the FTX Team scheduled an additional call with the Joint Defense Attorneys (the "2023.05.25 Meeting"), memorialized by the Government's contemporaneous notes. (Gov. Ex. 3, "2023.05.25 Gov. Meeting Notes".) The Joint Defense Attorneys did not take notes of the call.

Sassoon scheduled this meeting to "make clear that [the FTX Team] view[s] Ryan and Michelle as separate" and that resolution of Salame's case will not bear on the investigation of Bond's conduct. (2023.05.25 Gov. Meeting Notes.) Sassoon's testimony indicates that Sassoon made this statement: "just to be extremely diligent, and out of an abundance of caution, I wanted to spell out in no uncertain terms that if we reached a resolution as to Ryan, that would not end the investigation into Michelle, even though they had some overlapping criminal conduct." (Sassoon Tr. at 155:5–23.)

Linder told Sassoon that he "understood," but brought up the April 28, 2026 meeting where Sassoon "had said no promises outside of the plea agreement, but the plea will generally resolve investigation into Ryan's conduct that doesn't involve Sam." (Id.) Linder "appeared to be expressing some confusion or ambiguity," seeming to believe that Sassoon's previous indication about Salame's guilty plea was an implicit end to Bond's investigation. (Id. at 155:24–156:4.) Despite Linder's confusion, however, Linder "indicat[ed] that he understood [Sassoon's] clarification." (Id.) Sassoon again reiterated the following: "[I]n light of that conversation, meaning the conversation in April, I wanted to make very clear that we view discussions of Michelle and Ryan as separate. A Ryan disposition will not resolve an investigation of Michelle's conduct[,] and to the extent anything previously said was understood otherwise, that [is] superseded by this phone call." (Id. at 156:5–13.) Linder responded, "got it." (Id.)

6

Parlovecchio did not recall the conversation enumerated in the Government's notes of the meeting. (Parlovecchio Tr. at 230:17–24.) Instead, Parlovecchio testified that Sassoon made this statement of clarification in the May 5, 2023 meeting, as opposed to the May 25, 2023 meeting. (Parlovecchio Tr. at 145:16–20.)[3]  Parlovecchio testified that the May 25, 2023 call was "exclusively about Mr. Salame" and "nothing about Ms. Bond." (*Id.* at 230:8–16.)

### 4) May 2023–August 2023: Bond's Continuing Investigation

After the May calls, Bond was "really uncomfortable" that the FTX Team would not put in writing their assurance about not investigating her if Salame plead guilty. (Bond Tr. at 58:6–17.) The Joint Defense Attorneys, "at each step of the way," reassured Bond likely over "50 times" that "this is how these deals are done. This is how they're made. They're not putting it in writing, and the deals the deal, and the government would honor it." (*Id.*)

On August 24, 2023, Linder reiterated in text messages to Bond that although Salame's plea agreement would not explicitly mention Bond, he continued to believe that the Government would stop investigating Bond if Salame plead guilty, stating the following:

> I believe they want to be done with Ryan after this plea and do not intend, absent a meaningful shift in the evidence, to further investigate or prosecute him for anything. I also believe that they plan to leave you alone if Ryan pleads, in part because it would be difficult to imagine they'd want to charge you for transactions for which they're giving him a total pass.

(Def. Ex. 28, "2023.08.24 Bond Status Inquiry," at 3.)

---

[3] This statement is not found in either parties meeting notes for May 5, 2023. (*See* 2023.05.05 Gov. Meeting Notes; 2023.05.05 Def. Meeting Notes.) Instead, both Sassoon's testimony and the Government's meeting notes reflect that this statement was made on May 25, 2023. (*See* 2023.05.25 Gov. Meeting Notes; Sassoon Tr. 153:22–155:9.)

### 5) September 2023: Salame's Guilty Plea

On September 5, 2023, the FTX Team transmitted Salame's plea agreement to the Joint Defense Attorneys. (Sassoon Tr. at 157:9–12.) The plea agreement contained a standard integration clause:

> Apart from any written Proffer Agreement(s) that may have been entered into between this Office and defendant, this Agreement supersedes any prior understandings, promises, or conditions between this Office and the defendant. No additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

(Gov. Ex. 4, "Salame Plea Agreement", at 7.)

