**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

v.

MICHELLE BOND,

       Defendant.

Docket No. 1:24-cr-000494-GBD

## DEFENDANT'S OMNIBUS MOTION TO COMPEL
## DISCOVERY IN SUPPORT OF CONSTITUTIONAL DEFENSES

Edward C. O'Callaghan
**CAHILL GORDON & REINDEL LLP**
900 16th Street, N.W. Suite 500
Washington, DC 20006
Telephone: 202-862-8900
EOcallaghan@cahill.com

Kiersten A. Fletcher
Louis A. Capizzi III
**CAHILL GORDON & REINDEL LLP**
32 Old Slip
New York, NY 10005
Telephone: 212-701-3000
KFletcher@cahill.com
LCapizzi@cahill.com

*Attorneys for Defendant Michelle Bond*

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 5

    A.    The FTX Bankruptcy Leads To A Significant Criminal Investigation In The Southern District Of New York.................................................................................................... 5

    B.    Ms. Bond Is Indicted On Campaign-Finance Charges ................................................... 8

    C.    Ms. Bond's New Counsel Confers With The Government Regarding Discovery Requests ................................................................................................................. 9

ARGUMENT ................................................................................................................. 14

    I.    This Court Should Order The Bond Team To Comply With *Brady*................................ 14

    A.    The Bond Team's Failure To Produce Favorable Evidence Underscores The Inadequacy Of The Bond Team's *Brady* Process Thus Far.................................................... 15

    B.    The Bond Team's Review Of Ms. Bond's Case File Must Include A Review For Evidence That Ms. Bond Provided Services For FTX............................................................ 18

    C.    The Bond Team Must Review The FTX File As Part Of Its *Brady* Review ................ 20

    II.    Ms. Bond Is Entitled To Discovery To Support Three Potential Constitutional Motions 23

    A.    The Government's Decision To Charge Only Ms. Bond Among The Many Recipients Who Allegedly Received Unlawful FTX Donations Suggests An Improper Motive .......... 23

    B.    Ms. Bond Is Entitled To A *Franks* Hearing.................................................................... 26

        1.    *The June 28 Transfer* ........................................................................................ 27

        2.    *The August 31 Transfer*.................................................................................... 28

        3.    *The FTX Payment* ............................................................................................ 29

    C.    Ms. Bond Is Entitled To Production Of Grand Jury Minutes....................................... 31

CONCLUSION................................................................................................................ 32

## TABLE OF AUTHORITIES

**Cases**

*Brady* v. *Maryland*, 373 U.S. 83 (1963) .................................................................. 1, 14

*DiSimone* v. *Phillips*, 461 F.3d 181 (2d Cir. 2006) ...................................................... 18

*Franks* v. *Delaware*, 438 U.S. 154 (1978)............................................................... 1, 27

*Furlong* v. *Shalala*, 156 F.3d 384 (2d Cir. 1998) ......................................................... 24

*Kaley* v. *United States*, 571 U.S. 320 (2014) .............................................................. 31

*Kyles* v. *Whitley*, 514 U.S. 419 (1995)...................................................................... 15

*LeClair* v. *Saunders*, 627 F.2d 606 (2d Cir. 1980) ...................................................... 24

*Leka* v. *Portundo*, 257 F.3d 89 (2d Cir. 2001)............................................................. 14

*United States* v. *Agurs*, 427 U.S. 97 (1976)............................................................... 16

*United States* v. *Al Jibori*, 90 F.3d 22 (2d Cir. 1996)................................................... 25

*United States* v. *An*, 733 F.Supp.3d 77 (E.D.N.Y. 2024) ............................................. 32

*United States* v. *Avellino*, 136 F.3d 249 (2d Cir. 1998)................................................ 20

*United States* v. *Bagley*, 473 U.S. 667 (1985) ........................................................... 20

*United States* v. *Bankman-Fried*, 179 F.4th 104 (2d Cir. 2026)................................... 5, 7

*United States* v. *Bari*, 750 F.2d 1169 (2d Cir. 1984).................................................... 31

*United States* v. *Batchelder*, 442 U.S. 114 (1979)...................................................... 23

*United States* v. *Berrios*, 501 F.2d 1207 (2d Cir. 1974) ............................................... 24

*United States* v. *Bout*, 731 F.3d 233 (2d Cir. 2013)..................................................... 24

*United States* v. *Collins*, 409 F.Supp.3d 228 (S.D.N.Y. 2019)...................................... 20

*United States* v. *Comey*, 809 F.Supp.3d 396 (E.D. Va. 2025)....................................... 31

*United States* v. *George*, 386 F.3d 383 (2d Cir. 2004) ................................................. 17

*United States* v. *Gupta*, 848 F.Supp.2d 491 (S.D.N.Y. 2012) ........................................................ 22

*United States* v. *Hunter*, 32 F.4th 22 (2d Cir. 2022) ....................................................................... 14

*United States* v. *Kostin*, 2025 WL 1504409 (S.D.N.Y. May 27, 2025) ................................. 28, 30

*United States* v. *Mahaffy*, 693 F.3d 113 (2d Cir. 2012) ............................................................ 21, 22

*United States* v. *Moran*, 349 F.Supp.2d 425 (N.D.N.Y. 2005) ...................................................... 32

*United States* v. *Rittweger*, 524 F.3d 171 (2d Cir. 2008) .............................................................. 20

*United States* v. *Rivas*, 377 F.3d 195 (2d Cir. 2004) ..................................................................... 19

*United States* v. *Sandalo*, 70 F.4th 77 (2d Cir. 2023) .................................................................... 25

*United States* v. *Sanders*, 211 F.3d 711 (2d Cir. 2000) ................................................................. 26

*United States* v. *Triumph Capital Grp, Inc.*, 544 F.3d 149 (2d Cir. 2008) .................................... 18

*United States* v. *Williams*, 701 F. Supp.3d 257 (S.D.N.Y. 2023) .................................................. 26

*United States* v. *Zhang*, 135 F.4th 44 (2d Cir. 2025) ................................................................ 3, 17

*Wayte* v. *United States*, 470 U.S. 598 (1985) ................................................................................. 24

## Statutes, Regulations, and Rules

18 U.S.C. §3500 ................................................................................................................................. 21

52 U.S.C. §30101 ........................................................................................................................ 16, 18

52 U.S.C. §30109 ............................................................................................................................. 17

11 C.F.R. §113.1 ............................................................................................................................... 18

Fed. R. Crim. P. 5 ............................................................................................................................... 1

Jason Brett, *Meet Michelle Bond - The New D.C. Power Broker For Crypto On Wall Street*,
    FORBES (Nov. 1, 2020), https://tinyurl.com/bdt88n4y ................................................................. 1

Press Release, U.S. Att'y's Off., S.D.N.Y., *Former FTX Executive Ryan Salame Sentenced to 90
    Months in Prison* (May 28, 2024), https://tinyurl.com/44efysxs. ............................................... 8

*United States* v. *Bankman-Fried*, No. 1:22-cr -00673-LAK (S.D.N.Y.) ........................................ 8

U.S. Dep't of Just., Just. Manual § 9-5.001(C)............................................................................. 17

Michelle Bond respectfully submits this memorandum of law in support of her omnibus motion to compel the government to produce several critical categories of discovery necessary to ensuring Ms. Bond receives a fair trial in this case. Specifically, as explained below, Ms. Bond is entitled to: (1) an order requiring the government to complete a comprehensive review of its case file for exculpatory material pursuant to *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963), adequately explain the contours of such a review, and disclose to Ms. Bond any evidence identified through that review which is favorable to a pair of theories critical to Ms. Bond's defense; (2) discovery into whether the prosecution of Ms. Bond was motivated by an improper purpose; (3) a hearing, pursuant to *Franks* v. *Delaware*, 438 U.S. 154, 155–156 (1978), to determine whether certain evidence should be suppressed because exculpatory evidence was wrongfully omitted from the affidavits supporting the warrants in question; and (4) an order compelling the government to produce minutes from the grand jury which indicted Ms. Bond.[1]

## **INTRODUCTION**

Since 2018, Ms. Bond has worked tirelessly in support of the digital-asset economy. She has served as Global Head of Policy for two leading cryptocurrency companies; a board advisor of Securrency, Inc., a blockchain financial technology developer; and as CEO of a trade group in the industry called the Association for Digital Asset Markets ("ADAM"). In 2020, when Ms. Bond became ADAM's CEO, Forbes ran a feature on her entitled "Meet Michelle Bond—The New D.C. Power Broker For Crypto On Wall Street."[2] Prior to working in this space, Ms. Bond spent nearly

---

[1] Ms. Bond has not been able to locate on the docket a written order, issued pursuant to Federal Rule of Criminal Procedure 5(f)(1), "confirm[ing] the disclosure obligation of the prosecutor under *Brady* v. *Maryland*, 373 U.S. 83 (1963) and its progeny and the possible consequences of violating such order under applicable law." Ms. Bond requests that the Court issue such an order.

