UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

*v.*

MICHELLE BOND,

Defendant.

24 Cr. 494 (GBD)

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO THE DEFENDANT'S SECOND PRETRIAL MOTIONS**

SEAN S. BUCKLEY
Attorney for the United States, Acting Under
Authority Conferred by 28 U.S.C. § 515

David Felton
Paul M. Monteleoni
Stephanie Simon
Assistant United States Attorneys
– Of Counsel –

**TABLE OF CONTENTS**


PRELIMINARY STATEMENT ........................................ 1
BACKGROUND ........................................ 1
I. The Investigation and the Search Warrants ........................................ 1
II. The Indictment ........................................ 6
III. The Initial Discovery Productions ........................................ 6
IV. The First Pretrial Motions ........................................ 8
V. The Government's Continued Production of Discovery ........................................ 9
ARGUMENT ........................................ 10
I. There is No Basis for the Court to Enter Any Order Regarding the Government's Discharge of its Obligations Pursuant to *Brady v. Maryland* ........................................ 10
A. Legal Standard ........................................ 10
B. Discussion ........................................ 12
1. The Government Did Not Fail to Produce *Brady* Materials ........................................ 13
2. Evidence That the Defendant Performed Work Benefitting FTX in her Capacity as CEO of ADAM Is Not *Brady* Material ........................................ 17
3. The Government Has Reviewed and Will Continue To Review the FTX File .......... 18
II. The Defendant's Untimely Claim of Selective or Vindictive Prosecution is Baseless .... 19
A. Legal Standard ........................................ 20
1. Selective Prosecution ........................................ 20
2. Vindictive Prosecution ........................................ 22
B. Discussion ........................................ 23
1. The Motion is Untimely ........................................ 23
2. The Prosecution Is Not Selective ........................................ 25
3. The Prosecution is Not Vindictive ........................................ 27
III. The Defendant's Untimely Motion to Suppress Should be Denied Without a Hearing ... 28
A. Legal Standard ........................................ 28
1. Review of a Magistrate Judge's Probable Cause Determination ........................................ 28
2. Alleged Omissions or Misstatements in a Search Warrant Affidavit ........................................ 29
B. Discussion ........................................ 32
1. The Motion to Suppress is Untimely ........................................ 32
2. None of the Supposed Omissions is Material ........................................ 33
3. The Defendant Has Made No Showing of Intent to Mislead or Reckless Disregard for the Truth ........................................ 44

IV. The Defendant's Untimely Motion to Inspect the Grand Jury Transcripts Lacks Any Merit ........ 46
A. Legal Standard ........ 46
B. The Defendant's Motion is Untimely ........ 48
C. The Defendant Has Made No Showing of Any Irregularity Justifying Inspection of the Grand Jury Transcripts ........ 48
CONCLUSION ........ 49

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Brady v. Maryland*,
373 U.S. 83 (1963) ... 10

*Cobb v. Pozzi*,
363 F.3d 89 (2d Cir. 2004) ... 20

*United States v. Córdoba Ruiz*,
No. 22 Cr. 121 (LJL), 2023 WL 6811646 (S.D.N.Y. Oct. 16, 2023) ... 11, 12, 19

*Dennis v. United States*,
384 U.S. 855 (1966) ... 47

*Douglas Oil Co. v. Petrol Stops Northwest*,
441 U.S. 211 (1979) ... 47

*Franks v. Delaware*,
438 U.S. 154 (1978) ... 29, 30

*Gerstein v. Pugh*,
420 U.S. 103 (1975) ... 28, 39

*Giglio v. United States*,
405 U.S. 150 (1972) ... 10

*Illinois v. Gates*,
462 U.S. 213 (1983) ... 28, 29

*Nat'l Council of La Raza v. Dep't of Justice*,
411 F.3d 350 (2d Cir. 2005) ... 12, 19

*Panetta v. Crowley*,
460 F.3d 388 (2d Cir. 2006) ... 31

*Pittsburgh Plate Glass Co. v. United States*,
360 U.S. 395 (1959) ... 47

*Rivera v. United States*,
928 F.2d 592 (2d Cir. 1991) ... 29, 30

*Texas v. Brown*,
460 U.S. 730 (1983) ..... 28

*United States ex rel. Williams v. McMann*,
436 F.2d 103 (2d Cir. 1970) ..... 24

*United States v. Alameh*,
341 F.3d 167 (2d Cir. 2003) ..... 20

*United States v. Armstrong*,
517 U.S. 456 (1996) ..... 20, 21, 23

*United States v. Awadallah*,
349 F.3d 42 (2d Cir. 2003) ..... passim

*United States v. Banco Cafetero Panama*,
797 F.2d 1154 (2d Cir. 1986) ..... 39, 40

*United States v. Bari*,
750 F.2d 1169 (2d Cir. 1984) ..... 47

*United States v. Bass*,
536 U.S. 862 (2002) ..... 21, 26, 27

*United States v. Bove*,
888 F.3d 606 (2d Cir. 2018) ..... 48

*United States v. Boykoff*,
68 F. App'x 15 (2d Cir. 2003) ..... 14, 41

*United States v. Brown*,
744 F. Supp. 558 (S.D.N.Y. 1990) ..... 30

*United States v. Calk*,
No. 19 Cr. 366 (LGS), 2020 WL 3577903 (S.D.N.Y. Jul. 1, 2020) ..... 31, 39, 41, 45

*United States v. Canfield*,
212 F.3d 713 (2d Cir. 2000) ..... 29, 31, 32, 37

*United States v. Casamento*,
887 F.2d 1141 (2d Cir. 1989) ..... 47, 49

*United States v. Chem. Found., Inc.*,
272 U.S. 1 (1926) ..... 20

*United States v. Clark*,
638 F.3d 89 (2d Cir. 2011) ........ 29

*United States v. Coppa*,
267 F.3d 132 (2d Cir. 2001) ........ 10, 15

*United States v. Cromitie*,
No. 09 Cr. 558 (CM), 2010 WL 3025670 (S.D.N.Y. July 28, 2010) ........ 31, 43

*United States v. Dunn*,
No. 05 Cr. 127 (KMK), 2005 WL 1705303 n.7 (S.D.N.Y. July 19, 2005) ........ 47

*United States v. Falso*,
544 F.3d 110 (2d Cir. 2008) ........ 30, 32, 42

*United States v. Fama*,
758 F.2d 834 (2d Cir. 1985) ........ 29, 33, 39, 43

*United States v. Fares*,
978 F.2d 52 (2d Cir. 1992) ........ passim

*United States v. Gatto*,
316 F. Supp. 3d 654 (S.D.N.Y. 2018) ........ 10, 11, 13, 16

*United States v. Gillier*,
No. 11 Cr. 409 (PAE), 2022 WL 179204 (S.D.N.Y. Jan. 19, 2022) ........ 11

*United States v. Gomez*,
751 F. App'x 63 (2d Cir. 2018) ........ 11

*United States v. Gomez*,
199 F. Supp. 3d 728 (S.D.N.Y. 2016) ........ 11, 19

*United States v. Goodwin*,
457 U.S. 368 (1982) ........ 22

*United States v. Guan*,
No. 24 Cr. 322 (VM), 2026 WL 160995 (S.D.N.Y. Jan. 21, 2026) ........ 21

*United States v. Gustus*,
No. 02 Cr. 888 (LTS), 2002 WL 31260019 (S.D.N.Y. Oct. 8, 2002) ........ 11, 13

*United States v. Hinton*,
703 F.2d 672 (2d Cir. 1983) ........ 22

*United States v. Hossain*,
No. 19 Cr. 06 (SHS), 2020 WL 6874910 (S.D.N.Y. Nov. 23, 2020) ........ 12

*United States v. Hossain*,
No. 19 Cr. 06 (SHS), 2024 WL 4212321 (2d Cir. Sept. 17, 2024) ........ 12

*United States v. Johnson*,
171 F.3d 139 (2d Cir. 1999) ........ 22, 27

*United States v. King*,
126 F.3d 394 (2d Cir. 1997) ........ 22

*United States v. Klump*,
536 F.3d 113 (2d Cir. 2008) ........ 29

*United States v. Koh*,
199 F.3d 632 (2d Cir. 1999) ........ 22

*United States v. Lahey*,
967 F. Supp. 2d 698 (S.D.N.Y. 2013) ........ 32, 37, 46

*United States v. Leeper*,
--- F.4th ----, 2026 WL 2339544 (2d Cir. Aug. 13, 2026) ........ 29

*United States v. Leung*,
40 F.3d 577 (2d Cir. 1994) ........ 47

*United States v. Lewis*,
517 F.3d 20 (1st Cir. 2008) ........ 25

*United States v. Lombardozzi*,
491 F.3d 61 (2d Cir. 2007) ........ 48

*United States v. Maisonet*,
No. 12 Cr. 829 (AKH), 2013 WL 12204909 (S.D.N.Y. Mar. 22, 2013) ........ 31, 44

*United States v. Mandell*,
710 F. Supp. 2d 368 (S.D.N.Y. 2010) ........ passim

*United States v. Melendez*,
No. 16 Cr. 33 (LTS), 2016 WL 4098556 (S.D.N.Y. July 28, 2016) ........ 30

*United States v. Menendez*,
No. 23 Cr. 490 (SHS), 2024 WL 912210 (S.D.N.Y. Mar. 4, 2024) ........ 36, 37, 45

*United States v. Mustafa*,
753 F. App'x 22 (2d Cir. 2018) .............................................................................................. 24

*United States v. Neumann*,
No. 21 Cr. 439 (NSR), 2022 WL 3445820 (S.D.N.Y. Aug. 17, 2022)..................................... 11

*United States v. Olvis*,
97 F.3d 739 (4th Cir. 1996) .................................................................................................... 25

*United States v. Perez*,
247 F. Supp. 2d 459 (S.D.N.Y. 2003)...................................................................................... 31

*United States v. Powell*,
No. 18 Cr. 287 (AT), 2019 WL 6790634 (S.D.N.Y. Dec. 12, 2019) ...................................... 11

*United States v. Proctor & Gamble Co.*,
356 U.S. 677 (1958)................................................................................................................. 47

*United States v. R. Enters., Inc.*,
498 U.S. 292 (1991)................................................................................................................. 47

*United States v. Rajaratnam*,
719 F.3d 139 (2d Cir. 2013)............................................................................................. passim

*United States v. Reilly*,
76 F.3d 1271 (2d Cir. 1996)............................................................................................. 31, 44

*United States v. Rivera*,
750 F. Supp. 614 (S.D.N.Y. 1990).......................................................................................... 30

*United States v. Sandalo*,
70 F.4th 77 (2d Cir. 2023) ................................................................................................ 30, 42

*United States v. Sanders*,
211 F.3d 711 (2d Cir. 2000)............................................................................................. 22, 23

*United States v. Sells Engineering, Inc.*,
463 U.S. 418 (1983)................................................................................................................. 47

*United States v. Singh*,
390 F.3d 168 (2d Cir. 2004)..................................................................................................... 28

*United States v. Skyfield*,
No. 23 Cr. 569 (LJL), 2023 WL 8879291 (S.D.N.Y. Dec. 22, 2023) ................................ 30, 42

*United States v. Smith*,
231 F.3d 800 (11th Cir. 2000) ........ 25

*United States v. Stewart*,
590 F.3d 93 (2d Cir. 2009)........ 22

*United States v. Sun Myung Moon*,
718 F.2d 1210 (2d Cir. 1983)........ 20

*United States v. Teman*,
465 F. Supp. 3d 277 (S.D.N.Y. 2020)........ 13

*United States v. Thomas*,
788 F.3d 345 (2d Cir. 2015)........ 45

*United States v. Vilar*,
No. 05 Cr. 621 (KMK), 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007)........ 30, 35, 45, 46