Two days later, on September 7, 2023, Salame and the Joint Defense Attorneys reviewed the plea agreement together and signed it. (*Id.*) Salame waived indictment and was subsequently arraigned before Judge Kaplan and charged by information with one count of conspiracy to make unlawful political contributions and defraud the FEC, in violation of 18 U.S.C. § 371 and 52 U.S.C. §§ 30118, 30109(d)(1)(A) & (D), and 30122; and one count of conspiracy to operate an unlicensed money transmitting business, in violation of 18 U.S.C. §§ 371 and 1960. (Salame Dkt., ECF No. 262, "Salame Ind.") Salame pled guilty to both counts pursuant to the signed plea agreement with the Government.

During Salame's plea allocution, Salame answered various questions under oath. For example, when asked by Judge Kaplan whether "anyone offered you any inducements or threatened you or anyone else, or forced you in any way to plead guilty," Salame answered: "No, your Honor." (Salame Dkt., ECF No. 283, "Salame Plea Tr.", at 18–19.) When asked if "anyone made any promises other than whatever is set forth in the plea agreement that induced you to plead guilty?," Salame again answered: "No, your Honor." (*Id.* at 19.) Even though Salame was accompanied by his lawyers, neither Joint Defense Attorney sought to supplement or correct the

8

record. (Parlovecchio Tr. at 221:4–13.) Parlovecchio testified that this was because Mr. Salame's answer was correct. (*Id.* at 221:14–16.) Sassoon similarly testified that Salame's sworn answers to the Court were accurate. (Sassoon Tr. at 164:1.)

### 6) **January 2024: Mayer Brown Memorandum**

On January 29, 2024, the Joint Defense Attorneys sent Salame a memorandum regarding a potential motion for Salame to withdraw his guilty plea via a *coram nobis* petition. (Gov. Ex. 15, "Defense Memo to Salame".) The memo stated the following:

> AUSA Danielle Sassoon explained that to resolve their investigation into your conduct, they would expect you to plead to a felony offense, and if you did so, then the SDNY would cease their investigation of other conduct unrelated to FTX, which we understood as an implicit threat to sway you into pleading guilty in exchange for SDNY stopping its further investigation of campaign finance violations by Ms. Bond. Several days later in a subsequent phone call . . . AUSA Nicholas Roos retreated from this statement and clarified that the two matters—*i.e.*, your potential guilty plea and their investigation of events involving Ms. Bond's campaign— were not connected.

(*Id.* at 2.) Parlovecchio testified as to the accuracy of the memo and statements. (Parlovecchio Tr. at 213:2–215:19.)

### 7) **April 2024-July 2024: Bond's Criminal Investigation and Salame's Sentencing**

On April 15, 2024, seven months after Salame pleaded guilty, the Government emailed the Joint Defense Attorneys seeking "to get on a phone call to discuss the status of [Bond's] investigation." (Breslin Decl., Ex. D at 4.) Parlovecchio responded that the Joint Defense Attorneys were surprised to hear from the Government "given [their] course of dealing with the FTX prosecution team, which led [them] to believe that this matter was not going to be pursued." (Breslin Decl., Ex. D at 5.)

9

That same day, the Joint Defense Attorneys communicated with Bond the following:

> We are doing research, Michelle. I've also laid out for you in our last call the lay of the land: they were careful not to promise, there is an integration clause in the plea agreement, Ryan testified under oath that there was no other promise, inducement, etc. that led him to plead guilty. And, even if none of that was true, there would be nothing anyone could do to stop an investigation. The goal will be to use whatever we can from this shitty thing they've done and are apparently are doing to persuade them not to charge you. We are gathering the best arguments (through legal research) we can and will think how and when best to raise with them.

(Gov. Ex. 13, "2024.04.15 Texts Between Joint Defense Attorneys and Bond", at 5.)

On April 16, 2024, the Joint Defense Attorneys emailed Bond, letting Bond know the following:

> First, before we speak with the AUSAs, we wanted to assure you that in our first conversation with them we plan to raise the issue of the statements made by the FTX prosecutors that left us with the understanding that they were going to discontinue the part of their investigation relating to Ryan's payments to you during your congressional campaign if Ryan resolved his case through a plea . . . . as a legal matter, the case law we found indicates that this may not be our strongest argument, but as a matter of equity, we feel strongly that we should press this issue.