[2] Jason Brett, *Meet Michelle Bond - The New D.C. Power Broker For Crypto On Wall*

a decade working on financial policy in high-profile roles both within government and the private sector, including as Head of Global Regulatory Affairs at Bloomberg, LP.

Ms. Bond ran for the Republican nomination in New York's First Congressional District in 2022, on an "America First" platform, in order to leverage her significant expertise in this new and growing sector to help enact sound policy.  By the time she ran for office, her experience with digital assets included extensive consulting work with a now-bankrupt cryptocurrency exchange called FTX.  Among other services, from around July 2021 through November 2022, Ms. Bond extensively advised FTX leadership about policy issues, prepared FTX leadership for hearings before executive agencies and Congressional committees, and assisted FTX in developing and implementing strategic initiatives, none of which involved any of FTX's actual cryptocurrency trading or customer accounts.  Ms. Bond's eight-week, unsuccessful campaign for Congress in 2022 is the centerpiece of this criminal case.

On August 19, 2024, SDNY prosecutors marshalled, and a grand jury in the Southern District of New York returned, an indictment (the "Indictment") alleging that Ms. Bond violated various campaign-finance laws during the course of her brief campaign, including by allegedly receiving corporate donations from FTX; receiving individual donations exceeding federal contribution limits from her now-husband, a former FTX executive named Ryan Salame; and conspiring with Mr. Salame to violate certain campaign-finance laws.  Based on the discovery received by defense counsel from 2024 until recently, including representations from the government about what it has (and has not) produced, Ms. Bond is gravely concerned that the government possesses, but still has not turned over, nearly two years after her indictment, evidence favorable to the defense and critical to Ms. Bond's ability to receive a fair trial.  Ms. Bond has

_Street_, FORBES (Nov. 1, 2020), https://tinyurl.com/bdt88n4y.

similar concerns that the government's conduct in obtaining warrants to investigate Ms. Bond, and in pursuing an indictment against Ms. Bond, violated her constitutional rights.  Ms. Bond seeks discovery to hold the government to its obligations, preserve her rights, and ensure she receives a fair trial.

*First*, Ms. Bond's review of the discovery to date, combined with productions and representations the government has only made in the past several weeks, including *the night before this filing was due*, cast serious doubt as to whether the government truly appreciates and has thus far shared with Ms. Bond the sort of "favorable evidence" that "[u]nder *Brady* and its progeny, 'the government has an affirmative duty to disclose.'"  *United States* v. *Zhang*, 135 F.4th 44, 52 (2d Cir. 2025).   While the Indictment indicates the government's belief that three transfers referenced in the Indictment, totaling approximately $928,544, constitute illegal campaign contributions, Ms. Bond intends to demonstrate that the payments were entirely legal.  As relevant to *Brady*, Ms. Bond intends at trial to show that the purported $400,000 "donation" she received from an FTX subsidiary (the "FTX Payment") was not a donation at all, and was instead payment for consulting services she performed for FTX.  Ms. Bond will also demonstrate at trial that another supposed "donation" from Mr. Salame to Ms. Bond—a $313,544 wire transfer allegedly made on or about June 28, 2022 (the "June 28 Transfer")—constituted proceeds from the sale of Ms. Bond's interest in the sale of a house she owned with her former husband (the "Van Hazen Residence").

Because evidence supporting the legitimate nature of the payments directly undermines the government's theory, and given the upcoming trial, the government must share such evidence with Ms. Bond now, and she has requested that it do so.  However, the SDNY prosecutors handling this case (the "Bond Team") have, notwithstanding Ms. Bond's efforts to confer in good faith, refused to make satisfactory representations as to their review of relevant materials or by extension that all

3

such material has been disclosed to Ms. Bond.  That refusal contravenes *Brady*.  In a sign the Bond Team perhaps recognizes as much, last night the Bond Team produced, for the first time, a pair of Federal Bureau of Investigation ("FBI") reports from witness interviews that took place over two years ago, in which a current Bond Team member was present, and—even in the brief review Ms. Bond's counsel has had a chance to conduct thus far—those interviews contained exculpatory material helpful to Ms. Bond's defense.  The fact that it has taken so long for Ms. Bond to receive critical evidence indicates this Court's intervention is necessary to secure Ms. Bond her right to a fair trial, and prevent the trial delays that will likely result from the Government's repeated failure to timely disclose favorable evidence.

*Second*, Ms. Bond is entitled to discovery into whether SDNY's decision to investigate and pursue criminal charges against her was improperly motivated by her political leanings, her relationship with Mr. Salame, or both.  The Government's assertions that FTX carried out a scheme to illegally donate tens of millions of dollars to multiple candidates across hundreds of contributions, but that, to date, the only political candidate charged with receiving such donations was Ms. Bond, gives rise to a strong inference that Ms. Bond was improperly targeted by the Government.  Whether viewed as an arbitrary classification or redirected animus towards her now-husband, Mr. Salame, a referendum on her political stance, or both, prosecution of Ms. Bond on either basis would violate due process.  Ms. Bond is entitled to discovery to test whether SDNY has relied on such an improper purpose.

*Third*, Ms. Bond is entitled to a *Franks* hearing because the affidavits filed in support of warrant applications to search Ms. Bond's iCloud accounts and iPhones (collectively, the "Warrant Affidavits"), while attaching the prejudicial exhibit of an FTX Indictment that did not allude to Ms. Bond, improperly omitted critical information about each of the three payments to Ms. Bond

4

that form the basis of Ms. Bond's Indictment. Critically, the omitted information was known to the Government at the time the Warrant Affidavits were prepared. Had the omitted information been included in the Warrant Affidavits, the Government would not have been able to demonstrate probable cause that any of the payments to Ms. Bond constituted illegal campaign donations. Ms. Bond is entitled to a hearing to assess whether suppression of the evidence from these searches is necessary.

*Fourth*, the same omissions that plagued the Warrant Affidavits, and evidence obtained from those searches, cast doubt on whether the grand jury that indicted Ms. Bond was improperly misled about the three allegedly unlawful campaign donations before returning an Indictment. In order to confirm whether this is the case, the Government should produce the minutes of the grand jury's discussion of those three purported donations.

## **BACKGROUND**

**A.      The FTX Bankruptcy Leads To A Significant Criminal Investigation In The Southern District Of New York**

FTX was a cryptocurrency exchange that filed for bankruptcy on November 11, 2022. *United States* v. *Bankman-Fried*, 179 F.4th 104, 110 (2d Cir. 2026). In connection with the ensuing bankruptcy proceedings, Sullivan & Cromwell LLP ("S&C") represented the FTX debtor estate. *Id.* at 120 n.7. As the Court is aware, the U.S. Attorney's Office for the Southern District of New York ("SDNY") conducted a significant criminal investigation into FTX and its founders and, in the course of that investigation received "extensive disclosure[s]" from S&C. *See id.* at 120–121. The Bond Team has acknowledged that these disclosures from S&C constitute part of the FTX case file (the "FTX File") and that the Bond Team is in possession of the FTX File.

As part of its investigation into FTX, SDNY obtained warrants to search both Ms. Bond's and Mr. Salame's iCloud accounts and iPhones, despite the fact that Ms. Bond, through her then-

5

lawyers, was cooperating with the government requests for documents and data.  The iCloud warrant was issued on April 11, 2023, Ex. 1 at 22 ("iCloud Aff."), and the iPhone warrant—which included an attached premises warrant to search Ms. Bond's and Mr. Salame's home—was issued on May 1, 2023, Ex. 2 at 16 ("iPhone Aff.").  The FBI Special Agent who served as affiant submitted largely overlapping affidavits in support of each application.  These Warrant Affidavits maintained that "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" iCloud Aff. ¶15; iPhone Aff. ¶8 (similar).