*United States v. Walker*,
191 F.3d 326 (2d Cir. 1999)........ 14

*United States v. Williams*,
504 U.S. 36 (1993)........ 47

*United States v. Yousef*,
327 F.3d 56 (2d Cir. 2003)........ passim

*United States v. Zackson*,
6 F.3d 911 (2d Cir. 1993) ........ 15, 16

*Wayte v. United States*,
470 U.S. 598 (1985)........ 20, 21, 27

**Statutes**

18 U.S.C. § 2........ 6

18 U.S.C. § 371........ 2, 6

18 U.S.C. § 1343........ 2

18 U.S.C. § 1956........ 2

52 U.S.C. § 30104........ 2

52 U.S.C. § 30116........ 2

52 U.S.C. § 30118 ........ 2

52 U.S.C. § 30122 ........ 2, 6

52 U.S.C. § 30109 ........ 6

52 U.S.C. § 30116(a)(1)(A) ........ 6

52 U.S.C. § 30118(a) ........ 6

**Rules**

Fed. R. Crim. P. 12(b)(3)(A)(iv) ........ 23

Fed. R. Crim. P. 12(b)(3)(A)(v) ........ 48

Fed. R. Crim. P. 12(b)(3)(C) ........ 32

Fed. R. Crim. P. 12(b)(3)(E) ........ 23

Fed. R. Crim. P. 12(c)(3) ........ 23, 32

Fed. R. Crim. P. 16(a)(2) ........ 12

Fed. R. Crim. P. 5(f) ........ 11, 12

Fed. R. Crim. P. 12 ........ 24

## PRELIMINARY STATEMENT

The Government writes in opposition to the defendant's second pretrial motions (Dkt. 123), which are uniformly without merit and almost entirely untimely.

The bulk of the defendant's motions were brought over a year after the Court-ordered deadline and may be denied on this basis alone. They also fail on the merits. Contrary to the defendant's unsupported and false speculations, she was prosecuted not for any improper motive but because of the evidence of her guilt. Contrary to the defendant's characterization of the affidavits supporting the search warrants on her iCloud account and phone, the handful of trivial details she says were allegedly omitted were entirely immaterial and the affiant did not leave them out in an intentional or reckless attempt to mislead. And contrary to the defendant's characterization of the law, she has no entitlement to inspect the grand jury transcripts for alleged omission of supposedly exculpatory information. In any event, she has not made or even approached the demanding threshold showings necessary for discovery on any of those claims, and her motions should thus be denied.

Additionally, although the Government has acted in good faith to provide the defendant with extensive discovery far beyond that required by the law, the defendant nevertheless seeks an unwarranted *Brady* order. Such an order is unnecessary given the Government's productions to date and, in any event, is effectively mooted by the additional disclosures the Government is in the process of making in response to the defendant's requests.

## BACKGROUND

### I. The Investigation and the Search Warrants

Prior to the filing of the Indictment in this case, the Government conducted an extensive investigation, including the issuance of search warrants by three different magistrate judges in two different districts, all of whom found probable cause to suspect that the searches would yield

evidence of multiple criminal offenses. These offenses included the offenses with which the defendant was ultimately charged, related to the defendant's conspiracy with her then-boyfriend and now-husband Ryan Salame to violate the campaign finance laws by funding her failed 2022 congressional campaign with donations from Salame in excess of the legal limits, and with prohibited corporate donations from the now-defunct cryptocurrency exchange FTX.

On or about April 11, 2023, the Honorable Sarah L. Cave, United States Magistrate Judge for the Southern District of New York, issued a warrant (the "iCloud Warrant") for the contents of iCloud accounts used by the defendant and Salame, based on a finding that there was probable cause that those accounts contained evidence, fruits, and instrumentalities of violations of willfully making and receiving excessive campaign contributions, in violation of 52 U.S.C. § 30116; willfully making political contributions in the name of other persons, also known as conduit contributions, in violation of 52 U.S.C. § 30122; willfully making political contributions by a corporation, in violation of 52 U.S.C. § 30118; willfully making false reports to the Federal Election Commission ("FEC"), in violation of 52 U.S.C. § 30104; conspiracy to commit those offenses and to defraud the FEC, in violation of 18 U.S.C. § 371; wire fraud and conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349; and money laundering, in violation of 18 U.S.C. §§ 1956 and 1957 (the "Subject Offenses"). The iCloud Warrant was supported by a detailed 21-page affidavit (the "iCloud Affidavit" or "iCloud Aff.") sworn to by a Special Agent of the Federal Bureau of Investigation ("FBI"), which attached and incorporated by reference the indictment of FTX's Chief Executive Officer, Samuel Bankman-Fried (the "SBF Indictment" or "SBF Ind."). (*See* Dkt. 124 Ex. 1).

On or about April 23, 2023, the Honorable Timothy J. Sullivan, United States Magistrate Judge for the District of Maryland, issued warrants (the "Maryland Warrants") to search the

residence and persons of the defendant and Salame, based on a finding of probable cause that the searches would yield evidence, fruits, and instrumentalities of the Subject Offenses. The Maryland Warrants were supported by the 18-page affidavit of the same FBI Special Agent (the "Maryland Affidavit" or "Maryland Aff."), which similarly attached and incorporated the SBF Indictment. (*See* Dkt. 124 Ex. 2 (Maryland Aff. attached as Exhibit A)).

On or about May 1, 2023, the Honorable Stewart D. Aaron, United States Magistrate Judge for the Southern District of New York, issued a warrant (the "iPhone Warrant") to examine the contents of the phones seized during the execution of the Maryland Warrants, based on a finding of probable cause that the searches would yield evidence, fruits, and instrumentalities of the Subject Offenses. The iPhone Warrant was supported by a 16-page affidavit (the "iPhone Affidavit") that attached and incorporated the Maryland Affidavit. (*See* Dkt. 124 Ex. 2).

The iCloud Affidavit, the Maryland Affidavit, and the iPhone Affidavit (which, as noted, incorporated the Maryland Affidavit) each set forth, among other things, the following evidence:

[redacted]

[1] Unless otherwise noted, internal quotation marks, citations, and brackets are omitted.

[redacted]

The affidavits and the SBF Indictment also contained the following evidence regarding Salame's participation in a broader scheme to make illegal campaign contributions:

[redacted]

Each of the warrant affidavits further disclosed information arguably weighing against or limiting inferences of guilt, including information that the defendant now claims should have been included. The affidavits reported that [redacted] (iCloud Aff. ¶ 10 n.2; Maryland Aff. ¶ 8.d n.4; iPhone Aff. ¶ 7 n.2). The affidavits also reported that, [redacted] (iCloud Aff. ¶ 14.c n.3; Maryland Aff. ¶ 14.c n.5; iPhone Aff. ¶ 10.c n.3). The affiant further noted [redacted]

[redacted] (iCloud Aff. ¶ 14 n.3; Maryland Aff. ¶ 14.c n.5; iPhone Aff. ¶ 10.c n.3).

## II. The Indictment

The Indictment was unsealed on August 22, 2024, charging the defendant with (1) conspiracy to cause unlawful political contributions, in violation of 18 U.S.C. § 371 and 52 U.S.C. §§ 30109, 30116, 30118, and 30122, in connection with a $400,000 sham payment from FTX Digital Markets in June 2022 and two transfers from Salame to the defendant—one in June 2022 and the other in August 2022—totaling over $528,000, which the defendant then transferred almost entirely to her congressional campaign account (Count One); (2) causing and accepting excessive campaign contributions, in violation of 52 U.S.C. §§ 30116(a)(1)(A), 30116(f), and 30109(d)(1)(A)(i), and 18 U.S.C. § 2, with respect to the personal transfers from Salame to the defendant (Count Two); (3) causing and receiving an unlawful corporate contribution, in violation of 52 U.S.C. §§ 30118(a) and 30109(d)(1)(A)(i), and 18 U.S.C. § 2, with respect to the sham payment from FTX Digital Markets (Count Three); and (4) causing and receiving a conduit contribution, in violation of 52 U.S.C. §§ 30122, 30109(d)(1)(A)(i), and 18 U.S.C. § 2, in relation to both the sham payment from FTX Digital Markets and the personal transfers from Salame to the defendant (Count Four).

## III. The Initial Discovery Productions

Following the unsealing of the Indictment, the Government made multiple extensive productions of discovery to the defendant. The defendant's records from her Wells Fargo bank account that received the unlawful campaign contributions at issue were produced to the defendant on or about October 18, 2024, as were the returns from the iCloud Warrant and the iPhone Warrant. The iCloud Warrant and Affidavit and the iPhone Warrant and Affidavit were produced to the defendant on or about December 3, 2024. These productions also included numerous items that

were not required to be produced under Rule 16 and were provided as a courtesy to the defendant to enable her to prepare for trial, such as voluminous subpoena returns and records obtained through voluntary productions.

As the Government has also explained to the defense, the Government has made reasonable efforts to review the file maintained for the prosecution of Bankman-Fried in connection with the collapse of FTX (the "FTX file") for any Rule 16 and *Brady* materials, and since identified materials that were long ago produced to the defendant. As explained, those efforts included, among others, consultation with members of the team responsible for prosecuting Bankman-Fried and his coconspirators to identify categories of documents that were likely to include Rule 16 or *Brady* material; those categories of documents were either produced in full, or searches were conducted and identified materials were produced. As part of that process, the Government produced communications involving or concerning the defendant from numerous sources. For example, on or about October 18, 2024, the Government produced full and responsive warrant returns of the defendant's cellphone, and iCloud accounts belonging to the defendant and to Salame, which included, among other things, email communications involving the defendant's personal email account, as well as text messages and chats involving the defendant from several platforms. Further, the Government long ago produced, among other things, communications involving the defendant's email address from the Association for Digital Asset Markets ("ADAM"), the organization for which the defendant was the chief executive officer, and Slack channels that included the defendant; communications with or regarding the defendant located in the data marked as responsive to a Google search warrant in the FTX file; and communications with or regarding the defendant contained in certain subpoena returns or voluntary productions.

## IV. The First Pretrial Motions

The defendant's pretrial motions, which were filed on the Court-ordered deadline of May 9, 2025 (Dkt. 37), sought (a) to dismiss the Indictment based on alleged promises supposedly made in connection with Salame's plea, (b) to suppress statements made by the defendant allegedly in reliance on such supposed promises, and (c) to dismiss one count of the Indictment as multiplicitous. (Dkt. 39). Those motions did not seek any relief based on any alleged improper prosecutorial motive or any discovery in support of any such claim for relief; suppression of the fruits of the iPhone Warrant, the Maryland Warrants, or the iCloud Warrant or any discovery or hearing in support of any such claim for relief; or any relief based on any challenge to the grand jury presentation leading to her Indictment or any discovery in support of any such claim for relief.