(Def. Ex. 10, "2024.04.16 Email".)

On April 18, 2024, the Government and Joint Defense Attorneys had a phone call regarding Bond's investigation. (Def. Ex. 12, "2024.04.18 Emails".) AUSA Sebastian Swett stated on the call with the Joint Defense Attorneys that there was a call on May 25, 2023, Sassoon "walked back what she had previously stated and said that anything she had said earlier was superseded." (*Id.* at 2.) The Joint Defense Attorneys summarized the meeting and emailed Bond on the same day. Despite their previous correspondence with Salame about a potential *coram nobis* petition, the Joint Defense Attorneys told Bond that they "thought the [FTX Team] had stopped investigating until receiving their message this week." (*Id.* at 1.)

10

On May 28, 2024, Salame appeared before Judge Kaplan for sentencing. (Salame Dkt., 05/28/2024 ECF Entry.) Salame did not attempt to withdraw his plea during sentencing, nor did he bring up the Government's alleged representation to not prosecute Bond. (Salame Dkt., ECF No. 448, "Salame Sentencing Tr.".) The Joint Defense Attorneys were similarly aware of the Government's ongoing investigation into Bond, but also did not bring up the issue to Judge Kaplan during sentencing. (*See generally id.*) Judge Kaplan sentenced Salame to 90 months' imprisonment. (*Id.* at 24:5–13.) Salame was "not happy" with the sentence, posted on social media site "X," and hired new counsel. (Parlovecchio Tr. at 224:15–225:2.)

Meanwhile, the Joint Defense Attorneys and FTX Team continued to communicate about Bond's investigation from May 20, 2024 until July 30, 2024. (Breslin Decl., Ex. D; Gov. Ltr. Re: Hearing, ECF No. 65, "Exhibit D".)

### 8) August 2024 – September 2024: Bond's Indictment and Salame's *Coram Nobis* Petition

On August 19, 2024, a federal grand jury returned a sealed Indictment charging Bond. (Ind. at 13.) Two days later, on August 21, 2024, Salame filed a petition for *coram nobis*, seeking to dismiss the indictment of Bond or alternatively Salame's conviction. (Salame Dkt., ECF No. 470, "Salame *Coram Nobis* Pet.".) Salame also submitted a sworn declaration under oath, arguing the same. (Salame Dkt., ECF No. 471, "Salame *Coram Nobis* Decl.".) Bond's Indictment was unsealed the following day, on August 22, 2024. (ECF No. 3, "Order to Unseal Ind.".)

One week later, on August 29, 2024, Salame sought to withdraw his *coram nobis* petition without prejudice.[4] (Salame Dkt., ECF No. 484, "Salame Withdrawal"; Salame Dkt., ECF No. 503, "Salame *Coram Nobis* Hearing Tr.", at 17.) Judge Kaplan held a hearing on Salame's

---

[4] There is inconsistency in the record regarding the withdrawal of Salame's *coram nobis* petition. The initial letter requested withdrawal without prejudice, while the hearing transcript indicates Salame's lawyers requested withdrawal with prejudice. (Salame Withdrawal; Salame *coram nobis* Hearing Tr. at 17.)

withdrawal of his *coram nobis* petition on September 12, 2024. (Salame Dkt., ECF No. 503, "Salame Withdrawal Tr.".) In this hearing, Salame confirmed that he never directly spoke to the Government, but that his lawyers communicated the government's "assurance" that they would not prosecute Bond. (Salame Withdrawal Tr. at 7:18–9:14.) Salame also stated that he lied under oath in his change of plea proceeding by telling the Court that no one had "made any promises, other than whatever is set forth in the plea agreement, that induced [him] to plead guilty. (*Id.* at 10:7–19.) Salame was aware that the Government's assurance "had been walked back over a year earlier," but did not mention the Government's "walk back" in his declaration. (*Id.* at 16:19–17:1.) Salame's lawyers told Judge Kaplan that they would not "assert these allegations or seek relief based upon them in any court." (*Id.* at 17:22–23.)

On September 17, 2024, Bond was arraigned on the Indictment and entered a plea of not guilty on all counts. (09/17/2024 ECF Entry.)