To substantiate the allegations that Mr. Salame unlawfully funded Ms. Bond's campaign, the Warrant Affidavits pointed to two purportedly illegal transfers: (1) a June 29, 2022 transfer of $313,544.32, iCloud Aff. ¶11(c) (Ms. Bond "███████████████████████████████████████████" and made a pair of "██████████████████████████████████████████████████████████"); iPhone Aff. ¶7(g) (similar); and (2) an August 31, 2022 wire transfer for $215,000 from Mr. Salame to Ms. Bond (the "August 31 Transfer"), which was allegedly followed in the ensuing weeks by three wires from Ms. Bond's personal account "███████████████████████████████████████" iCloud Aff. ¶11(d); iPhone Aff. ¶7(h).

The Warrant Affidavits also claimed that Ms. Bond signed a consulting agreement with an FTX subsidiary shortly before she launched her campaign, that the agreement provided for a $400,000 sign-on bonus and a $100,000 payment per year, that Mr. Salame signed it on the FTX subsidiary's behalf, and that Ms. Bond wired approximately $300,000 to her campaign roughly three weeks after receiving the $400,000 payment from the FTX subsidiary.  *See* iCloud Aff. ¶¶10, 11(a); iPhone Aff. ¶7(e).  The Warrant Affidavits were silent as to whether Ms. Bond performed any work for FTX.

Notwithstanding the Government's awareness from its witness interviews that Ms. Bond had told one of her campaign consultants, E.Z., that "████████████████████████ ████████████████████████" Ex. 3 at 1, the Warrant Affidavits' reference to this fact was limited to a single footnote acknowledging that E.Z. understood that "████████████ ████████████████████████████████████████████" iCloud Aff. ¶14(c) n.3; iPhone Aff. ¶10(c) n.3.  The affiant went on to say in the Warrant Affidavits that "████████████████████████████████████████ ████████████████████████████████" iCloud Aff. ¶14(c) n.3; iPhone Aff. ¶10(c) n.3.  The origination and motivation of the money that Ms. Bond lent to her campaign is essential to assessing probable cause because money obtained from a bona fide sale of assets constitutes personal funds, and not a campaign donation.  *Infra* p.16.  This footnote— which is untethered to any of the allegedly illegal payments—is the only reference the Warrant Affidavits make to the fact that the funds at issue originated from a real-estate transaction.[3]

SDNY's investigation into the FTX bankruptcy ultimately led to several convictions of high-level FTX executives for a variety of offenses, *see Bankman-Fried*, 179 F.4th at 110, 112, including Mr. Salame.  On September 7, 2023, Mr. Salame pled guilty to conspiracy to defraud the United States and willfully violate the Federal Election Campaign Act, and conspiracy to operate an unlicensed money transmitting business.  Dkt. 50-1 at 4.  With respect to the political-donation charge, Mr. Salame admitted to making "political contributions in [his] name that were

---

[3] In fact, Ms. Bond and her former husband had entered into a contract to sell the Van Hazen Residence to a third party buyer in a sale that was expected to net Ms. Bond and her former husband a combined $627,088.63 in profit, split evenly between them.  Mr. Salame purchased Ms. Bond's interest in the sale of the Van Hazen Residence for exactly half of that price, $313,544.32, which is the exact amount Mr. Salame sent her in the June 28 Transfer.  In other words, the June 28 Transfer was payment for Ms. Bond's half-interest in the Van Hazen Residence proceeds structured to give Ms. Bond additional personal funds, not to illegally fund her campaign.

funded by transfers from the bank accounts of [a corporate] subsidiary" with the understanding "that FEC reporting would state that [Mr. Salame], rather than [the subsidiary], made these political contributions."  Transcript of Proceedings as to Ryan Salame re: Plea at 21:18-22:9, *United States* v. *Bankman-Fried*, No. 1:22-cr-00673-LAK (S.D.N.Y. Sept. 7, 2023), Dkt. 283.  In a press release issued after Mr. Salame was sentenced, SDNY asserted that FTX executives carried out a scheme to donate tens of millions of dollars across over 300 political contributions.  Press Release, U.S. Att'y's Off., S.D.N.Y., Former FTX Executive Ryan Salame Sentenced to 90 Months in Prison (May 28, 2024), https://tinyurl.com/44efysxs.  Neither Mr. Salame's plea allocution nor the Government's subsequent press release identified Ms. Bond as a recipient of any unlawful donations.

### B.    Ms. Bond Is Indicted On Campaign-Finance Charges

Prior to Mr. Salame's guilty plea, for approximately eight weeks in 2022, Ms. Bond unsuccessfully sought the Republican nomination in New York's First Congressional District. Dkt. 2 ("Indictment") ¶¶7, 27.  She ran on an "America First" platform aligned with the political views of President Trump.

The central premise of the Indictment is that Ms. Bond and Mr. Salame—who was at the time both Ms. Bond's "romantic partner" and the CEO of an FTX subsidiary—"illegally funded [Ms. Bond's] campaign."  Indictment ¶¶1, 3.  Ms. Bond is charged with four counts, each of which pertains to at least one of a series of transfers to and from Ms. Bond's personal account that the Indictment alleges was actually an unlawful campaign donation.  *See id.* ¶¶42–53.

These counts largely mirror the allegations contained in the Warrant Affidavits. Specifically, the Indictment identifies three allegedly illegal payments: (1) the $400,000 FTX Payment, (2) the June 28 Transfer, and (3) the August 31 Transfer.  In putting forth conclusory

allegations that these payments were illegal campaign contributions, the Indictment omits any reference to the legitimate nature of each transaction, notwithstanding that the Government was aware of evidence supporting the transactions' legitimacy.  *First*, nowhere does the Indictment acknowledge the extensive work Ms. Bond had performed for FTX justifying the FTX Payment.  *Second*, the Indictment fails to acknowledge that the June 28 Transfer constituted proceeds from Ms. Bond's sale of her interest in the Van Hazen Residence, notwithstanding the government's awareness of this fact through E.Z.'s attorney proffer.  And *third*, the Indictment suggests that Mr. Salame sent Ms. Bond the August 31 Transfer in order to fulfill an alleged promise to pay off her campaign debt if she did not win the primary.  Indictment ¶¶26–27.  But nowhere does the Indictment acknowledge that Ms. Bond did not even know she had $214,231 in campaign debt until September 9, when E.Z. told Ms. Bond (who by then had already wired her campaign $180,000 to pay campaign debt, Ex. 4 at 1) that she owed an additional "34,231 [to] close out the campaign."  Ex. 5 at 1.

### C.    Ms. Bond's New Counsel Confers With The Government Regarding Discovery Requests

After Ms. Bond was indicted, she—through prior counsel—moved to dismiss the Indictment on the ground that her Indictment amounted to a breach of Mr. Salame's plea agreement.  Dkt. 38.  After hearing testimony from three witnesses, this Court denied the motion.  Dkt. 111 at 1–2.  Following the Court's denial of that motion, Ms. Bond's prior law firm moved to withdraw as counsel, Dkt. 113, and were replaced by Cahill Gordon & Reindel LLP, ("Cahill") *see* Dkt. 112, 115, 119.  This Court has scheduled Ms. Bond's trial to commence on November 9, 2026.  Tr. of June 24, 2026 Status Conference at 25.

As Cahill attorneys reviewed the case materials, it became apparent that exculpatory evidence likely in the government's possession had not yet been produced to Ms. Bond.  In order

9

to discern whether additional exculpatory material existed, Cahill on June 23, 2026, sent a letter to the Bond Team seeking several categories of discovery.  *See* Ex. 6 (the "June 23 Letter"). Among other materials, the June 23 Letter asked that the Bond Team:

- produce all materials showing that Ms. Bond performed work for FTX and FTX-related individuals and entities, which would rebut the allegation that Ms. Bond "did not perform any services" under the consulting agreement between her and the FTX subsidiary, Indictment ¶12;

- confirm in writing that the Bond Team had disclosed all such evidence, including evidence obtained from S&C in its representation of the FTX bankruptcy estate;

- produce all documents, communications, interviews, and other information concerning the Van Hazen Residence and the June 28 Transfer, including the statements from E.Z.'s attorney proffer that were cited in the Warrant Affidavits;

- produce a Signal messaging app thread of FTX Executives titled "Donation Processing" that was referenced in the Warrant Affidavits, iCloud Aff ¶8(g); iPhone Aff ¶8(g).[4]

June 23 Letter at 2–4.  At a recent status conference, the Court ordered the government to respond to Ms. Bond's request in the June 23 Letter by July 2.  Tr. of June 24, 2026 Status Conference at 18.