The Court held a three-day evidentiary hearing on the defendant's motion to dismiss the Indictment, which included testimony from former U.S. Attorney Danielle Sassoon, who had, while an Assistant United States Attorney, participated in the investigation into FTX, as well as the defendant's and Salame's former attorney from Mayer Brown. Following several rounds of briefing, the Court denied the defendant's motion in full. (Dkt. 111 at 1).[2] The Court found that "[t]he evidence compiled, including three days of hearings, undisputably indicates that the Government did not promise to not prosecute Bond in exchange for Salame's guilty plea," and indeed "clearly disavowed any indication that Bond was immune from prosecution prior to Salame's guilty plea." (Dkt. 111 at 14-15). In support of that finding, the Court cited the testimony

[2] By letter dated October 24, 2025, the Government informed the Court that "it does not intend to offer in its case-in-chief any of the statements the defendant seeks to suppress in her motion." (Dkt. 76). In denying the defendant's motions, the Court noted that the defendant did not press other arguments in her post-hearing briefing beyond those raised in support of her motion to dismiss and proceeded to find that "[a]ll of Bond's pending motions are denied in their entirety." (Dkt. 111 at 1 n.1).

of the defendant's former attorney, who "repeatedly acknowledged . . . under oath" that "the Government . . . made clear that no such promise existed prior to Salame's guilty plea[,] . . . meaning that a[ll] parties were aware that Bond and Salame were being investigated separately." (Dkt. 111 at 16). The Court further found that the defendant lacks standing to enforce any promise supposedly made to Salame. (Dkt. 111 at 16-19).

## V. The Government's Continued Production of Discovery

The Government has continued to produce discovery and to engage in good faith with the defendant's requests. As relevant here, following discovery requests from the defendant, the Government conducted additional searches in the FTX file for the defendant's known personal and ADAM email addresses and, on August 14, 2026, produced materials identified through those searches to the defendant.

Further, after conferring with the defendant about pre-trial disclosures, the Government, on August 21, 2026, made available to the defendant a production that includes impeachment material for Salame and potential Government trial witnesses formerly employed by FTX or its subsidiaries. This production also includes—at the request of the defendant—redacted copies of the transmittal letters itemizing the discovery to Bankman-Fried, so that if the defendant wishes to identify additional materials from that prosecution and articulate her views about whether they should be produced, she may do so. The Government is also preparing to produce additional impeachment materials to the defendant, which are described in the cover letter accompanying the August 21, 2026 production. The Government will, of course, continue to engage with the defendant regarding discovery in good faith.

## ARGUMENT

### I. There is No Basis for the Court to Enter Any Order Regarding the Government's Discharge of its Obligations Pursuant to *Brady v. Maryland*

Throughout the defendant's submission, the defendant casts unfounded aspersions on the Government's discharge of its discovery obligations. Because the defendant's motion is "flatly contrary to the law in this Circuit," *United States v. Gatto*, 316 F. Supp. 3d 654, 657-58 (S.D.N.Y. 2018), and because the Government has been undertaking extensive efforts to meet and exceed its disclosure obligations, this motion should be denied.

#### A. Legal Standard

Under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, "[t]he prosecution has a constitutional duty to disclose evidence favorable to an accused when such evidence is material to guilt or punishment." *United States v. Coppa*, 267 F.3d 132, 135 (2d Cir. 2001). This duty covers not only exculpatory material, but also information that could be used to impeach a government witness. *Id.* (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)).

The Second Circuit has recognized that the *Brady* obligation is committed to the Government and is ill-suited to pretrial intervention by a court, because the "scope of the government's constitutional duty . . . is ultimately defined retrospectively, by reference to the likely effect that the suppression of particular evidence had on the outcome of the trial." *Coppa*, 267 F.3d at 140. Because "[t]here is no Brady violation unless there is a reasonable probability that earlier disclosure of the evidence would have produced a different result at trial," *id.* at 144, the Second Circuit explicitly recognized that "[t]he prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of reasonable probability is reached," *id.* at 143. As a result, courts will not "micromanage how the Government discharges its *Brady*

obligations" before trial. *United States v. Córdoba Ruiz*, No. 22 Cr. 121 (LJL), 2023 WL 6811646, at *3 (S.D.N.Y. Oct. 16, 2023); *United States v. Gustus*, No. 02 Cr. 888 (LTS), 2002 WL 31260019, at *2 (S.D.N.Y. Oct. 8, 2002) ("[I]t is the Government's responsibility to determine what evidence is material and when such evidence should be disclosed in time for its effective use."); *Gatto*, 316 F. Supp. 3d at 657-58 (a pretrial *Brady* order requiring the Court to "decide in advance of trial whether the government's non-production of specific documents or categories of evidence would violate its *Brady* obligations" would be "flatly contrary to the law in this Circuit," citing *Coppa*).

After issuing the order required under Federal Rule of Criminal Procedure 5(f), courts will typically not "issue a further order" regarding *Brady* when the Government represents it is taking its obligations seriously, at least absent concrete evidence that the Government has withheld *Brady* material. *Córdoba Ruiz*, 2023 WL 6811646, at *3; *see also, e.g.*, *United States v. Neumann*, No. 21 Cr. 439 (NSR), 2022 WL 3445820, at *17 (S.D.N.Y. Aug. 17, 2022) (declining to "issue an order or to hold a hearing" where there was no evidence that the Government's representations regarding its compliance with disclosure obligations were "inaccurate or false"); *United States v. Gillier*, No. 11 Cr. 409 (PAE), 2022 WL 179204, at *2 (S.D.N.Y. Jan. 19, 2022) (denying motion for order as to *Brady* material where government represented it acknowledged its obligations, was unaware of any non-disclosed *Brady* material, and committed to promptly produce *Brady* material); *United States v. Powell*, No. 18 Cr. 287 (AT), 2019 WL 6790634, at *6 (S.D.N.Y. Dec. 12, 2019) (similar). Similarly, the Government is required to comply with its disclosure obligations, but need not disclose to the defendant how it has done so. *See United States v. Gomez*, 199 F. Supp. 3d 728, 751-52 (S.D.N.Y. 2016) ("No more is required" when the Government has acknowledged its discovery obligations and confirmed it will comply with them), *aff'd*, 751 F.

App'x 63 (2d Cir. 2018); *United States v. Hossain*, No. 19 Cr. 06 (SHS), 2020 WL 6874910, at *4 (S.D.N.Y. Nov. 23, 2020) (same), *aff'd*, No. 22-618-CR, 2024 WL 4212321 (2d Cir. Sept. 17, 2024). Indeed, the Government's internal steps regarding its discharge of its discovery obligations are protected from disclosure by the Federal Rules of Criminal Procedure and by the deliberative process privilege. *See Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005) (deliberative process privilege extends to "documents reflecting . . . deliberations comprising part of a process by which governmental decisions . . . are formulated"); *see also* Fed. R. Crim. P. 16(a)(2) ("Except as permitted by Rule 16(a)(1)(A)-(D), (F), and (G), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case.").

**B. Discussion**

The Government takes its discovery and disclosure obligations under *Brady* and its progeny seriously, has complied with—and indeed, exceeded—those obligations, and will continue to comply with those obligations. The Government of course has no objection to the Court, as the defendant requests (Dkt. 123 at 1 n.1), docketing a written order pursuant to Federal Rule of Criminal Procedure 5(f) confirming the Government's disclosure obligations (which the Government has in any event complied with). There is, however, no need or basis for the Court to enter a "further order," *Córdoba Ruiz*, 2023 WL 6811646, at *3, specifying how the Government must comply with its obligations or directing the Government to provide information about how it has done so. The Government has already made lengthy disclosures of arguably *Brady* or non-*Brady* materials to assist the defense, including the materials the defendant seeks in her motion.

### 1. The Government Did Not Fail to Produce *Brady* Materials

The defendant faults the Government for its recent production of (1) the Donation Processing Chat regarding certain campaign contributions at FTX; (2) notes from interviews with the defendant's campaign consultants; and (3) notes from an interview with a public relations consultant who worked for ADAM and for the defendant's campaign. (Dkt. 123 at 15-17). The information contained in those documents does not constitute *Brady* materials, for several reasons and, in any event, was produced to the defendant months before the scheduled trial date.

#### *a. Donation Processing Chat*

The Donation Processing Chat was introduced at trial in *United States v. Bankman-Fried*, 22 Cr. 673 (LAK) (S.D.N.Y.), and thus has been publicly available since at least November 2, 2023, when the trial concluded. Indeed, the defendant herself had access to the document and cited it in a letter to the Government dated June 23, 2026. Failure to produce that document therefore could not have been a *Brady* violation. *See United States v. Teman*, 465 F. Supp. 3d 277, 343 & n.38 (S.D.N.Y. 2020) (evidence that was "available on a public database" cannot form the basis of a motion for a new trial based on the Government's failure to disclose under *Brady* and *Giglio* because "the evidence . . . was a matter of public record, which [the defendant] himself had the ability to, and ultimately did, locate").

In any event, it is "flatly contrary to the law in this Circuit" for a defendant to ask the Court to "decide in advance of trial whether the government's non-production of specific documents or categories of evidence would violate its *Brady* obligations." *Gatto*, 316 F. Supp. 3d at 657-58; *Gustus*, 2002 WL 31260019, at *2 ("[I]t is the Government's responsibility to determine what evidence is material and when such evidence should be disclosed in time for its effective use."). But even leaving aside the impossibility of determining at this stage whether a particular document has a reasonable probability of changing the outcome of the trial, the Donation Processing Chat

does not even on its face support the defendant's claim. That document does not purport to be the exclusive discussion of campaign contributions by FTX or its subsidiaries; indeed, on its face, the chat includes messages only between on or about October 17 and November 4, 2022 (*i.e.*, a period of less than three weeks, more than four months after the defendant received $400,000 from FTX Digital Markets on or about June 1, 2022), with messages set to automatically disappear after a certain time.[3] (*See* Dkt. 124 Ex. 9 at 1 (noting "disappearing message time" setting)). At most, the document establishes that, during a less-than-three-week period, months after the unlawful campaign contribution from FTX Digital Markets at issue here, certain FTX employees discussed campaign contributions to people and entities other than the defendant. But just as other good acts or the lack of other bad acts do not bear on whether the defendant committed the charged crime, the omission of the defendant's name from the Donation Processing Chat says nothing about whether FTX Digital Markets made an illegal campaign contribution to the defendant's campaign on June 1, 2022. *Cf. United States v. Boykoff*, 68 F. App'x 15, 20-21 (2d Cir. 2003) ("[E]vidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant."); *United States v. Walker*, 191 F.3d 326, 336 (2d Cir. 1999) (affirming district court's refusal to allow defendant accused of preparing false asylum applications to admit evidence of truthful applications he had allegedly submitted, because whether the defendant "had prepared other, non-fraudulent applications was simply irrelevant to whether the applications charged as false statements were fraudulent").

[3] Nor did the Government represent that the Donation Processing Chat was an exclusive list. To the contrary, the affiant on the iCloud and Maryland Affidavits described it as listing only [redacted] of the corporate contributions. (*See* iCloud Aff. ¶ 8.g [redacted] (emphasis added)); Maryland Aff. ¶ 8.g (same)).

*b. Interviews with or on Behalf of Campaign Consultants*

There was also nothing improper about the Government's production of notes regarding her former campaign consultants. (Dkt. 123 at 16). As the defendant notes, [redacted] (Dkt. 123 at 16). However, the defendant fails to mention that this very information was contained in a search warrant affidavit produced to the defense on or about December 3, 2024, so it is not new to her. (*See* iCloud Affidavit at 14 n.3). And even if the information was new, the campaign consultant was merely relaying what the defendant had communicated to him, which, by definition, cannot be *Brady* material. *See United States v. Zackson*, 6 F.3d 911, 918 (2d Cir. 1993) (evidence is not "suppressed" by Government under *Brady* "if the defendant either knew, or should have known, of the essential facts permitting him to take advantage" of the evidence). Regardless, even leaving aside the impossibility of determining pre-trial whether the disclosure of evidence "would have produced a different result at trial," *Coppa*, 267 F.3d at 144, the information contained in the Consultant-1 proffer notes is hardly favorable to the defense. That is because the defendant's statements to Consultant-1 were lies. Indeed, the defendant did not in fact get money from the sale of her home to support her campaign; rather, she got money from Salame, which she then transferred to her campaign account, contrary to her claim that such money was the product of "a bona fide, good-faith, market-value transaction" (Dkt. 123 at 16).