### 9)  May 2025 – Present: Bond's Motion to Dismiss

On May 7, 2025, Bond filed the instant motion to: (1) suppress certain evidence; (2) conduct a hearing; and (3) dismiss Count Four of the indictment. (Mot.; Mem.) The Government opposed on June 5, 2025. (Gov.'s Mem. in Opp., ECF No. 43, "Opp.".) Bond replied on June 19, 2025. (Def.'s Reply, ECF No. 44, "Reply".) This Court heard oral argument on July 22, 2025. (07/22/2025 ECF Entry.)

This Court GRANTED Bond's request for an evidentiary hearing, and held hearings on the motion on October 16, 2025, November 20, 2025, and March 4, 2026. (10/16/2025 ECF Entry; 11/20/2025 ECF Entry; 03/04/2026 ECF Entry.) Bond testified on October 16, 2025, Sassoon testified on November 20, 2025, and Parlovecchio, because of an accident, was not physically able to testify until March 4, 2026. (*Id.*)

At the culmination of the evidentiary hearings, the parties submitted an updated briefing schedule on the motion. (ECF No. 92, "Briefing Schedule".) Bond filed an updated memorandum in support of the motion to dismiss on March 27, 2026. (Updated Mot.) The Government opposed on April 21, 2026. (Gov.'s Mem. in Opp., ECF No. 100, "Updated Opp.".) Bond replied on May 1, 2026. (Def.'s Reply, ECF No. 105, "Updated Reply".) Before this Court is Bond's fully briefed remaining motion to dismiss.

## II. APPLICABLE LAW

"The dismissal of an indictment is an 'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights." *United States v. Cohen*, No. 23-CR-134 (VSB), 2025 WL 3687502, at *2 (S.D.N.Y. Dec. 19, 2025). The party alleging a breach of a plea agreement bears the burden to prove the breach by a preponderance of the evidence. *United States v. Alexander*, 901 F.2d 272, 273 (2d Cir. 1990).

## III. BOND'S MOTION TO DISMISS THE INDICMENT IS DENIED

Bond's motion to dismiss the Indictment is primarily based on a statement made by then-AUSA Sassoon on the April 28, 2023 Meeting, where Sassoon stated, "without making promises outside the four corners of the plea agreement," that the Government expected that Salame's guilty plea would "conclude the aspects of [the] investigation that concern RS (Ryan Salame), but not SBF (Sam Bankman-Fried)." (2023.04.28 Gov Meeting Notes at 2.) Bond argues that the Indictment against her should be dismissed because the Government "fail[ed] to comply with Mr. Salame's plea agreement" by inducing Salame to plead guilty in exchange for an offer to not prosecute Bond. (Mem. at 10; Updated Mot. at 11.)

### 1) The Government did not Breach Salame's Plea Agreement

Government conduct in negotiating plea agreements must "comport[] with the highest standard of fairness." *United States v. Feldman*, 939 F.3d 182, 189 (2d Cir. 2019). Because such

agreements involve waivers of fundamental constitutional rights, "prosecutors are held to meticulous standards of performance." *Id.* Therefore, "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York*, 404 U.S. 257, 262 (1971). In keeping with these general principles, a Court determines whether a plea agreement has been breached by looking to the reasonable understanding of the parties and by resolving any ambiguities against the Government. *In re Altro*, 180 F.3d 372, 375 (2d Cir. 1999). "A defendant is deprived of due process when the government breaches a plea-agreement provision on which the defendant relied 'in any significant degree' when entering the guilty plea." *United States v. Doyle*, 545 F. App'x 73, 75 (2d Cir. 2013).

The evidence compiled, including three days of hearings, undisputably indicates that the Government did not promise to not prosecute Bond in exchange for Salame's guilty plea. Parlovecchio admitted as much under oath — testifying that, regardless of what discussions were had, she did not believe Sassoon's statement was a promise at the time it was made. Parlovecchio stated that the Government's use of the word "offer" "was an indication that this is something they would consider doing," (Parlovecchio Tr. at 206:6–8), but ultimately, "[t]here was no promise, so no there was not a breach." (Parlovecchio Tr. at 227:13.) Bond's attorneys also communicated to Bond that the FTX team "had been careful not to *promise*[,] but they did convey that if Ryan pled guilty, that they would conclude the aspect of the investigation that concerned her." (*Id.* at 144:11–15 (emphasis added).)