In response, the Bond Team took the position that it "does not agree that the information identified in [Ms. Bond's] letter is in fact 'exculpatory' or '*Brady*' material.'"  Ex. 7 ("July 2 Response") at 5; Ex. 8 at 2 ("July 24 Letter") (renewing this position with respect to evidence Ms.

---

[4] Through a careful review of public records, including exhibits introduced at the trial of FTX's former CEO, counsel for Ms. Bond was able to locate this Signal thread before it was produced by the government on July 2.

Bond performed services for FTX).  The Bond Team also produced a small number of exculpatory documents to Ms. Bond *for the first time.*  *See* July 2 Response at 6.  Among these documents was the "Donation Processing" Signal chat that was relied upon in the Warrant Affidavits, which revealed that Ms. Bond was *not* listed as one of the recipients of FTX's covert campaign donations. *See* Ex. 9.  The Bond Team also produced notes from a purported attorney proffer of E.Z., in which E.Z. recounted—well before Ms. Bond was under indictment—that Ms. Bond had conveyed that "████████████████████████████████████████████" Ex. 3 at 1. And it was not just E.Z.:  The Bond Team also recently produced notes from a call with several of Ms. Bond's campaign consultants in which a different witness shared a "████████████ ████████████████" Ex. 10 at 1.  In other words, it was not until Cahill specifically requested the materials that the government provided these notes of witness statements that showed that Ms. Bond received the June 28 Transfer not as an illegal campaign contribution, but from a bona fide real-estate related transaction.  SDNY did not produce any other material pursuant to the court's order by the July 2 date.

The Bond Team's failure to produce *Brady* material until Cahill specifically asked for it, coupled with the Bond Team's continued protestations that such material does *not* constitute *Brady* material, suggests that still more favorable material remains unproduced.  In order to understand how the Bond Team was endeavoring to comply with its *Brady* obligations and ascertain whether those efforts were in fact reasonable, Ms. Bond's counsel asked the Bond Team to clarify the following four points: 1) whether the Bond Team considered the FTX File part of Ms. Bond's case file and had searched that file for *Brady* material; 2) whether the Bond Team had produced all evidence pertaining to Ms. Bond's provision of services to FTX and the connection between the June 28 Transfer and the sale of the Van Hazen Residence; 3) whether the Bond Team possessed

11

the files S&C had produced to SDNY during its investigation into FTX, whether S&C's production had been reviewed by the Bond Team for evidence favorable to her defense, and whether all materials obtained by S&C had been produced to Ms. Bond; and 4) whether the Bond Team "has reviewed the witness statements in its file for *Brady* material and has produced all such material to the defense." Ex. 11 (the "July 8 Reply") at 2–3. The July 8 Reply spawned a meet-and-confer, a follow-up email exchange, Ex. 12, and an additional letter from the Bond Team, i.e., the July 24 Letter.

Throughout all these discussions, the Bond Team has acknowledged that the FTX File is within its possession and has continually claimed to be cognizant of both the existence and the ongoing nature of its *Brady* obligations. *E.g.*, July 2 Response at 1; July 24 Letter at 1–2. But the Bond Team has continually refused to represent that it has fully reviewed the entirety of Ms. Bond's case file, which would include, but is not limited to, the FTX file, and that all *Brady* material has already been produced. The Bond Team has likewise continually refused to represent how much of Ms. Bond's case file has been reviewed, and (if more remains to be reviewed) when that review is expected to be complete.

With respect to the FTX File, the Bond Team has explained only that it worked with the prosecutors assigned to the FTX investigation to determine what documents Ms. Bond was entitled to, and, in many respects, relied on the representations of the FTX Team to determine the universe of documents for which production was required. The Bond Team acknowledged that it has not personally reviewed the FTX File, and has refused to expressly represent that it has completed its review of the FTX File for materials that were responsive to either of the specific defense theories Ms. Bond had repeatedly raised through this conferral process—i.e., that Ms. Bond performed services for FTX for which she was paid and that the June 28 Transfer was connected to the sale

12

of the Van Hazen Residence.    Instead, the Bond Team has represented that it relied on representations made by the FTX team and that such reliance was reasonable.  When Ms. Bond's counsel asked the Bond Team to produce an index of the FTX File identifying which portions had been reviewed by the FTX team for: (i) communications involving or concerning Ms. Bond; (ii) evidence of work for FTX; and (iii) evidence concerning the home-sale proceeds, Ex. 12 at 3, the Bond Team refused, July 24 Letter at 1.

Instead, the Bond Team pointed to S&C's production, at the government's request, of "[c]ertain non-privileged communications and documents … containing a date of February 1, 2021 or later that relate to Michelle Bond and the Association for Digital Asset Markets," Ex. 13 at 1. But the way in which S&C searched for responsive documents to this request was not designed to capture communications from Ms. Bond's personal email address, which FTX confirmed she used to interact with FTX personnel.  Ex. 14 at 1-2.  The Bond Team confirmed that it was "not aware of the Government having requested that S&C conduct a follow-up search using" Ms. Bond's personal email.  Ex. 12 at 2.

The Bond Team's dilatory production of favorable evidence to Ms. Bond continued last night, July 30.  Shortly after 5:00pm, the Bond Team emailed Ms. Bond's counsel notes from two witness interviews, each of which occurred over two years ago.  One set of notes memorialized an interview of media consultant ("P.J.") on May 9, 2024.  Ex. 15 at 1.  The other memorialized an interview of the President of the ADAM Board ("B.V.") during Ms. Bond's services as CEO which took place on June 19, 2024.  Ex. 16 at 1.  Given the recency of this production, Ms. Bond's counsel is still reviewing these detailed reports.  But even at this early stage, the exculpatory nature of the statements made by these witnesses is immediately obvious.  For example, it is clear that—more than two years ago—P.J. told the government that when P.J. was advising Ms. Bond during

13

her campaign, Ms. Bond or Mr. Salame said in a phone call that they "" with respect to their campaign. Ex. 15 at 5. P.J. also told the government that Ms. Bond told him that her consulting agreement reflected "████" that this work "███████████" and that "████

██████████████████████████████████

████████" *Id.* at 8.

## ARGUMENT

This omnibus motion seeks additional discovery on four issues. *First*, Ms. Bond seeks an order compelling the Bond Team to review the FTX File, describe for the Court the scope and methodology of such a review, and produce the evidence relating to two of Ms. Bond's critical defense theories, which undisputedly constitutes *Brady* material. *Second*, Ms. Bond seeks discovery to support a defense that her prosecution was motivated by improper considerations. *Third*, Ms. Bond seeks a hearing to determine whether the Warrant Affidavits were materially misleading. And *fourth*, Ms. Bond seeks production of the minutes of the grand jury that indicted her, in order to determine whether SDNY withheld critical information from the grand jurors in seeking her Indictment.

## I.    THIS COURT SHOULD ORDER THE BOND TEAM TO COMPLY WITH *BRADY*

It is well established that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady* v. *Maryland*, 373 U.S. 83, 87 (1963). The *Brady* rule "implements the prosecution's 'special role' in the search for truth in criminal trials." *Leka* v. *Portundo*, 257 F.3d 89, 98 (2d Cir. 2001). As such, "[t]he Supreme Court has … counseled several times that the 'prudent prosecutor will resolve doubtful questions in favor of disclosure.'" *United States* v. *Hunter*, 32 F.4th 22, 35 & n.56 (2d Cir. 2022);

14

*accord* U.S. Dep't of Just., Just. Manual § 9-5.001(C).  And "[w]hen the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." *United States* v. *Agurs*, 427 U.S. 97, 106 (1976).