The other quoted material in the defendant's motion—culled from notes of an attorney proffer, reporting that [redacted] (Dkt. 123 at 16)—is even further afield, as it says nothing about the source of the campaign contribution at issue. Importantly, the defendant omits that those same notes

reflect that *none* of the campaign consultants recalled discussing with the defendant that she would supposedly sell an interest in the sale of her home to Salame.

*c. Interview with Public Relations Consultant*

Nor was there anything problematic about the Government's recent production of notes from an interview with a witness relaying statements made by the defendant to the witness. (Dkt. 123 at 16-17). Again, that the defendant made self-serving statements to this witness cannot be *Brady* material, as that is information that "the defendant either knew, or should have known." *Zackson*, 6 F.3d at 918. Here too, the defendant leaves out critical information showing that the statements are not favorable to the defense, even assuming the Court were to conduct any such analysis before trial, which would be "flatly contrary to the law in this Circuit." *Gatto*, 316 F. Supp. 3d at 657-58. First, the defendant claims that [redacted] (Dkt. 123 at 16). But the notes report the witness in fact stating that [redacted] (Dkt. 124 Ex. 15 at 5 (emphasis added)). In context, the witness was plainly referring to the firewall that had been set up between Salame's political action committee and the defendant's campaign, not the unlawful campaign contributions at issue here.

The defendant then asserts that the "interview report [of that witness] also includes evidence of Ms. Bond, before she was indicted, explaining that she performed services for FTX above and beyond the work she was doing for them in her capacity as ADAM's CEO." (Dkt. 123 at 17). But what the defendant fails to mention is that in 2022, shortly after she received a $400,000 payment from FTX Digital Markets and in response to subsequent press inquiries about that payment, the defendant told this witness multiple times (in writing) that she was not and never had been an FTX consultant. (*See, e.g.*, Dkt. 124 Ex. 15 at 8 [redacted]

[redacted] The defendant also omits that this witness further said that [redacted] (Dkt. 124 Ex. 15 at 8). That the defendant changed her story years later, when she was trying to get a new business venture off the ground, is hardly exculpatory; to the contrary, the defendant's shifting explanations for the $400,000 payment are strongly reflective of her consciousness of guilt.

Regardless, the Government produced these materials to the defendant months before the scheduled trial date, and thus the defendant has no cause for complaint.

#### 2. Evidence That the Defendant Performed Work Benefitting FTX in her Capacity as CEO of ADAM Is Not *Brady* Material

The defendant is also incorrect that *any* evidence that the defendant performed work benefitting FTX is favorable to the defense. (Dkt. 123 at 18-20). As the Government explained to the defense and as is evident from the Indictment itself, the Government's theory is and has always been that the defendant never performed work for FTX *pursuant to the May 27, 2022 consulting agreement* and thus the $400,000 the defendant received from FTX Digital Markets on or about June 1, 2022 was not income from bona fide employment. (*See* Indictment ¶ 12 ("BOND did not perform any services for the Exchange pursuant to the Consulting Agreement."), ¶ 13 ("On or about June 1, 2022, the Subsidiary sent a $400,000 wire transfer . . . to the BOND Personal Account . . . , notwithstanding that BOND had not performed any services in exchange for the Exchange Payment pursuant to the Consulting Agreement.")).

The Government does not dispute and has never disputed that the defendant did work that benefited FTX in her capacity as CEO of ADAM, and that she attended certain events with Salame,

her then-boyfriend and CEO of FTX Digital Markets. Indeed, the Government produced voluminous materials to the defendant beginning on or about October 18, 2024 (*i.e.*, within two months after the unsealing of the Indictment) reflecting work that the defendant did for the benefit of FTX as CEO of ADAM, including communications over her ADAM email address. But that information is not favorable to the defense, as it does not establish that the defendant in fact worked as a consultant for FTX pursuant to the consulting agreement and earned the $400,000 that FTX Digital Markets paid her.

### 3. The Government Has Reviewed and Will Continue To Review the FTX File

Lastly, the defendant's arguments about the way the Government has complied with its discovery and disclosure obligations, including its search for emails sent to or from the defendant's personal email address within the FTX file (Dkt. 123 at 20-23), ignore essential context that demonstrates the Government's continued good faith discharge of its obligations. To be clear, the Government has never denied that the FTX case file is in its possession, custody, or control, as the Government has communicated to the defense on multiple occasions. As described in Background Sections III and V, above, the Government has produced voluminous materials from the FTX file to the defendant and performed additional searches in the FTX case files after further conferring with the defendant.

Indeed, as noted in Background Section V, well in advance of trial and to accommodate the defendant's request for earlier production of impeachment information to assist in trial preparation, the Government has produced and is in the process of producing extensive materials from the prosecution of Bankman-Fried, including transmittal letters that will allow the defendant to identify additional materials, if any, that she may believe should be produced. These

productions, in addition to being provided long before trial, also exceed the Government's disclosure obligations.

Accordingly, there is no justification for any order that would "micromanage how the Government discharges its *Brady* obligations," *Córdoba Ruiz*, 2023 WL 6811646, at *3, let alone one that would require the Government to reveal privileged information about how it does so, *see Gomez*, 199 F. Supp. 3d at 751-52; *Nat'l Council of La Raza*, 411 F.3d at 356. The Government is aware of its discovery obligations, has been complying with them through extensive productions that the Government expects will effectively moot the defendant's pending requests, and will continue to comply with them. "No more is required." *Gomez*, 199 F. Supp. 3d at 751-52.

## II. The Defendant's Untimely Claim of Selective or Vindictive Prosecution is Baseless

The defendant seeks discovery to support a claim that the Government allegedly prosecuted her, not because of the evidence of her guilt, but purportedly for political reasons or out of unspecified supposed "animus" towards either her or Salame for unknown reasons. (*See* Dkt. 123 at 23-26). Despite the seriousness of these false accusations of Government misconduct, the defendant offers not a shred of support for them, let alone the substantial threshold showing necessary to obtain discovery.

The defendant's arguments are factually and legally baseless. As set forth in a detailed Indictment and as further supported in discovery materials, including warrants reflecting probable cause findings by three different judges in two different districts, the defendant was charged with crimes because there is overwhelming evidence that she committed them. There is no government scheme, involving multiple people at multiple agencies, to prosecute the defendant for political reasons. The defendant is entitled to dispute the charges against her and ask a jury to hold the Government to its burden of proving those charges beyond a reasonable doubt. She is not entitled to compel the Government to produce internal documents or other discovery to disprove her

fantastical notions as to why she was charged, particularly without showing that there is clear evidence—not hyperbolic allegations or baseless insinuations—that the prosecution against her is both discriminatory in effect and discriminatory in purpose. The defendant does not come close to such a showing.

**A. Legal Standard**

A defendant challenging the Government's decision to prosecute her bears a heavy burden. *United States v. Armstrong*, 517 U.S. 456, 463-64 (1996). Federal prosecutors retain "broad discretion to enforce the Nation's criminal laws." *Id.* at 464. "As a result, '[t]he presumption of regularity supports' their prosecutorial decisions and, 'in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.'" *Id.* (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926)); *see also, e.g.*, *Wayte v. United States*, 470 U.S. 598, 607 (1985).

**1. Selective Prosecution**

To establish a claim of selective prosecution, a defendant must present "clear evidence" that the decision to prosecute not only (1) "had a discriminatory effect" but was also (2) "motivated by a discriminatory purpose." *Armstrong*, 517 U.S. at 465; *United States v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003); *United States v. Fares*, 978 F.2d 52, 59 (2d Cir. 1992); *United States v. Sun Myung Moon*, 718 F.2d 1210, 1229 (2d Cir. 1983).

With respect to the first of the two required prongs (discriminatory effect), a defendant must establish that "others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against the defendant" and that the defendant has been "singled out." *Fares*, 978 F.2d at 59 (quoting *Sun Myung Moon*, 718 F.2d at 1229); *see also Cobb v. Pozzi*, 363 F.3d 89, 110 (2d Cir. 2004) (same). With respect to the second of the two required prongs (discriminatory purpose), a defendant must establish that the Government's

"selection of the defendant for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights." *Fares*, 978 F.2d at 59. This means more than that the Government acted with an "awareness of consequences." *Wayte*, 470 U.S. at 610. Rather, it must have "selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects." *Id.* Where a defendant "has not shown that the Government prosecuted him *because of*" his protected status or conduct, his claim fails. *Id.* (emphasis in original).

Consistent with the presumption of regularity, the Supreme Court has explained that "the showing necessary to obtain discovery" in support of a selective prosecution claim "should itself be a significant barrier." *Armstrong*, 517 U.S. at 464. A defendant must meet a "rigorous standard for discovery in aid of such a claim," *id.* at 468, because the "decision to prosecute is particularly ill-suited to judicial review," and "[e]xamining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy," *Wayte*, 470 U.S. at 607; *see also, e.g.*, *United States v. Guan*, No. 24 Cr. 322 (VM), 2026 WL 160995, at *10 (S.D.N.Y. Jan. 21, 2026) ("A high standard is set because of the costs associated with permitting a defendant—before trial—to pursue an investigation of a Government investigation and thereby delay his prosecution."). To obtain discovery, a defendant accordingly first "must show some evidence of both discriminatory effect and discriminatory intent." *United States v. Bass*, 536 U.S. 862, 863 (2002) (per curiam); *see also* *Fares*, 978 F.2d at 59 (same). "Mere assertions and generalized proffers on information and belief are insufficient" to meet this burden. *Fares*, 978 F.2d at 59.

**2. Vindictive Prosecution**

Similarly, a defendant is entitled to dismissal of a charge on the ground of alleged vindictiveness only if she demonstrates "'actual' vindictiveness, or if there is a presumption of vindictiveness that has not been rebutted by objective evidence justifying the prosecutor's action." *United States v. Johnson*, 171 F.3d 139, 140 (2d Cir. 1999) (per curiam).

To establish actual vindictiveness, a defendant must prove that the prosecutor's charging decision was a "direct and unjustifiable penalty," *United States v. Goodwin*, 457 U.S. 368, 384 n.19 (1982), that resulted "solely from the defendant's exercise of a protected legal right," *id.* at 380 n.11. "Put another way, the defendant must show that '(1) the prosecutor harbored genuine animus toward the defendant, or was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a 'stalking horse,' and (2) the defendant would not have been prosecuted except for the animus.'" *United States v. Sanders*, 211 F.3d 711, 717 (2d Cir. 2000) (quoting *United States v. Koh*, 199 F.3d 632, 640 (2d Cir. 1999)). "A finding of actual vindictiveness requires 'direct' evidence, such as evidence of a statement by the prosecutor, which is available 'only in a rare case.'" *Johnson*, 171 F.3d at 140 (quoting *Goodwin*, 457 U.S. at 380-81 & nn.12-13, 384 & n.19).