Parlovecchio testified that the Joint Defense Attorneys believed that the Government's statement constituted some sort of "wink and nod" promise from the Government, which they frequently communicated to Bond. But the Government subsequently denied such a promise before Salame pled guilty. The Government is not "permanently bound by everything it says in

14

the course of plea negotiations." *Feldman*, 939 F.3d at 190. Instead, if the Government "wishes to retract promises and representations earlier made, it is free to do so" so long as the Government "make[s] clear to the defendant that prior commitments have been withdrawn." *Id.* Here, Parlovecchio's recollection of the May 5, 2023 meeting with the Government was as follows: "after a lengthy discussion of Mr. Salame's plea arrangement" the Government "want[ed] to clarify one thing, that going forward Mr. Salame and Ms. Bond will be treated separately." (Parlovecchio Tr. at 145:16–20.) Sassoon's testimony and the Government's meeting notes reflect such a statement was made later, on May 25, 2025, but the substance of the statement remains the same — the Government clearly disavowed any indication that Bond was immune from prosecution prior to Salame's guilty plea. (Sassoon Tr. at 153:22–155:9; 2025.05.25 Gov. Meeting Notes.)

Bond argues that the Government's retraction, regardless of its timing, was so "half-hearted" and "vague" that "it hardly registered at all with Mr. Salame and Ms. Bond's attorneys." (Updated Mot. at 12–13.) This argument is wholly unsupported by the evidence. Parlovecchio testified that she had "no doubt" that the Government "decoupled the Bond matter and the Salame matter" and that the "two matters would proceed separately" by May of 2023. (Parlovecchio Tr. at 197:3–12.) Furthermore, the Joint Defense Attorneys authored a memo to Salame in January 2024 similarly acknowledging that the Government had "clarified their position that the two matters — *i.e.*, [Salame's] potential guilty plea and their investigation of events involving Ms. Bond's campaign — were not connected." (Defense Memo to Salame at 2.) Any argument to the contrary is unsupported by the testimony under oath and as set forth on the record.

Moreover, Salame's written plea agreement explicitly "supersede[d] any prior understandings, promises, or conditions between this Office and the defendant." (Salame Plea Agreement at 7.) And in Salame's plea allocution, Salame assured Judge Kaplan that no one had made any promises other than whatever was set forth in the plea agreement that induced him to

plead guilty. (Salame Plea Tr. at 19.) Bond is correct that this Court's analysis should not be limited to the four corners of the plea agreement, integration clause or otherwise. *United States v. Graves*, 374 F.3d 80, 84 (2d. Cir. 2004); *Feldman*, 939 F.3d at 190. However, when "the Government incorporates into the plea agreement an integration clause expressly disavowing the existence of any understandings other than those set forth in the plea agreement, a defendant may not rely on a purported implicit understanding in order to demonstrate that the Government is in breach." *Altro*, 180 F.3d at 376. The evidence indicates any alleged understanding that Bond would be immune from prosecution was unjustifiably implicit and unilateral.

Taking the entirety of the record before this Court, along with the plain text of the written plea agreement, this Court finds that no reasonable party would believe that Salame's guilty plea guaranteed immunity from prosecution for Bond. *In re Altro*, 180 F.3d at 375. Indeed, the record does not support an argument that there were representations by the Government upon which Salame could rely on as motivation for his guilty plea. Sassoon's statement during preliminary negotiations was clearly not a promise. Further, even if the Joint Defense Attorneys misunderstood Sassoon's prior statement to be a promise, the Government subsequently made clear that no such promise existed prior to Salame's guilty plea. Bond's attorney repeatedly acknowledged that fact under oath before this Court, meaning that aa parties were aware that Bond and Salame were being investigated separately.

Accordingly, Bond's counsel's false hope based off of the Government's cursory statement is insufficient to constitute a breach of Salame's plea agreement by the Government.

### 2) Bond Lacks Standing to Enforce Salame's Plea Agreement

Due Process requires that "when the government breaches a plea agreement, a defendant's remedy is either specific performance of the plea agreement or an opportunity to withdraw his guilty plea." *United States v. Alexander*, 869 F.2d 91, 94 (2d Cir. 1989) (*citing Santobello*, 404

U.S. at 262–63. Here, Bond is asking for specific performance, arguing that she should be able to benefit from the Government's alleged breach as a "third-party beneficiary" of Salame's plea agreement. (Updated Mot. at 13–16.)