As recounted above, since the June 23 Letter, Ms. Bond has made two specific requests for *Brady* material: (1) evidence showing she genuinely performed services for FTX; and (2) evidence showing that Mr. Salame initiated the June 28 Transfer in order to purchase Ms. Bond's interest in the sale of the Van Hazen Residence.  *Supra* p.10.  As explained below, the steps the Bond Team has taken to date with respect to these requests do not reflect compliance with the obligation "to learn of any favorable evidence known to the others acting on the government's behalf in this case." *Kyles* v. *Whitley*, 514 U.S. 419, 437 (1995).  This court should accordingly order that the Bond Team immediately: (1) review the Bond Team's entire case file (which includes the FTX File) for materials pertaining to either Ms. Bond's work for FTX or the June 28 Transfer being payment to Ms. Bond for purchase of her interest in the sale of the Van Hazen Residence; (2) describe for the Court the contours of that review so that the Court can assess its reasonableness; and (3) produce to Ms. Bond all such materials found from these searches or represent that no such materials were found.

### A. The Bond Team's Failure To Produce Favorable Evidence Underscores The Inadequacy Of The Bond Team's *Brady* Process Thus Far

A telltale sign this Court's intervention is necessary to ensure the Bond Team complies with *Brady* is the fact that just since the conference in this matter on June 24, Ms. Bond has had to specifically ask on several occasions for certain evidence that is favorable to her defense *before* the Bond Team produced it, including as recently as last night.  Specifically, the Bond Team did not produce any of the "Donation Processing" Signal chat, notes from E.Z.'s attorney proffer, or notes from SDNY's call with multiple consultants to Ms. Bond's campaign until the June 23 Letter

15

asked for these materials. *Supra* pp.10-11. And it did not produce reports from either P.J.'s interview or B.V.'s interview until last night. *Supra* p.13. Only cursory review of each of these documents is necessary to determine they are favorable to Ms. Bond.

The "Donation Processing" Signal chat's exculpatory value is most obvious. That document listed specific political candidates and committees that received FTX donations, including the Delaware Democratic Party, Beto O'Rourke, Katie Hobbs, the New York State Democratic Committee, the Democratic National Committee, and the Senate Majority PAC. Ex. 9 at 2, 4, 5, 8. One candidate *not* appearing in this list is Ms. Bond. *See generally id.* Her absence from this chat provides strong evidence that even if FTX was looking to unlawfully funnel corporate donations to political candidates, Ms. Bond was not one of them. The two sets of notes regarding former campaign consultants likewise support Ms. Bond's contention that the June 28 Transfer was related to Ms. Bond's sale of her interest in the sale of the Van Hazen Residence: The notes from E.Z.'s proffer discussed his recollection that Ms. Bond "███████████████████ ██████████████████████████████████" Ex. 3 at 1, while the notes from SDNY's call with several of Ms. Bond's campaign consultants reflect that one of the consultants (not E.Z.) shared a "████████████████████████████████" Ex. 10 at 1. The exculpatory nature of these notes is obvious, because proceeds from the sale of an asset in a bona fide, good-faith, market-value transaction are considered personal funds. *See* 52 U.S.C. §30101(26)(A), (B)(ii).

As for the Bond Team's latest production, which she received only yesterday evening, that production contains witness statements demonstrating that around the time of the alleged crimes, Ms. Bond told the government's witnesses that she wanted to be sure her campaign was run in a "█████████" way. Ex. 15 at 5. In a criminal case alleging that Ms. Bond violated the campaign-

finance laws "knowingly and willfully," 52 U.S.C. §30109(d)(1)(A)(i), it is difficult to conceive of evidence more favorable to her defense than a contemporaneous instruction that her campaign follow the law. *See United States* v. *George*, 386 F.3d 383, 400 n.15 (2d Cir. 2004). The P.J. interview report also includes evidence of Ms. Bond, before she was indicted, explaining that she performed services for FTX above and beyond the work she was doing for them in her capacity as ADAM's CEO. Ex. 15 at 8. This squarely rebuts both the Indictment's characterization of the FTX Payment as a "sham," Indictment ¶1, and the Bond Team's recently revealed "current theory of the defendant's liability," i.e., "that any work the defendant did for FTX in 2021 and 2022 was in her capacity as CEO of ADAM, not as an FTX consultant," July 24 Letter at 2.

"Under *Brady* and its progeny," the Second Circuit has explained, "the government has an affirmative duty to disclose favorable evidence known to it, e*ven if no specific disclosure request is made by the defense*." *United States* v. *Zhang*, 135 F.4th 44, 52 (2d Cir. 2025) (emphasis added). The Bond Team's failure to produce this facially favorable material until asked, especially when combined with its reluctance to represent how complete its review of Ms. Bond's case file is, raises the strong possibility that yet more favorable evidence remains unproduced. This concern is only amplified by the fact that the government produced the plainly exculpatory statements from P.J. only on the eve of this motion and only after weeks of defense requests. Because Court oversight of the government's *Brady* review appears necessary at this point, the Court should order the SDNY Bond Team (not a deputized outside law firm) to review Ms. Bond's case file, to describe for the Court the contours of its review, and promptly produce any evidence consistent with Ms. Bond's two critical defense theories.

17

**B.      The Bond Team's Review Of Ms. Bond's Case File Must Include A Review For Evidence That Ms. Bond Provided Services For FTX**

The Court should reject the government's protestations that the evidence Ms. Bond seeks is not *Brady* material, *supra* p.10–11.  The Second Circuit has squarely held that "it [i]s the prerogative of the defendant and its counsel—and *not* of the prosecution—to exercise judgment in determining whether the defendant should make use of" the assertedly favorable evidence it is seeking.  *DiSimone* v. *Phillips*, 461 F.3d 181, 195 (2d Cir. 2006) (emphasis added).  Ms. Bond believes evidence of her work for FTX is helpful to her defense.  That alone makes it favorable.

Regardless, deference to Ms. Bond's characterization of evidence of her work for FTX as favorable is not necessary to conclude that such evidence is, in fact, favorable to her defense.  Even evidence that has inculpatory aspects to it is considered *Brady* material if "its exculpatory character harmonize[s] with the theory of the defense case."  *United States* v. *Triumph Capital Grp, Inc.*, 544 F.3d 149, 164 (2d Cir. 2008).  Evidence that Ms. Bond performed services for FTX bolsters her theory that the FTX Payment was for her extensive work, and not the "sham" the Indictment characterizes it as, Indictment ¶1.  That theory, if successful, would undermine any charges flowing from the FTX Payment, because "a salary and other earned income from bona fide employment" is considered part of a candidate's "personal funds," and not a campaign contribution.  52 U.S.C. §30101(26)(B)(i); *accord* 11 C.F.R. §113.1(g)(7).  Such evidence also would rebut the Indictment's allegations that Ms. Bond "had not performed any services in exchange for the [FTX] Payment pursuant to the Consulting Agreement."  Indictment ¶13; *accord* ¶12 (similar).

Perhaps recognizing the robust evidence demonstrating that Ms. Bond performed a significant amount of work for FTX, the Bond Team recently shared that its "current theory … is not that [Ms. Bond] performed *no* work for FTX," but rather the new, contorted theory "that any

18

work [she] did for FTX . . . was in her capacity as CEO of ADAM, . . . and that [she] attended certain events related to FTX . . . in her capacity as Ryan Salame's girlfriend." July 24 Letter at 2. The fact that the evidence Ms. Bond is seeking is not inconsistent with the Bond Team's theory does not strip it of its exculpatory value. *See United States* v. *Rivas*, 377 F.3d 195, 199-200 (2d Cir. 2004) (government witness's pre-trial statement in a drug-smuggling case that he had brought the narcotics on board a ship believing it was a package of alcohol belonging to the defendant was favorable to the defendant, even though it was also inculpatory insofar as it was "consistent with [the witness's] trial testimony that the narcotics belonged to" the defendant). For instance, evidence that Ms. Bond performed work for FTX to a degree and a volume that went beyond the work she performed for other ADAM clients would support the notion that Ms. Bond assisted FTX in both her individual and her ADAM capacities. Such evidence is easily in harmony with Ms. Bond's theory that the FTX Payment represents compensation for services rendered. Moreover, the Bond Team just last night produced evidence from P.J.'s interview, which directly rebuts this new theory. *Supra* pp.13–14. The fact that it has taken the Bond Team so long to produce this document, notwithstanding the presence of one of the current members of the Bond Team at that interview, suggests the need for careful review of the FTX File to ensure similar documents do not remain wrongfully unproduced.