To establish a presumption of prosecutorial vindictiveness, a defendant "must show that 'the circumstances of a case pose a realistic likelihood of such vindictiveness.'" *Sanders*, 211 F.3d at 717 (quoting *United States v. King*, 126 F.3d 394, 397 (2d Cir. 1997)). "[A]ny such presumption may be overcome by objective evidence justifying the prosecutor's action." *Sanders*, 211 F.3d at 717. The Second Circuit "has consistently adhered to the principle that the presumption of prosecutorial vindictiveness does not exist in a pretrial setting." *United States v. Stewart*, 590 F.3d 93, 122 (2d Cir. 2009); *see also, e.g.*, *United States v. Hinton*, 703 F.2d 672, 678 (2d Cir. 1983) ("[A] presumption of prosecutorial vindictiveness does not exist in a pre-trial setting.").

As with a claim for selective prosecution, the standard for obtaining discovery in support of such a claim is "'rigorous.'" *Sanders*, 211 F.3d at 717 (quoting *Armstrong*, 517 U.S. at 468). "To warrant discovery, the defendant must show some evidence of genuine animus, not the mere possibility that animus might exist under the circumstances." *Sanders*, 211 F.3d at 718. This is for good reason: "It would be too easy for defendants to obtain discovery on vindictive prosecution claims if all that was required was to identify a potential motive for prosecutorial animus." *Id.*

**B. Discussion**

**1. The Motion is Untimely**

The defendant offers no reason for failing to file this motion on the deadline set by the Court, which was more than a year ago. Notably, although the defendant's timely-filed pretrial motions did *not* seek discovery in support of a selective or vindictive prosecution claim, the motions did baselessly suggest that her prosecution resulted from her relationship with Salame and her political affiliation. (*See* Dkt. 39 at 1 ("Ms. Bond came to this position solely because of the government's relentless pursuit of her husband, Ryan Salame, the only Republican-leaning executive at the bankrupt cryptocurrency exchange FTX.")). Now, over a year later, the defendant premises a motion for discovery on these very same (baseless) assertions. The defendant should not be permitted to take a second bite at the apple in this way.

Motions for discovery, as well as motions to dismiss based on selective or vindictive prosecution, are pretrial motions subject to the rules governing the timing of such motions. *See* Fed. R. Crim. P. 12(b)(3)(A)(iv) (requiring allegations of "selective or vindictive prosecution" to be brought as pretrial motions if basis reasonably available); Fed. R. Crim. P. 12(b)(3)(E) (same for motion for "discovery under Rule 16"). Those rules are strictly enforced, barring later attempts to seek relief absent "good cause," Fed. R. Crim. P. 12(c)(3). *See, e.g.*, *United States v. Yousef*, 327 F.3d 56, 125 (2d Cir. 2003) (a failure to bring timely a motion required to be brought under

Federal Rule of Criminal Procedure 12 constitutes a "complete" waiver, and "[a] strategic decision by counsel not to pursue a claim, inadvertence of one's attorney, and an attorney's failure to timely consult with his client are all insufficient" to overcome such waiver); *United States v. Mustafa*, 753 F. App'x 22, 44 (2d Cir. 2018) (same, citing the amended Rule 12(c)(3)).

This motion is over a year late and the defendant does not even attempt to establish "good cause" to excuse the untimely filing (nor could she). The defendant plainly could reasonably have sought discovery based on alleged selective or vindictive prosecution, particularly given that she made similar (baseless) assertions in the motions she did bring. Indeed, the only recently-produced document even cited in this motion—a copy of the Donation Processing Chat—was available to her long before she was even indicted, as it was entered into evidence and publicly available at the trial of Bankman-Fried, which concluded on November 2, 2023.[4] Accordingly, even if the Donation Processing Chat were sufficient to establish the defendant's entitlement to relief (it does not, *see infra* Section II.B.2), that document could not resuscitate a motion that was subject to "complete" waiver long ago. *Yousef*, 327 F.3d at 125. The defendant cannot assert (without any basis) a claim of improper prosecutorial motive, conduct an entire hearing (without ever seeking any relief on that baseless claim), and then—when the results of that hearing are not to her liking—seize on an irrelevant or at best scarcely relevant document, that was long ago publicly available to her, to launch a new round of motions on that claim. The legal system does not countenance such a "heads-I-win-tails-you-lose gamble." *United States ex rel. Williams v. McMann*, 436 F.2d 103, 107 (2d Cir. 1970).

[4] Indeed, the defendant was able to obtain the Donation Processing Chat from public records prior to its production by the Government (Dkt. 123 at 10 n.4), underscoring that she could presumably have done so at any time she chose following Bankman-Fried's trial.

**2. The Prosecution Is Not Selective**

Even if considered on the merits (and it need not be), the defendant's motion fails and comes nowhere near the required showing for discovery.

*a. The Defendant Fails to Show that Similarly Situated Individuals Were Not Prosecuted*

As discussed, with respect to the first prong of the selective prosecution analysis, the defendant must show that "others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against [her]." *Fares*, 978 F.2d at 59. "A similarly situated offender is one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced." *United States v. Lewis*, 517 F.3d 20, 27 (1st Cir. 2008); *see also, e.g.*, *United States v. Smith*, 231 F.3d 800, 811 (11th Cir. 2000) (defendant "must establish that the government could prove beyond a reasonable doubt that someone else had engaged in the same type of conduct, committing the same crime in that or substantially the same manner"); *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996) ("[D]efendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them.").

The defendant comes nowhere near making this showing. The defendant points to the convictions of Bankman-Fried and Salame for making unlawful campaign contributions and wildly speculates that "it is inconceivable that had SDNY investigated all recipients of FTX campaign donations, it would have been unable to find any indictable conduct" beyond the defendant's. (Dkt. 123 at 25). But simply pointing at a broad group and suggesting that investigations would likely have found criminal conduct does not qualify as a showing that any individuals were similarly situated. *See, e.g.*, *Fares*, 978 F.2d at 59 ("Mere assertions and

generalized proffers on information and belief are insufficient"). Indeed, the indictments and press statements cited by the defendant (Dkt. 123 at 24) do not say anything suggesting any knowing participation by the recipient campaigns, as the charges in this case do. Similarly, the Donation Processing Chat—far from being the prima facie evidence of disparate treatment that she claims (Dkt. 123 at 26)—does not demonstrate any candidate's or campaign's knowing receipt of illegal campaign contributions. (*See* Dkt. 124 Ex. 9). It thus provides not a shred of support for the defendant's claim that similarly situated recipients of campaign contributions were not prosecuted.

The defendant also fails to identify any other contribution involving the numerous aggravating factors alleged in her Indictment. The defendant identifies no individual who (a) received almost $1 million of illegal campaign contributions (Indictment ¶ 30); (b) signed a sham consulting contract with an alleged coconspirator to disguise a multi-hundred-thousand-dollar payment (*id.* ¶¶ 9-13); (c) personally engaged in financial transactions through her own bank accounts to disguise the campaign contributions (*id.* ¶¶ 14-17, 19, 28); *and* (d) made false statements, including in her mandated public financial disclosure forms, to conceal the payments (*id.* ¶¶ 22-25, 35). This threshold deficiency in showing any similarly situated individual justifies denial of her motion in its entirety. *See, e.g.*, *Bass*, 536 U.S. at 863 (reversing grant of motion for discovery, holding "because respondent failed to submit relevant evidence that similarly situated persons were treated differently, he was not entitled to discovery"); *Fares*, 978 F.2d at 59.

*b. The Defendant Fails to Show Discriminatory Purpose*

Because the defendant fails to make an evidentiary showing in support of the first required prong, her motion for discovery must be denied. *See, e.g.*, *Bass*, 536 U.S. at 863. But even if this Court were to assume *arguendo* that the defendant had made such a showing, the motion still fails, because the defendant also fails to meet the second required prong.

The defendant makes the inflammatory and false assertion that her political views played a role in her prosecution. (Dkt. 123 at 24-25). But she identifies no actual "evidence," *Bass*, 536 U.S. at 863, that she was prosecuted "*because of*" of such activity, *Wayte*, 470 U.S. at 610 (emphasis in original); rather, she offers only "[m]ere assertions," *Fares*, 978 F.2d at 59. The defendant's only support for this accusation of grave Government misconduct is the speculation—in the form of a question—that her political views "set her apart." (Dkt. 123 at 24-25). This baseless and unsupported speculation is not remotely sufficient to make the required evidentiary showing of discriminatory purpose. This provides an independent basis to deny the motion, even if—contrary to fact—the defendant's motion were timely or had made a threshold showing of similarly situated individuals.[5]

**3. The Prosecution is Not Vindictive**

To the extent that the defendant seeks to establish that her prosecution represents a vindictive attempt to retaliate for unspecified reasons, any such claim is baseless. Because the defendant does not even attempt to offer "direct evidence," *Johnson*, 171 F.3d at 142, any vindictiveness claim fails as a matter of law. In any event, the conclusory and unsupported arguments the defendant advances do not come close to making out a claim and indeed do not even lay out any coherent theory of "animus" whatsoever. (Dkt. 123 at 25). In short, the defendant offers nothing to support her theory that the investigation was launched, pursued, and resulted in charges for any reason other than the evidence of her guilt.

[5] The defendant's alternative speculation that the prosecution may have been launched "because Ms. Bond was then in a committed relationship with" Salame (Dkt. 123 at 25) is equally implausible and unsupported by the facts, and likewise comes nowhere near the required threshold evidentiary showing to establish this theory.

## III. The Defendant's Untimely Motion to Suppress Should be Denied Without a Hearing

The defendant's motion to suppress the fruits of two search warrants is woefully belated and lacks any merit. The motion is more than a year overdue, and the defendant had the affidavits required to make the motion as early as December 2024. The motion also fails on the merits. Rather than identify any flaw in the showing of probable cause set forth in the affidavits or even a single incorrect statement in a single affidavit, the defendant faults the affiant for not including a scattering of fragmentary facts that were in no way material to probable cause and did not reflect any intent to mislead the issuing magistrate judges. Because an "affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation," *United States v. Mandell*, 710 F. Supp. 2d 368, 373 (S.D.N.Y. 2010), the omission of such "fragments of information," *id.* at 376, does not justify any hearing.

### A. Legal Standard

#### 1. Review of a Magistrate Judge's Probable Cause Determination

In considering a request for a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Such determinations must be approached in a practical way, *id.* at 231-32, because "probable cause is a flexible, common-sense standard." *Texas v. Brown*, 460 U.S. 730, 742 (1983). Probable cause "does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience." *United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004). It "does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands." *Gerstein v. Pugh*, 420 U.S. 103, 121 (1975). Probable cause requires "only the probability, and not a prima facie showing, of criminal activity." *Gates*, 462 U.S. at 235.

Accordingly, "the fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause." *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985); *see also, e.g.*, *United States v. Leeper*, --- F.4th ----, 2026 WL 2339544, at *5 (2d Cir. Aug. 13, 2026), (affirming warrant for DNA collection, reasoning, "The supporting affidavit does not establish with certainty that there would be a sample against which to compare [the individual's] DNA, but that is not what the Fourth Amendment requires.").

**2. Alleged Omissions or Misstatements in a Search Warrant Affidavit**

A search warrant affidavit is presumed reliable. *See Franks v. Delaware*, 438 U.S. 154, 171 (1978); *United States v. Klump*, 536 F.3d 113, 119 (2d Cir. 2008). "The task of a reviewing court is simply to ensure that the 'totality of the circumstances' afforded the [issuing judge] a 'substantial basis' for making the requisite probable cause determination." *United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (quoting *Gates*, 462 U.S. at 238). "In certain circumstances, however, a defendant may challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search or seizure." *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003). Not every statement in a warrant affidavit must be true. *See United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000). To invoke the *Franks* doctrine, the defendant must demonstrate that there were intentional misstatements or omissions in the search warrant affidavit and that those misstatements or omissions were material. *See Awadallah*, 349 F.3d at 64. The defendant must establish both components—*i.e.*, intent and materiality—by a preponderance of the evidence. *See Klump*, 536 F.3d at 119.