Even if the Government had breached Salame's plea agreement, Bond is unable to use Salame's plea agreement to dismiss her own indictment in this unrelated criminal proceeding. Generally, "only the pleading defendant possesses a due process interest in prosecutors' adherence to the plea agreement," and "[n]on-parties to the agreement suffer no due process deprivation as a result of a breach of another defendant's plea agreement." *Wright v. U. PO*, No. 10 Civ. 5127 (MKB), 2021 WL 2779451, at *18 (E.D.N.Y. July 2, 2021); *see also Santobello v. United States*, No. 95 Civ. 4404, 1998 WL 113950, at *3 (S.D.N.Y. Mar. 12, 1998) ("[T]here is little known authority that would allow [a defendant] to enforce [another defendant's plea] agreement[] as a third party beneficiary").

Bond cites dicta in *Wright* to argue that there is "a *possible exception* in which a defendant enters into a plea agreement with the intent to benefit another (for instance, an agreement to plead guilty in exchange for a commitment to spare a spouse from prosecution)." *Wright,* 2021 WL 2779451, at *18 (emphasis added). Although the case law in this Circuit is sparse, this Court does not find that Bond's situation here constitutes an exception that would allow this Court to consider her a third party beneficiary of Salame's plea agreement.

Individuals who are not parties to a contract may enforce its terms only when the original parties intended the contract to directly benefit them as third parties. *See* Restatement (Second) of Contracts § 304 (1979); *Holbrook v. Pitt,* 643 F.2d 1261, 1270 (7th Cir.1981) ("Under settled principles of federal common law, a third party may have enforceable rights under a contract if the contract was made for his direct benefit."). The evidence here does not reflect that Salame, nor the Government, intended for Bond to benefit from the plea agreement. Salame signed a plea

17

agreement denying any such promise by the Government and repeatedly testified under oath that no such promises had been made to him. (*See generally* Salame Plea Agreement at 7.; Salame Sentencing Tr.; Salame Plea Tr. at 19.) Upon withdrawing his *coram nobus* petition before Judge Kaplan, Salame abandoned his claim.

Moreover, the non-binding cases that Bond cites in support of her argument are inapposite to the circumstances here. Various cases involved written contracts that contained explicit clauses that promised the Government would not prosecute certain individuals. *See United States v. Stolt-Nielsen*, 524 F. Supp. 2d 609, 613-14 (E.D. Pa. 2007) (holding that the employee defendant was a third-party beneficiary of an agreement which promised to not prosecute "directors, officers, and employees"); *see also United States v. Florida West International Airways, Inc.*, 853 F. Supp. 2d 1209, 1214-16 (S.D. Fla. 2012) (holding that the employee defendant was a third-party beneficiary of an agreement that stated the "United States will not bring criminal charges against any current or former director, officer, or employee"). The case cited with oral representations involved disputes as to ambiguous terms within the oral representations. *See United States v. El-Sadig*, 133 F. Supp. 2d 600, 602 (N.D. Ohio 2001) (holding that a defendant was a third-party beneficiary of an oral non-prosecution agreement that was unclear in its scope of who constituted a "Saudi national").

Here, there is no ambiguity as to the scope of the written plea agreement's literal terms, which do not mention Bond or anyone else other than Salame. Nor is there any ambiguity as to the Government's alleged oral "promise" to not prosecute Bond. As the evidence made clear, all parties, including the defendants and their counsel, were aware that the Government had not promised Bond's immunity by the time Salame entered his guilty plea. Because there is no evidence that the parties intended to confer a benefit on Bond within the terms of the plea

agreement, Bond's argument that she should benefit as a third-party beneficiary of Salame's plea agreement is without merit, and Bond's motion fails on these additional grounds.

## IV. CONCLUSION

Bond provides no reason for this Court to dismiss the Indictment against her. Accordingly, Bond's motion to dismiss the Indictment is DENIED. The Clerk of Court is directed to close the open motions at ECF Nos. 38 and 72. The status conference for June 24, 2026 at 10:00 A.M. shall proceed as scheduled.

**SO ORDERED.**

Dated: JUN 17 2026
New York, New York

GEORGE B. DANIELS
United States District Judge

19