The Bond Team's denial that evidence of Ms. Bond's performance of services for FTX is favorable to her defense also underpins the Bond Team's refusal to share witness-related evidence with Ms. Bond at this time, and its unwillingness to provide an estimate of when they will provide such evidence prior to trial. Such delay is justified, according to the Bond Team, because of SDNY's repeated refrain that it is consistent with the requirement in the Jencks Act, 18 U.S.C. §3500, that the government produce prior statements and reports of a witness by the time the

19

witness finishes her direct examination.  July 2 Response at 5.  "Complying with the Jencks Act, [however], does not shield the government from its independent obligation to timely produce exculpatory material under *Brady*—a constitutional requirement that trumps the statutory power of 18 U.S.C. § 3500."  *United States* v. *Rittweger*, 524 F.3d 171, 181 n.4 (2d Cir. 2008) (Sotomayor, J.).  And given Ms. Bond's specific request for this material, production in short order is warranted.  After all, "the prosecutor's failure to respond fully to a *Brady* request may impair the adversary process" by prompting "the defense [to] abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued."  *United States* v. *Bagley*, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.).  With trial fast approaching, Ms. Bond is entitled to an accurate, and timely, understanding of the evidence the Bond Team has on her work for FTX in order to ensure her defense is as fulsome as possible.

## C.  The Bond Team Must Review The FTX File As Part Of Its *Brady* Review

The prosecution's obligation under *Brady* to disclose evidence favorable to the defendant extends to "material evidence … known to the prosecutor," and each "individual prosecutor is presumed[] to have knowledge of all information gathered in connection with his office's investigation of the case."  *United States* v. *Avellino*, 136 F.3d 249, 255 (2d Cir. 1998).  This universe of relevant information encompasses "materials within prosecutors' possession, custody, or control."  *United States* v. *Collins*, 409 F. Supp. 3d 228, 239 (S.D.N.Y. 2019).  The Bond Team (rightfully) acknowledged during the parties' meet-and-confer that the FTX File is under its control.  *Supra* p.12.  As such, the Bond Team's *Brady* review must include a direct—not delegated—review of the FTX File for evidence of Ms. Bond's genuine performance of services for FTX.

Last week, the Bond Team claimed that it "has made reasonable efforts to review the FTX file for any … *Brady* materials," and that it is "not aware of any outstanding … *Brady* materials"

20

from the FTX File related to Ms. Bond's critical defense theories.  July 24 Letter at 1.  Ms. Bond is in no position to assess the reliability of that representation until the Bond Team explains what exactly has been reviewed from the FTX File.  Ms. Bond's request for an index chronicling just this information was denied.  *Supra* p.13.  And the steps the Bond Team has represented have been taken to carry out that review are constitutionally inadequate.

To start, the Bond Team has not represented that it has reviewed the FTX File.  Instead, it has represented only that review of the FTX File was conducted in conjunction with members of the FTX prosecution team, and that in at least some instances, the Bond Team relied on representations from the FTX team about the universe of materials from the FTX File that were responsive to requests from Ms. Bond.  *Supra* p.13.  Significant case law confirms that delegating responsibility to make *Brady* determinations to the FTX team is insufficient, and that the Bond Team must be the ones to review the FTX File.

*United States* v. *Mahaffy*, 693 F.3d 113 (2d Cir. 2012), is particularly instructive.  There, defendants faced a re-trial for a securities-fraud conspiracy charge after the jury deadlocked during the first trial.  *Id.* at 118–119.  Defendants were convicted during the second trial and, shortly after sentencing, the Securities and Exchange Commission ("SEC") initiated administrative proceedings against one of the defendants.  *Id.* at 119.  During the course of those proceedings, the SEC produced transcripts of investigative depositions taken from as far back as before defendants' first trial.  *Id.*  Defendants argued that these transcripts consisted of improperly suppressed *Brady* material, and that their convictions needed to be set aside.  *Id.*  The Second Circuit agreed.  *Id.*

As relevant here, the government argued that the team which prosecuted defendants at their second trial reasonably relied on the "disclosure decisions" of the first trial team, which "consisted of experienced prosecutors."  *Mahaffy*, 693 F.3d at 133.  The court rejected that argument, and

21

explained that the second prosecution team's "decision not to review or revisit disclosure decisions compounded the government's failure to turn over the SEC transcripts prior to the first trial." *Id.* Just as the second prosecution team in *Mahaffy* acted improperly in effectively delegating *Brady* decisions to the first prosecution team, so too here did the Bond Team act improperly in effectively delegating *Brady* decisions to the FTX team. *See also United States* v. *Gupta*, 848 F.Supp.2d 491, 494 (S.D.N.Y. 2012) ("Although, as noted, the SEC did voluntarily agree to review its memoranda for '*Brady*' material and furnish any such material to [the defendant], only the USAO is in a position to adequately evaluate whether anything in the SEC memoranda constitutes '*Brady*' material in the criminal case.").

The Bond Team's representation that it requested S&C produce to it all documents relevant to Ms. Bond that S&C had produced to the FTX team, and that it subsequently turned over wholesale all documents that S&C produced in response to that request, *supra* p.13, was not an adequate substitute for the Bond Team's direct review of the FTX File. For one, any materials S&C included in this supplemental production would, by definition, not include materials relevant to Ms. Bond that were found in the FTX File and not previously produced by S&C. But even beyond that defect, the parameters of S&C's supplemental production cast serious doubt on whether the supplemental production provides an accurate lens into material in the FTX File addressing work Ms. Bond performed for FTX.

As explained above, S&C informed the Bond Team that it was aware of *two* email addresses Ms. Bond used to communicate with FTX, one a personal Gmail address and the other her address with ADAM. *Supra* p.13. However, the search terms S&C used to compile documents for its supplemental production to the Bond Team included only ADAM's full name and the domain for ADAM email addresses. *Supra id.* Neither of those terms would necessarily capture

22

communications Ms. Bond sent from her personal email address.  Communications from her email address are paradigmatic *Brady* material (and subject to Federal Rule of Criminal Procedure 16's disclosure requirements) because they would demonstrate, in direct contravention of the Bond Team's current theory, that Ms. Bond performed services for FTX *beyond* her capacity as ADAM's president, July 24 Letter at 2.  The readily apparent possibility that the Bond Team's supposed fallback method of discovery into the FTX File would not identify these critical materials underscores why the Bond Team itself needs to review the FTX File for materials responsive to Ms. Bond's request.

II.    **Ms. Bond Is Entitled To Discovery To Support Three Potential Constitutional Motions**

Setting aside the serious questions raised about the Bond Team's adherence to its *Brady* obligations, the government's disclosures in advance of Ms. Bond's Indictment give rise to serious constitutional concerns.  *First*, the decision to indict Ms. Bond (and no other political candidate) reflects a constitutionally impermissible motive.  *Second*, the Warrant Affidavits improperly withheld material information from the issuing Magistrate Judge that would have defeated probable cause had they been disclosed.  *Third*, given the content of the Indictment, there is strong reason to believe that SDNY prosecutors misled the grand jury about critical facts in securing the Indictment.  Ms. Bond is entitled to discovery on each of these issues to assess whether government misconduct gives rise to a violation of her rights and calls into question whether the Indictment can stand.