"The *Franks* standard is a high one." *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991). To secure a *Franks* hearing, a defendant must make a "'*substantial preliminary showing*' that a deliberate falsehood or statement made with reckless disregard for the truth was included in the warrant affidavit and the statement was necessary to the judge's finding of probable cause."

*United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (quoting *Franks*, 438 U.S. at 155, 170) (emphasis added). The burden to obtain a *Franks* hearing is thus itself a heavy one, and such hearings are rare. *See, e.g.*, *United States v. Sandalo*, 70 F.4th 77, 86 (2d Cir. 2023) ("[T]he substantial preliminary showing standard imposes a 'high' burden on [the defendant]." (quoting *Rivera*, 928 F.2d at 604)); *United States v. Skyfield*, No. 23 Cr. 569 (LJL), 2023 WL 8879291, at *8 (S.D.N.Y. Dec. 22, 2023) (defendant's burden is "'a heavy one that requires more than a mere conclusory showing'" (quoting *Sandalo*, 70 F.4th at 86)); *United States v. Melendez*, No. 16 Cr. 33 (LTS), 2016 WL 4098556, at *7 (S.D.N.Y. July 28, 2016) ("The burden to obtain [a *Franks*] hearing is a heavy one, and such hearings are exceedingly rare."); *United States v. Brown*, 744 F. Supp. 558, 567 (S.D.N.Y. 1990) ("A defendant seeking to have the Court hold a *Franks* hearing bears a substantial burden.").

In reviewing a challenge to a warrant, alleged "[o]missions are not subject to the same high level of scrutiny as misstatements." *United States v. Rivera*, 750 F. Supp. 614, 617 (S.D.N.Y. 1990). Because "all storytelling involves an element of selectivity," it is "not shocking that every affidavit will omit facts which, in retrospect, seem significant." *United States v. Vilar*, No. 05 Cr. 621 (KMK), 2007 WL 1075041, at *27 (S.D.N.Y. Apr. 4, 2007); *see also Awadallah*, 349 F.3d at 67. "An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *Mandell*, 710 F. Supp. 2d at 373. Thus, "as a practical matter the affirmative inclusion of false information in an affidavit is more likely to present a question of impermissible official conduct than a failure to include a matter that might be construed as exculpatory." *Id.* at 374. This is because "allegations of omission potentially open officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit." *Id.*

As a result, the law recognizes that while "an officer may not disregard plainly exculpatory evidence," *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006), an affiant is "not required to include all potentially exculpatory information" in seeking the search warrant, *United States v. Maisonet*, No. 12 Cr. 829 (AKH), 2013 WL 12204909, at *1 (S.D.N.Y. Mar. 22, 2013); *see also United States v. Calk*, No. 19 Cr. 366 (LGS), 2020 WL 3577903, at *5 (S.D.N.Y. Jul. 1, 2020). Indeed, "[a] requirement that all potentially exculpatory evidence be included in an affidavit would severely disrupt the warrant process and place an extraordinary burden on law enforcement officers, and is not the law." *United States v. Cromitie*, No. 09 Cr. 558 (CM), 2010 WL 3025670, at *6 (S.D.N.Y. July 28, 2010). Accordingly, "[o]mitted information that is potentially relevant but not dispositive is not enough to warrant a *Franks* hearing." *Mandell*, 710 F. Supp. 2d at 374.

To permit the inference that an affiant acted with reckless disregard for the truth, the omitted information must be "clearly critical" to assessing the legality of the search. *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996). The movant must make a substantial preliminary showing that a reasonable person would have known that the magistrate judge would have wanted to know the kind of information that was omitted. *See United States v. Perez*, 247 F. Supp. 2d 459, 474 (S.D.N.Y. 2003). "Courts have repeatedly been warned not to interpret the affidavit in a hypertechnical, rather than a commonsense, manner." *Canfield*, 212 F.3d at 719.

A search warrant affiant "does not necessarily act with reckless disregard for the truth simply because he or she omits certain evidence that a reviewing court, in its judgment, considers to be clearly critical." *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013). "Rather, the reviewing court must be presented with credible and probative evidence that the omission of information . . . was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'" *Id.* (quoting *Awadallah*, 349 F.3d at 68). "[T]he mere intent to exclude information is

insufficient . . . [since] every decision not to include certain information in the affidavit is 'intentional' insofar as it is made knowingly." *Awadallah*, 349 F.3d at 67-68.

"To prove reckless disregard for the truth, the defendant[] [must] prove that the affiant in fact entertained serious doubts as to the truth of his allegations." *Rajaratnam*, 719 F.3d at 154; *see also Falso*, 544 F.3d at 126 ("Allegations of negligence or innocent mistake are insufficient.").

"To determine if misrepresentations or omissions are material, a court corrects the errors and then resolves de novo whether the hypothetical corrected affidavit still establishes probable cause." *United States v. Lahey*, 967 F. Supp. 2d 698, 711 (S.D.N.Y. 2013). "If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate." *Canfield*, 212 F.3d at 718. In other words, "[t]he ultimate inquiry is whether, after putting aside erroneous information and material omissions, there remains a residue of independent and lawful information sufficient to support probable cause." *Id.*

**B. Discussion**

**1. The Motion to Suppress is Untimely**

The defendant has waived her motion for a *Franks* hearing by not filing it on the deadline set by the Court. Indeed, the defendant was well aware that motions seeking the "suppression of evidence" must be filed timely, Fed. R. Crim. P. 12(b)(3)(C), given that she did timely file a motion to suppress certain statements she made (Dkt. 39 at 15-16). As she did not file the instant motions on the Court-ordered deadline, they are subject to "complete" waiver. *Yousef*, 327 F.3d at 125.

The defendant clearly could reasonably have brought this suppression motion at the Court-ordered deadline and thus she cannot establish "good cause," Fed. R. Crim. P. 12(c)(3), for her failure to do so. Her motion asserts that the warrant affidavits (which were produced to her on December 3, 2024, well before the May 9, 2025 motion deadline), purportedly omitted: (a) bank records (Dkt. 123 at 28-29), which—to the extent she needed copies of her own bank records from

the Government—were produced to her on October 18, 2024; (b) the Donation Processing Chat (Dkt. 123 at 30-31), which was publicly available since at least the November 2, 2023 conclusion of Bankman-Fried's trial, before the Indictment in this case; (c) the statements of Consultant-1 (Dkt. 123 at 27-28) which were in fact summarized in the affidavits (iCloud Aff. ¶ 14.c n.3; Maryland Aff. ¶ 14.c n.5; iPhone Aff. ¶ 10.c n.3) and which in any event related the defendant's own conversations with the consultant and were known to her; and (d) unspecified other evidence of work she did related to FTX (Dkt. 123 at 30), which she was obviously fully aware of since the moment she performed the work, years before the Indictment. Even leaving aside the lack of merit of her claims regarding any of these alleged omissions, she was just as able to make such claims on May 9, 2025, as she is now, and should not be permitted to flout this Court's scheduling order just because, advised by new counsel, she wishes to take a different strategic approach. *See Yousef*, 327 F.3d at 125 (noting that the "strategic decision by counsel not to pursue a claim" is "insufficient" to overcome waiver).

**2. None of the Supposed Omissions is Material**

The affidavits in support of the challenged warrants clearly set forth probable cause with or without any of the allegedly omitted material. Some of the allegedly omitted material is actually inculpatory, or else entirely neutral as to probable cause. But even if any of the alleged omissions was susceptible to a reasonable exculpatory interpretation, that would still not make any of them material to probable cause. *See, e.g.*, *Fama*, 758 F.2d at 838 ("The fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause."). At base, the defendants offer only the sort of "endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit," *Mandell*, 710 F. Supp. 2d at 376, that courts have uniformly held does not justify a *Franks* hearing.

*a. Consultant-1's Statements*

The defendant's lead supposed omission is a statement that was in fact summarized in the affidavits, and was if anything summarized in a manner that was less inculpatory than the actual interview report she claims was omitted. The slight difference in wording between the affidavit's summary and the underlying statement is a paradigm example of an immaterial "fragment[] of information," *Mandell*, 710 F. Supp. 2d at 376, that cannot justify a *Franks* hearing.

i. <u>The Affidavits Summarized the Consultant-1 Attorney Proffer Neutrally or Favorably to the Defendant</u>

Contrary to the defendant's claims, each warrant affidavit scrupulously noted that Consultant-1 believed the defendant claimed that the transfers to the defendant's campaign were funded by the defendant's own funds, including from the sale of her house. Specifically, the defendant claims that the affidavits only "obliquely mention a house sale (buried in a footnote in a section of the affidavits having nothing to do with the June 28 Transfer)." (Dkt. 123 at 27-28). However, the affiant noted explicitly that Consultant-1 [redacted] (iCloud Aff. ¶ 14.c n.3 (emphasis added); *see also* Maryland Aff. ¶ 14.c n.5 (same); iPhone Aff. ¶ 10.c n.3 (same)).

Notwithstanding that the information was in fact disclosed in the warrant, the defendant claims that additional disclosure of the precise wording of the report of the attorney proffer supposedly would have cast the warrant in a different light, purportedly negating probable cause. (Dkt. 123 at 28). Specifically, the defendant claims that the warrant should have stated that the notes of the attorney proffer reflected that the defendant had told Consultant-1 that the sale of her house "was happening in the immediate future, e.g., contract was signed and just waiting on the closing." (Dkt. 123 at 27). But this minute detail could not have changed the entire nature of the

probable cause supporting the issuance of the warrant. To the contrary, it is a prototypical example of the sort of "endless conjecture about . . . fragments of information, or other matter that might, if included, have redounded to defendant's benefit," *Mandell*, 710 F. Supp. 2d at 376, which courts uniformly hold insufficient for a *Franks* hearing in light of the "element of selectivity" inherent in any warrant application, *Vilar*, 2007 WL 1075041, at *27. It is simply impossible to imagine that a hypothetical affidavit including this quotation would fail to make out probable cause even as to the June 28 transfer of funds.

Indeed, to the marginal extent that this wording differs from the affidavit's summary that the defendant claimed that her [redacted] (iCloud Aff. ¶ 14.c n.3; Maryland Aff. ¶ 14.c n.5; iPhone Aff. ¶ 10.c n.3), the allegedly omitted wording is inculpatory. The allegedly omitted statement that the sale "was happening in the immediate future" was a statement of the defendant's forward-looking intent only, and thus provided no assurance that that intent was ever followed through on. The summary in the affidavits actually gave the defendant the benefit of the doubt by construing [redacted] (iCloud Aff. ¶ 14.c n.3; Maryland Aff. ¶ 14.c n.5; iPhone Aff. ¶ 10.c n.3).[6] Had the particular wording in the attorney proffer notes been included in the affidavit (as the defendant now claims to prefer), it would have allowed the magistrate judge to draw the inculpatory inference that the defendant at one point claimed that she would use her house sale proceeds, but then in fact did not do so. An affidavit that included additional inculpatory information would of course support probable cause even

[6] As noted in Section III.B.3, below, the fact that the affiant summarized the attorney proffer without including these inculpatory details is not consistent with any claim that the affiant intentionally or recklessly misled the magistrate judge.

more strongly. *See, e.g.*, *United States v. Menendez*, No. 23 Cr. 490 (SHS), 2024 WL 912210, at *5 (S.D.N.Y. Mar. 4, 2024) ("In addition, the CS's [allegedly omitted comments]—to the extent they are not *inculpatory*—do not undermine the probable cause in any manner whatsoever." (emphasis in original)).

ii. <u>The Wording of Consultant-1's Statements Was Not Material Even if Exculpatory</u>

Even if the wording of the Consultant-1 attorney proffer had any exculpatory character—which it did not—it was plainly not material.