A. **The Government's Decision To Charge Only Ms. Bond Among The Many Recipients Who Allegedly Received Unlawful FTX Donations Suggests An Improper Motive**

Although prosecutors have broad discretion over who to charge and when, this discretion "is, of course, subject to constitutional constraints." *United States* v. *Batchelder*, 442 U.S. 114,

125 (1979).  One such restriction is the principle of equal protection that charging decisions may not be "deliberately based upon an … arbitrary classification." *Wayte* v. *United States*, 470 U.S. 598, 608 (1985); *see also Furlong* v. *Shalala*, 156 F.3d 384, 392 (2d Cir. 1998) (noting the "implicit equal protection component within the Fifth Amendment").  After all, "[n]othing can corrode respect for a rule of law more than the knowledge that the government looks beyond the law itself to arbitrary considerations . . . as the basis for determining its applicability." *United States* v. *Berrios*, 501 F.2d 1207, 1209 (2d Cir. 1974).  A "malicious or bad faith intent to injure a person" is an impermissible basis for such differential treatment or arbitrary consideration. *See LeClair* v. *Saunders*, 627 F.2d 606, 609–610 (2d Cir. 1980) (drawing from *Berrios*'s selective-prosecution analysis to adopt a liability standard claims of civil selective-enforcement brought under 42 U.S.C. §1983).  Beyond selective enforcement of the law on the basis of an arbitrary classification, the Fifth Amendment's Due Process Clause also bars the government from relying on vindictive animus towards a defendant as the basis to indict.  *See United States* v. *Bout*, 731 F.3d 233, 238 (2d Cir. 2013).

The government itself has repeatedly represented that FTX carried out a scheme to make *hundreds* of unlawful campaign contributions, including multiple candidates, aggregating to over *tens of millions* of dollars.  Paragraph 46 of Mr. Bankman-Fried's indictment, for instance, alleged that he "███████████████████████████████████████████████████████████████████████" iCloud Aff. at 41.  And after Mr. Salame pled guilty, SDNY issued a boastful press release, referencing similar figures.  *Supra* p.8.  Notwithstanding this allegedly sprawling scheme, Ms. Bond—and Ms. Bond alone—stands as the only political candidate whom SDNY charged with accepting unlawful corporate contributions from FTX.  This fact alone begs the question: Why did the government target Ms. Bond and charge not a single other political candidate?  Was

24

it because her "America First" politics set her apart?  Or was it because Ms. Bond was then in a committed relationship with an FTX executive whom SDNY had previously prosecuted?  In either case, whether viewed as an arbitrary classification of "romantic partner of FTX executive," or the reflection of SDNY's animus towards Mr. Salame or Ms. Bond, such a prosecutorial motive would not comport with due process.

In light of Ms. Bond appearing to have been singled out, the June 23 Letter asked the Bond Team to disclose "evidence related to prosecutorial bias."  June 23 Letter at 3.  This concern of bias existed because "it stands to reason that SDNY would have pursued charges against numerous candidates" "[i]f there were '██████████████████'  in purported illegal campaign contributions" involved in this scheme.  *Id.*  The July 2 Response asserted that Ms. Bond "comes nowhere close to meeting the 'rigorous' standard for showing entitlement to the discovery she seeks," was unable to "show a shred of evidence of 'genuine animus,'" and that the materials she requested, "if they exist," were likely privileged.  July 2 Response at 3.  The absence of any meaningful response to the allegation that Ms. Bond is an outlier, particularly in light of the dubious track record of *Brady* compliance uncovered thus far, only raises further concerns.

The Second Circuit has explained that a defendant seeking discovery into a selective-prosecution defense "must make at least 'a credible showing of different treatment of similarly situated persons' to … become eligible for discovery."  *United States* v. *Al Jibori*, 90 F.3d 22, 25 (2d Cir. 1996).  The same standard applies to a vindictive-prosecution defense.  *United States* v. *Sanders*, 211 F.3d 711, 717 (2d Cir. 2000).  Here, Ms. Bond has presented more than sufficient evidence.  For one, it is inconceivable that had SDNY investigated all recipients of FTX campaign donations, it would have been unable to find any indictable conduct beyond what Ms. Bond, who had a brief and unsuccessful congressional campaign, is alleged to have done (and which Ms. Bond

25

does not concede is indictable).  *See United States* v. *Williams*, 701 F. Supp. 3d 257, 266 (S.D.N.Y. 2023) (explaining that the critical question is whether individuals outside the protected or disfavored class "committed roughly the same crime in roughly the same circumstances but were not prosecuted").  This is especially so because unlike many other recipients of FTX campaign donations, Ms. Bond *was not even mentioned* in the "Donation Processing" Signal chat that the government chose to feature prominently in the Warrant Affidavits.  *See* Ex. 9; *see also* iCloud Aff. ¶8(g); iPhone Aff. ¶11.  Discovery on this issue is warranted to ensure that Ms. Bond's unique treatment was not fueled by improper considerations.

### B.    Ms. Bond Is Entitled To A *Franks* Hearing

Even before it decided to pursue charges against Ms. Bond, and at a time when Ms. Bond was cooperating with SDNY requests for data and documents, SDNY obtained warrants to search Ms. Bond's iCloud and iPhones based off the largely overlapping Warrant Affidavits.  As the Warrant Affidavits make clear, SDNY had already assembled significant evidence regarding Mr. Salame and Ms. Bond, including "███████████" and Mr. Salame's "████████████████" iCloud Aff. ¶14, 14(d); iPhone Aff. ¶10, 10(d).  Those records contain several pieces of information that directly undercut the SDNY's charging theory as articulated in the Warrant Affidavits.  Though the affiant referenced the sort of materials where this critical information was found, key exculpatory facts were noticeably absent from the Warrant Affidavits.

Troubled by critical omissions in the Warrant Affidavits, Ms. Bond's counsel shared these concerns in the June 23 Letter.  June 23 Letter at 2–3.  Here again, the Bond Team denied that Ms. Bond was entitled to any discovery under this issue.  July 2 Response at 4–5.  Here, too, discovery is appropriate to ensure Ms. Bond receives a fair trial.  A defendant is entitled to a hearing to challenge the validity of an affidavit supporting a warrant application if she is able to make a

"substantial preliminary showing" of (1) falsity, i.e., "that a false statement . . . was included by the affiant in the warrant affidavit," (2) knowledge, i.e., that the affiant made the statement "knowingly and intentionally, or with reckless disregard for the truth," and (3) materiality, i.e., that "the allegedly false statement is necessary to the finding of probable cause." *United States* v. *Sandalo*, 70 F.4th 77, 85–86 (2d Cir. 2023). As explained below, Ms. Bond is able to make all three showings, as to all three allegedly illegal payments. She is therefore entitled to a hearing pursuant to *Franks* v. *Delaware*, 438 U.S. 154 (1978), to determine whether the fruits of those warrants should be suppressed.

### 1.    The June 28 Transfer

With respect to the June 28 Transfer, the Warrant Affidavits conceal the legitimate nature of the transaction by failing to inform the Magistrate Judge of the connection between the June 28 Transfer and the sale of the Van Hazen Residence. In the Warrant Affidavits, the affiant stated that Ms. Bond "███████████████████████████████████████" iCloud Aff. ¶11(c), iPhone Aff. ¶7(g), but then omitted that the purpose of this payment related to the sale of Ms. Bond's home. The affiant had to have known that there was evidence indicating that the payment for a specified amount from Ryan Salame to Ms. Bond was for a lawful purpose. Indeed, on March 28, 2023, 14 days before the iCloud Warrant and more than a month before the iPhone warrant, the government received E.Z.'s attorney proffer. Ex. 3 at 1. At this proffer, E.Z.'s attorneys told SDNY that Ms. Bond had "████████████████████████████████████ ████████████████████████"; that the sale "████████████████████████████ ████████████████████████████"; and that she "██████████████████████ ██████████████" *Id.* The "████████████" referenced here is, of course, the sale of the Van Hazen residence and, relatedly, Ms. Bond's sale of her interest in that transaction to Mr. Salame.

27

Although the Warrant Affidavits obliquely mention a house sale (buried in a footnote in a section of the affidavits having nothing to do with the June 28 Transfer), the broader context of E.Z.'s attorney proffer, which included exculpatory contemporaneous statements by Ms. Bond (and thus constitutes *Brady* material) were not shared with the issuing Magistrate.  For instance, the footnote does not tell the Magistrate Judge that Ms. Bond's own campaign consultant reported that she had informed him a sale was imminent and that she was soon to be in possession of funds with which to fund her campaign.  Ex. 3 at 1.  That imminence makes clear that any transfers to Ms. Bond's campaign around the time of transactions related to the sale of the Van Hazen Residence and reflected Ms. Bond's personal funds—not illegal campaign contributions.  *Supra* n.3.