With or without the wording of the Consultant-1 attorney proffer, hypothetical affidavits that included the alleged omitted information would still have set out ample probable cause with respect to the June 28 transfer of funds. That probable cause was based on powerful contemporaneous documentary evidence of: [redacted]

[redacted] (iCloud Aff. ¶¶ 8.a-h, 13; Maryland Aff. ¶¶ 8.a-h, 13; SBF Ind. ¶¶ 1-2, 18, 21-26, 32, 39, 32-34, 40, 42, 47). Against this powerful contemporaneous documentation, the wording of Consultant-1's statements could not possibly have been material even if it had any exculpatory tendency at all (which it did not). *See, e.g.*, *Mandell*, 710 F. Supp. 2d at 374 ("Omitted information that is potentially relevant but not dispositive is not enough to warrant a *Franks* hearing.").

But even if—contrary to all fact or logic—the report of the Consultant-1 attorney proffer somehow negated probable cause related to the June 28 transfer of funds, it would still not be material to the warrant, because the "hypothetical corrected affidavit" with the omitted information "still establishes probable cause" that the search would reveal evidence, fruits, or instrumentalities of the Subject Offenses. *Lahey*, 967 F. Supp. 2d at 711; *Canfield*, 212 F.3d at 718. As an initial matter, this alleged omission would hardly affect the campaign contributions deriving from the August 31 transfer from Salame and the June 1 transfer from FTX Digital Markets, neither of which have anything to do with the defendant's home sale (let alone whether she spoke to Consultant-1 before, during, or after the home sale). But even entertaining the absurd premise that the attorney proffer report could have negated *all probable cause for campaign finance offenses whatsoever*, it would still not be material, because the warrants would still have been properly issued based on probable cause that they would reveal evidence, fruits, or instrumentalities of money laundering, another Subject Offense, based on the fact that this transfer was funded by an account receiving commingled funds from FTX customers. *See, e.g.*, *Menendez*, 2024 WL 912210, at *5 ("[T]he affidavit need only establish probable cause that the evidence, fruits, or

instrumentalities of a crime would be found in the search, even if the crime was only perpetrated among [individuals other than the objecting defendant].”). This evidence giving rise to probable cause to suspect money laundering was included in the warrant affidavits (iCloud Aff. ¶ 12; Maryland Aff. ¶ 12; *see also* iPhone Aff. ¶ 7.i), as well as in the SBF Indictment incorporated therein (SBF Ind. ¶¶ 18, 21), and would have sufficed for issuance of each of the warrants even in the (preposterous) counterfactual world where the difference between the Consultant-1 attorney proffer notes and the summary negated all probable cause for all of the campaign finance offenses.

*b. The Defendant's Bank Balance*

The defendant next faults the affiant for including her bank balance around the time of the June 28 transfer but not the time of the August 31 transfer. (Dkt. 123 at 28-29). Her claim is that if the affidavits had stated that prior to the August 31 transfers from Salame, the defendant's account had a balance sufficient to fund her early-September transfers to her campaign, the magistrate judges would have concluded there was no probable cause that those campaign transfers were traceable to the funds from Salame. (*Id.* at 28). This argument is not only illogical; it is contrary to the binding law of the Second Circuit, which expressly holds that when an account contains both tainted and untainted funds, there is probable cause that subsequent withdrawals are made with tainted funds.

As an initial matter, the defendant gives no reason to believe that the magistrate judges reviewing the warrants in fact concluded that the defendant's August 31 account balance was insufficient to fund her September transfers to her campaign without Salame's incoming transfer. Indeed, the fact that—as the defendant notes—the affidavit *does* list that the defendant's June 28 balance was insufficient to fund her June 29 transfers to her campaign without Salame's funds, but does *not* make any similar statement about her August 31 balance (Dkt. 123 at 28-29) suggests, if anything, the opposite inference. The magistrate judges presumably would reason that if the

affiant had evidence that the defendant's account balances were insufficient on August 31, the affiant would have listed it, as she did for the June 28 transfer. Where the affidavit does not give rise to the inference that a fact does not exist, the omission of that fact cannot be material. *See Calk*, 2020 WL 3577903, at *9 ("The omission of the fact that Defendant himself did not draft the loan memoranda is not material because it is not assumed in its absence that Defendant, CEO and Chairman of the Bank drafted the memoranda himself.").

But even if the magistrate judges reviewing the affidavit concluded, in the absence of information about the defendant's August 31 balances, that those balances were insufficient to fund the September campaign transfers, evidence of the actual balances would still be immaterial as a matter of law. That is because the Second Circuit has held, in *United States v. Banco Cafetero Panama*, 797 F.2d 1154 (2d Cir. 1986), that—because of the very nature of the probable cause standard—when an account contains sufficient balances of both tainted and untainted funds to cover an outgoing transfer, there is probable cause to suspect *both* that the outgoing transfer contained tainted funds *and* that it did not. *Id.* at 1160-61. This rule makes sense because probable cause "does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands," *Gerstein*, 420 U.S. at 121, and "the fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause." *Fama*, 758 F.2d at 838. Accordingly, in claiming that the magistrate judge "would likely have concluded that" there was no probable cause that the subsequent withdrawals were traceable to the Salame transfer (Dkt. 123 at 29), the defendant is simply misapplying the probable cause standard set by the Second Circuit. (*Compare* Dkt. 123 at 29 ("If the magistrate judge was informed of this fact, that judge would likely have concluded that any money Ms. Bond lent her campaign in early September 2022 came from her own set of personal funds that were already in her account before

Mr. Salame effectuated the August 31 Transfer. On those facts, there would be no probable cause to suggest that the August 31 Transfer was a campaign donation of any kind, let alone an unlawful one.") *with Banco Cafetero Panama*, 797 F.2d at 1160-61 ("In almost all cases, once the Government has shown probable cause to believe that a person has sold drugs and has deposited the proceeds of a drug sale into a bank account, there will be probable cause to believe that the bank account contains 'traceable proceeds' of the sale (if the balance has not fallen below the amount of the deposit) *and* probable cause to believe that a withdrawal contains such 'traceable proceeds' (if the withdrawal exceeds the deposit)." (emphasis in original)).

In any event, even if the bank account balance on August 31 had any exculpatory character, it could not be material. *First*, the timing of the inflows and outflows, the striking similarity to the June 1 transfer and the June 28 transfer, and each of the other indicia of campaign finance offenses described in Section III.B.2.a.ii would still—even without the Second Circuit's holding in *Banco Cafetero Panama*—have strongly supported probable cause that the August 31 transfer was in fact an illegal campaign contribution. *Second*, the June 1 transfer and the June 28 transfer would still have sufficed to provide probable cause to suspect campaign finance offenses even if the August 31 transfer was completely negated. (*See* Section III.B.2.a.ii, *supra*). And *third*, even if all of the campaign finance offenses were negated, the warrant would in any event still be supported by probable cause as to money laundering offenses and a *Franks* hearing would still be inappropriate.

*c. The Donation Processing Chat*

The next supposed omission the defendant cites—and the last one involving a specific known document—is the defendant's claim that the affidavit—which explicitly referenced the Donation Processing Chat—should have also been explicit that the defendant was not named in the Donation Processing Chat as a recipient of corporate contributions. (Dkt. 123 at 30-31). But this fact would have been obvious to the issuing magistrate judges, so the failure to make it explicit

cannot be material. *See Calk*, 2020 WL 3577903, at *9 ("The omission of the fact that Defendant himself did not draft the loan memoranda is not material because it is not assumed in its absence that Defendant, CEO and Chairman of the Bank drafted the memoranda himself."). The magistrate judges would hardly have assumed that, in seeking a warrant premised on whether the defendant received a corporate contribution, the Government was in possession of a chat in which the defendant was explicitly named as having received a corporate contribution but simply did not bother to mention what would have been such a damning fact.

In any event, whether or not the defendant was mentioned by name in the Donation Processing Chat, a chat that was presented only as listing [redacted] of the corporate contributions, is not material to probable cause given the extensive documentary evidence of illegal campaign contributions described above. (*See* iCloud Aff. ¶ 8.g [redacted] (emphasis added)); Maryland Aff. ¶ 8.g (same)). Indeed, as noted above, the Donation Processing Chat is not at all exculpatory, any more than any instance of a defendant not committing an uncharged crime is exculpatory. *See, e.g.*, *Boykoff*, 68 F. App'x 20–21 ("[E]vidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant.").

But even if the failure of the Donation Processing Chat to mention the defendant had any exculpatory tendency, it would still be immaterial. It is inconceivable that a hypothetical affidavit stating explicitly that the defendant was not named in the Donation Processing Chat would fail to make out probable cause, despite the numerous pieces of evidence that the June 1 transfer was an illegal corporate contribution, let alone that the June 28 and August 31 transfers were illegal

excessive contributions, let alone the evidence that certain of the transfers were funded from an account containing commingled FTX customer funds. (*See* Section III.B.2.a.ii, *supra*).

*d. Unspecified Other FTX Materials*

The defendant goes even farther afield with the *ipse dixit* assertion that the affiant was probably aware of unspecified evidence that the defendant purportedly did work for FTX, supposedly justifying the June 1 payment from FTX Digital Markets. (Dkt. 123 at 29-30). This "mere conclusory showing" is simply insufficient to justify a *Franks* hearing, *Sandalo*, 70 F.4th at 86, for the obvious reason that a "substantial preliminary showing," *id.*, of a material omission requires some showing that there has in fact been an omission.

The defendant's failure to identify any actual omissions that were known to the affiant is fatal. Under settled law, a defendant may not make a "mere conclusory showing" to obtain a *Franks* hearing for the purpose of conducting a fishing expedition to see *if* there were any omissions. *Skyfield*, 2023 WL 8879291, at *8 (defendant's burden is "'a heavy one that requires more than a mere conclusory showing'" (quoting *Sandalo*, 70 F.4th at 86)). As inappropriate as it is to use *actual omissions* to open officers up to "endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit," *Mandell*, 710 F. Supp. 2d at 376, it is even more impermissible to do so to look for *hypothetical omissions*, and prohibited by the requirement of a "substantial preliminary showing." *Falso*, 544 F.3d at 125.

Here, the defendant claims (without support) that "[t]he FTX File should contain significant evidence that Ms. Bond performed work on behalf of FTX," and then cites to an exhibit with an itinerary for the 2022 Miami hackathon hosted by FTX. (Dkt. 123 at 30 (citing Dkt. 124 Ex. 18); *see also* Dkt. 124 ¶ 20 (describing Ex. 18)). As an initial matter, the defendant never establishes that the affiant knew about this document at the time the warrant affidavit was sworn.

Regardless, the itinerary lists the defendant both as a point of contact for the event and as an attendee to certain meals, and in doing so lists her not as any consultant for FTX, but instead in her capacity as the CEO of ADAM, a cryptocurrency trade organization of which multiple cryptocurrency exchanges, including FTX, were members. (Dkt. 124 Ex. 18 at 1 ("Michelle Bond, CEO, Association for Digital Asset Markets")). This document on its face reflects that the defendant participated in the hackathon in her capacity as CEO of ADAM, not as a consultant for FTX or its subsidiaries, and thus could not have supported a $400,000 payment from FTX Digital Markets under the guise of a consulting agreement.