Put another way, E.Z.'s proffer made clear that the funds Mr. Salame transferred to Ms. Bond in the June 28 Transfer were a purchase of a particular asset, not a campaign donation, and Ms. Bond's transfer of that money to her campaign was a transfer of personal funds.  That understanding would defeat any basis to believe the June 28 Transfer was an unlawful campaign donation.  *Supra* p.16.  The affiant's failure to include this information in the Warrant Affidavit was therefore material.  And, given the express representation in the Warrant Affidavits that she was familiar with this proffer, *supra* p.7, the failure to include the broader context was, at minimum, reckless.  *See United States* v. *Kostin*, 2025 WL 1504409, at *19 (S.D.N.Y. May 27, 2025) (affiant "made material misstatements and omitted material facts in reckless disregard of the truth because she consciously omitted clearly critical facts" from the affidavit).

### 2.    *The August 31 Transfer*

The Warrant Affidavits similarly omit critical information regarding the August 31 Transfer.  Unlike the Warrant Affidavits' deliberate recitation of the small amount of money Ms.

28

Bond had in her personal bank account before the FTX Payment was made, the Warrant Affidavits are silent as to how much money Ms. Bond had in her personal bank account prior to the August 31 Transfer. In fact, as the government well knew, *see* iCloud Aff. ¶14(d), iPhone Aff. ¶10(d), Ms. Bond's bank records reflected that she held approximately $375,989 in her Wells Fargo account before the August 31 Transfer. Ex. 17. This amount was greater than the $215,000 she allegedly received from Mr. Salame via the August 31 Transfer.

If the magistrate judge was informed of this fact, that judge would likely have concluded that any money Ms. Bond lent her campaign in early September 2022 came from her own set of personal funds that were already in her account before Mr. Salame effectuated the August 31 Transfer. On those facts, there would be no probable cause to suggest that the August 31 Transfer was a campaign donation of any kind, let alone an unlawful one. Probable cause as to this transaction would be vitiated. And given her admitted review of bank records prior to submitting the Warrant Affidavits, it follows that the affiant made, at the least, a deliberate decision to recklessly omit evidence of Ms. Bond's substantial bank account balance at the time of the August 31 Transfer.

 3.     *The FTX Payment*

The Warrant Affidavits' account of the FTX Payment, the final remaining allegedly unlawful donation, was, for two reasons, also misleading. The first is that at the time the affiant prepared the Warrant Affidavits, the government had considerable evidence of Ms. Bond's extensive work for FTX. As noted above, FTX's bankruptcy—the instigating event of SDNY's focus on the company and its personnel—occurred in November 2022, several months before the first of the Warrant Affidavits was sworn. *Supra* p.5. SDNY's FTX case team developed a significant case file over the course of this investigation. *Supra* p.5. Indeed, that investigation

29

was so advanced that Exhibit A to the iCloud Warrant was the indictment of Samuel Bankman-Fried, FTX's former CEO. *See* iCloud Aff. at 24–66.

The FTX File should contain significant evidence that Ms. Bond performed work on behalf of FTX. *See generally* Ex. 18. Evidence that Ms. Bond performed work for FTX would directly undermine probable cause that the FTX Payment was an unlawful corporate campaign contribution because compensation for services rendered constitutes personal funds. *Supra* p.18.[5] Moreover, the affiant demonstrated considerable familiarity with the FTX investigation in the Warrant Affidavits, as demonstrated by the significant references she made to that investigation. *E.g.*, iCloud Aff. ¶8; iPhone Aff. ¶7. There is a significant likelihood that her review of relevant materials prior to swearing out the Warrant Affidavits would have led her to evidence of Ms. Bond's work for FTX. The deliberate exclusion of that evidence is, at minimum, reckless. *See Kostin*, 2025 WL 1504409, at *19.

Another reckless omission was the affiant's failure to reveal critical content about the "Donations Processing" Signal chat thread. Both of the Warrant Affidavits specifically referenced this thread as a place where "███████████████████████████████ ███████████████" and explained that "███████████████████████████████████ ████████████████████████████████████████ ████████████" iCloud Aff. ¶8(g); iPhone Aff. ¶8(g). Although several Democratic candidates and organizations affiliated with the Democratic Party are specifically mentioned in this chat, Ms.

---

[5] Nor would production of material from the FTX File necessarily duplicate materials already in Ms. Bond's possession. For example, while Ms. Bond can no doubt access her own email account, she does not have access to any FTX slack communications, or to internal communications between FTX employees regarding the work she performed to the extent she was not copied on those communications. Ms. Bond is therefore entirely reliant on the government to identify and produce that material to her consistent with its discovery obligations.

Bond's name does not appear once.  *Supra* p.11.  In selectively cherry-picking what features of the "Donations Processing" chat she would include in the Warrant Affidavits, the affiant exhibited recklessness.

### C.    Ms. Bond Is Entitled To Production Of Grand Jury Minutes

The failure of the Warrant Affidavits to paint an accurate picture regarding the FTX Payment, the June 28 Transfer, and the August 31 Transfer supports not just a *Franks* hearing, but also production of the minutes of the grand jury that indicted Ms. Bond discussing those three transactions.

"It is well established that courts may, and indeed on occasion must, use their supervisory authority to 'safeguard the integrity of the grand jury process.'"  *United States* v. *Comey*, 809 F.Supp.3d 396, 411 (E.D.Va. 2025).  One such safeguarding tool is Federal Rule of Criminal Procedure 6(e)(3)(E)(ii).  Under this Rule, a court may authorize disclosure of grand jury minutes "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury."  The Second Circuit has held that when it comes to grand-jury related misconduct, "dismissal is warranted only where the prosecutor's conduct amounts to a knowing or reckless misleading of the grand jury as to an essential fact."  *United States* v. *Bari*, 750 F.2d 1169, 1176 (2d Cir. 1984).  This standard bears a striking resemblance to the standard for a *Franks* hearing.  That is unsurprising, as just as warrant affidavits play a critical role in upholding the Fourth Amendment's mandate that "no Warrants shall issue, but upon probable cause," U.S. Const. amend. IV, so too does the grand jury play a "singular role in finding the probable cause necessary to initiate a prosecution for a serious crime," *Kaley* v. *United States*, 571 U.S. 320, 328 (2014).

As explained in Part II.B, there is significant reason to suspect that material facts as to the presence of probable cause were knowingly or recklessly omitted from the Warrant Affidavits,

31

thereby misleading the magistrate judge into believing SDNY had probable cause to search Ms. Bond's iCloud account and iPhones. These same omissions from the Indictment that was ultimately returned in this case suggest that the Indictment of Ms. Bond was obtained only after failing to inform the grand jury of critical facts that would have otherwise defeated a finding of probable cause that Ms. Bond committed the crimes in the Indictment. *Cf. United States* v. *An*, 733 F.Supp.3d 77, 107 (E.D.N.Y. 2024); *United States* v. *Moran*, 349 F.Supp.2d 425, 466 (N.D.N.Y. 2005). Ms. Bond is thus entitled to the minutes of the grand jury presentation regarding the FTX Payment, the June 28 Transfer, and the August 31 Transfer, the same three aspects of the Warrant Affidavits for which there is significant reason to believe material information was improperly withheld.

## **CONCLUSION**

For the foregoing reasons, Ms. Bond's motion should be granted. The government should be ordered to produce the discovery Ms. Bond is seeking both pursuant to *Brady* and in support of her potential prosecutorial bias defense. The government should also produce the relevant sections of its grand jury minutes. And the Court should order a *Franks* hearing to determine whether the fruits of the searches into Ms. Bond's iCloud accounts and iPhones should be suppressed.

Dated: July 31, 2026                                    Respectfully submitted,


                                                        */s/ Edward C. O'Callaghan*
                                                        Edward C. O'Callaghan
                                                        **CAHILL GORDON & REINDEL LLP**
                                                        900 16th Street, N.W. Suite 500
                                                        Washington, DC 20006
                                                        Telephone: 202-862-8900
                                                        EOcallaghan@cahill.com

                                                        Kiersten A. Fletcher
                                                        Louis A. Capizzi III
                                                        **CAHILL GORDON & REINDEL LLP**
                                                        32 Old Slip
                                                        New York, NY 10005
                                                        Telephone: 212-701-3000
                                                        KFletcher@cahill.com
                                                        LCapizzi@cahill.com

                                                        *Attorneys for Defendant Michelle Bond*