In any event, given the extensive contemporaneous documentary evidence of closely coordinated payments from Salame to the defendant and then the defendant to her campaign, whether she did or did not ever perform any work for FTX simply is not material to probable cause to suspect that the June 1 transfer from FTX Digital Markets (caused by Salame, the day after she officially formed her campaign) was a campaign contribution and not simply a consulting payment. *See, e.g.*, *Fama*, 758 F.2d at 838 ("the fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause."); *Cromitie*, 2010 WL 3025670, at *6 ("A requirement that all potentially exculpatory evidence be included in an affidavit would severely disrupt the warrant process and place an extraordinary burden on law enforcement officers, and is not the law."). And of course, as with all of the other evidence, even if this and other unspecified FTX evidence existed was known to the affiant, and negated probable cause as to this transfer (which the defendant has not carried her burden of showing), the warrant would still properly have issued based on the evidence of the June 28 and August 31 transfers, or—even on the absurd counterfactual scenario in which there was no probable cause as to any campaign finance offense—based on the evidence of money laundering. (*See* Section III.B.2.a.ii, *supra*).

### 3. The Defendant Has Made No Showing of Intent to Mislead or Reckless Disregard for the Truth

Even if any of the above-described information were material—and it is not—a *Franks* hearing would still be inappropriate because of the lack of any showing of intent to mislead or reckless disregard for the truth. As described above, a search warrant affiant "does not necessarily act with 'reckless disregard for the truth' simply because he or she omits certain evidence that a reviewing court, in its judgment, considers to be 'clearly critical.'" *Rajaratnam*, 719 F.3d at 154. Instead, the defendant must establish with "credible and probative evidence" that the omission of information "was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'" *Id.*

The defendant has established nothing of the sort, particularly in light of the robust showing of probable cause in each of the warrant affidavits, the marginal—if any—relevance of the allegedly omitted information to probable cause, and the care the affiant took to include numerous details qualifying or arguably in tension with theories of guilt. None of the omissions cited by the defendant can remotely be described as "clearly critical," *Reilly*, 76 F.3d at 1280, and even the omission of "clearly critical" information is not enough to warrant a *Franks* hearing, *Rajaratnam*, 719 F.3d at 154.

The defendant's argument that the Court can infer recklessness or intent to mislead is refuted not just by the nature of the alleged omissions but also by the affidavits themselves. Each was a detailed document citing powerful contemporaneous documentary evidence. The carefully marshalled detail alone provides no basis to infer that the "affiant in fact entertained serious doubts as to the truth of [her] allegations." *Rajaratnam*, 719 F.3d at 154; *see also, e.g.*, *Maisonet*, 2013 WL 12204909, at *1 (an affiant is "not required to include all potentially exculpatory information" in seeking a search warrant).

Even if the defendant was able to show that the affiant "exercised poor judgment in not considering to include this information"—and there is no basis whatsoever to find poor judgment—"that would, at best, support a claim of negligence. But, such a finding, even if the Court were inclined to make it, would not get [the defendant] over the first *Franks* hurdle." *Vilar*, 2007 WL 1075041, at *29.

Indeed, far from showing any intent to mislead or reckless disregard, the circumstances here show the opposite. Throughout the series of warrants, the affiant included information arguably in tension with the theories supporting probable cause. (*See, e.g.*, iCloud Aff. ¶ 10 n.2; Maryland Aff. ¶ 8.d n.4; iPhone Aff. ¶ 7 n.2). The affiant's inclusion of such material defeats the defendant's attempt to meet her burden to show intent to mislead or reckless disregard for the truth. *See, e.g.*, *Calk*, 2020 WL 3577903, at *6 ("This evidence, which was arguably inconsistent with the Government's theory of guilt, suggests that any omission from the Affidavit was not designed to mislead.").

Indeed, the fact that the fuller context regarding Consultant-1's statements was inculpatory refutes any suggestion of intent to mislead. *See, e.g.*, *United States v. Thomas*, 788 F.3d 345, 351 (2d Cir. 2015) ("[W]e cannot conclude that any omission here was made deliberately or with reckless disregard for the truth when it is clear that full disclosure of the relevant information would only have strengthened the search warrant application."); *Rajaratnam*, 719 F.3d at 155 n.18 ("it is difficult to imagine a situation where the government would intentionally or with reckless disregard omit information that would strengthen its probable cause or necessity showing," referring to wiretap application); *Menendez*, 2024 WL 912210, at *6 ("[T]he omission of inculpatory information, such as certain of the alleged admissions discussed above, cannot be evidence of intent to mislead.").

At bottom, instead of making any substantial preliminary showing justifying her very serious accusations of intent to mislead the issuing magistrate judges or reckless disregard for the truth, the defendant simply asks the Court to infer it from the fact that a series of detailed and careful affidavits did not include every fact that the defendant now asserts is potentially relevant. This is, for good reason, not a basis for a *Franks* hearing. *See, e.g.*, *Awadallah*, 349 F.3d at 67-68 (it is unreasonable to require an affiant "to include . . . every piece of information gathered in the course of an investigation."; *Vilar*, 2007 WL 1075041, at *27 (because "all storytelling involves an element of selectivity," it is "not shocking that every affidavit will omit facts which, in retrospect, seem significant"); *Mandell*, 710 F. Supp. 2d at 373 ("the mere intent to exclude information is insufficient" to demonstrate recklessness, since "every decision not to include certain information in the affidavit is 'intentional' insofar as it is made knowingly"); *Lahey*, 967 F. Supp. 2d at 709 (the omission of information that was "clearly critical" is not itself sufficient; the court must find "'credible and probative evidence that the omission of information in a[n] … application was designed to mislead or was made in reckless disregard of whether [it] would mislead'" (quoting *Rajaratnam*, 719 F.3d at 154)).

## IV. The Defendant's Untimely Motion to Inspect the Grand Jury Transcripts Lacks Any Merit

Not only is the defendant's motion to inspect the grand jury transcripts fatally untimely, but it is also precluded by the binding law of the Supreme Court and the Second Circuit, which holds that failing to present exculpatory evidence to the grand jury—which is all that the defendant even alleges—is not a ground for relief.

### A. Legal Standard

The bar for obtaining disclosure of grand transcripts is exceedingly high, and such relief is not granted absent extraordinary circumstances. That is because grand jury proceedings are

"accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process." *United States v. R. Enters., Inc.*, 498 U.S. 292, 301 (1991). The "proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 218 (1979). Indeed, "[s]ince the 17th century, grand jury proceedings have been closed to the public, and records of such proceedings have been kept from the public eye. The rule of grand jury secrecy . . . is an integral part of our criminal justice system." *Id.* at 218 n.9. This fundamental presumption of grand jury secrecy is now embodied in Rule 6(e) of the Federal Rules of Criminal Procedure. A party seeking disclosure of grand jury material under Rule 6(e) must make "a strong showing of particularized need" for the material sought. *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 443 (1983); *see also Dennis v. United States*, 384 U.S. 855, 870 (1966); *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400 (1959); *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 681 (1958). A review of grand jury transcripts "should not be permitted without concrete allegations of Government misconduct." *United States v. Leung*, 40 F.3d 577, 582 (2d Cir. 1994).

In *United States v. Williams*, the Supreme Court rejected a defense request to dismiss an indictment over the Government's alleged failure to disclose "substantial exculpatory evidence" that lower courts had found "rendered the grand jury's decision to indict gravely suspect," 504 U.S. 36, 38-39 (1993), holding instead the Government does not have a "legal obligation to present exculpatory evidence" to the grand jury, *id.* at 52. Second Circuit cases prior to *Williams* held that an indictment could be dismissed for failure to present to a grand jury exculpatory evidence that was "substantial" and "might reasonably be expected to lead the [grand] jury not to indict." *United States v. Casamento*, 887 F.2d 1141, 1183 (2d Cir. 1989); *see also United States v. Bari*, 750 F.2d 1169, 1176 (2d Cir. 1984). These cases were overruled by *Williams*. *See United States v. Dunn*,

No. 05 Cr. 127 (KMK), 2005 WL 1705303, at *4 n.7 (S.D.N.Y. July 19, 2005) (noting overruling of *Casamento*, remarking "*Williams*, however, explicitly rejected such a rule."). Indeed, the Second Circuit has made clear, following *Williams*, that "the government ha[s] no duty to present exculpatory evidence to the grand jury." *United States v. Bove*, 888 F.3d 606, 611 (2d Cir. 2018).[7]

**B. The Defendant's Motion is Untimely**

Like her motions alleging selective or vindictive prosecution and to suppress, the defendant's motion to inspect the grand jury minutes to search for evidence of alleged error is untimely. An allegation of "an error in the grand-jury proceeding" must be raised by pretrial motion, Fed. R. Crim. P. 12(b)(3)(A)(v), and the time to do so has long passed, working a "complete" waiver. *Yousef*, 327 F.3d at 125. As her motion to inspect the grand jury minutes is based on the same grounds as her motion to suppress, it could similarly have been brought by the May 9, 2025 deadline. Accordingly, it may not be brought now, on the eve of trial.

**C. The Defendant Has Made No Showing of Any Irregularity Justifying Inspection of the Grand Jury Transcripts**

Even if considered on the merits, the defendant's motion falls far short of the standard required for the extraordinary relief she seeks. Under the governing legal standard recognized by the Second Circuit, *see Bove*, 888 F.3d at 611 ("the government ha[s] no duty to present exculpatory evidence to the grand jury."), the defendant's claim—seeking inspection of the transcripts to ascertain if any allegedly exculpatory material was supposedly "improperly withheld" (Dkt. 123 at 32) is simply non-viable on its face.[8]

---

[7] An indictment may be dismissed where a prosecutor's conduct amounts "to a knowing or reckless misleading of the grand jury as to an essential fact," *United States v. Lombardozzi*, 491 F.3d 61, 79 (2d Cir. 2007), but following *Williams* this doctrine is necessarily limited to affirmative misleading representations, not failure to disclose exculpatory information.

[8] The defendant's reliance on a pre-*Williams* case simply illustrates that the premise of her motion has been overruled. (*See* Dkt. 123 at 31 (citing *Bari*)).

Even if this Court were free to disregard the clear holdings of the Supreme Court in *Williams* and of the Second Circuit in *Bove*, the defendant makes no showing of any improper withholding of information from the grand jury. Even under the old standard before the Supreme Court's decision in *Williams*, the defendant makes no showing whatsoever that the Government failed to present "substantial" exculpatory evidence that "might reasonably be expected to lead the [grand] jury not to indict," *Casamento*, 887 F.2d at 1183. For all of the reasons set forth in Section III.B.2, above, just as none of the allegedly withheld information was material to any of the warrant affidavits, none could remotely be expected to lead the grand jury not to indict. Indeed, the Indictment recites additional and damning evidence of the defendant's lies regarding the FTX payment showing her consciousness of guilt, which was not included in the warrant affidavits, further showing the irrelevance of any supposed omissions. (*See* Indictment ¶¶ 31-41).

## **CONCLUSION**

For the foregoing reasons, the defendant's motions should be denied without a hearing.

Dated: New York, New York
August 21, 2026

Respectfully submitted,

SEAN S. BUCKLEY
Attorney for the United States, Acting Under
Authority Conferred by 28 U.S.C. § 515

By: s/
David R. Felton
Paul M. Monteleoni
Stephanie Simon
Assistant United States Attorneys
(212) 637-2299 / 2219 / 2581

cc: All Counsel of Record