**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

October 16, 2026

**BY ECF AND EMAIL**

The Honorable George B. Daniels
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re: *United States v. Michelle Bond*, 24 Cr. 494 (GBD)**

Dear Judge Daniels:

The Government respectfully submits this supplemental letter in opposition to defendant Michelle Bond's motions *in limine* and in support of the Government's motions *in limine*, as invited by the Court during the September 16, 2026 pretrial conference in this matter. (Sept. 16, 2026 Tr. ("Tr.") at 67-68).

## ARGUMENT

### I. The Court Should Admit Non-Hearsay Agent Statements Under Rule 801(d)(2)(D)

As the Government explained in its motions *in limine*, and for the additional reasons set forth below, the Court should admit as non-hearsay various agent statements under Rule 801(d)(2)(D), since the statements were made on a matter within the scope of the declarants' employment and made during the existence of the agency relationship. (Dkt. 133 at 5-6, 8-9).

#### A. Legal Standard

Federal Rule of Evidence 801(d)(2)(D) excludes from the definition of "hearsay" a statement offered against an opposing party that was "made by the party's agent or employee on a matter within the scope of that relationship and while it existed." The Second Circuit has made clear that admissibility under Rule 801(d)(2)(D) "should be granted freely" and proof under this Rule is accorded "liberal treatment." *Pappas v. Middle Earth Condominium Ass'n*, 963 F.2d 534, 537-38 (2d Cir. 1992) (reversing district court's exclusion of statement under Rule 801(d)(2)(D)).[1] The proponent must establish "only" the following: "(1) the existence of the agency relationship,

[1] Unless otherwise noted, internal quotation marks, citations, and brackets in case citations are omitted.

(2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." *Id.* at 537.

With respect to the first prong, the existence of the agency relationship, the Second Circuit has explained that an agency relationship exists where a declarant is "answerable" to a defendant. *See United States v. Rioux*, 97 F.3d 648, 660 (2d Cir. 1996). "Where an individual defendant controls the entity that employs the declarant, and is the declarant's ultimate supervisor, the employee is an agent of the defendant for purposes of F.R.E. 801(d)(2)(D), and his statements are admissible against that individual defendant." *In re Reserve Fund Secs. & Derivs. Litig.*, No. 09 Civ. 4346 (PGG), 2012 WL 12354233, at *7 (S.D.N.Y. Oct. 3, 2012). This "foundational" agency relationship "predicate may be established by circumstantial evidence." *Pappas*, 963 F.2d at 538; *see Farganis v. Town of Montgomery*, 397 F. App'x 666, 668 (2d Cir. 2010).

Under this framework, courts routinely find an agency relationship where, as here, employees take their orders from a defendant. Courts, including the Second Circuit, have found an agency relationship between, for example: a company's vice president of sales and the company's president, *Zaken v. Boerer*, 964 F.2d 1319, 1323 (2d Cir. 1992); sheriff's office personnel and the sheriff, *Rioux*, 97 F.3d at 660; two persons hired by a defendant to help prepare the defendant's tax returns and the defendant, where one of the two gathered relevant information and the other prepared and filed the returns, *United States v. Neumann*, No. 21 Cr. 439 (NSR), 2023 WL 8700974, at *5 (S.D.N.Y. Dec. 14, 2023); a senior corporate officer and an employee, *United States v. Agne*, 214 F.3d 47, 54 (1st Cir. 2000); a part owner and an employee, *United States v. Kirk*, 844 F.2d 660, 663 (9th Cir. 1988); an attorney and the client, *United States v. Jung*, 473 F.3d 837, 841 (7th Cir. 2007); an interpreter and a defendant whose statement the interpreter translated, *United States v. Sanchez-Godinez*, 444 F.3d 957, 960 (8th Cir. 2006); and a secretary and a company president, *United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 322 (4th Cir. 1982). Indeed, "a direct reporting relationship is sufficient, but not necessary" for the exception to apply, *United States v. Goldstein*, No. 21 Cr. 550 (DC), 2023 WL 3662971, at *7 (E.D.N.Y. May 25, 2023), as "courts engage in a common-sense inquiry into agency given the specific facts presented," Charles Alan Wright & Arthur R. Miller, *Agent or Employee Statements (Rule 801(d)(2)(D))*, 30B Fed. Prac. & Proc. Evid. § 6776 (2026 ed.) (hereinafter "*Wright & Miller*"); *see also United States v. Paxson*, 861 F.2d 730, 734 (D.C. Cir. 1988) (finding agency relationship, rejecting "hyper-technical construction of the rule" that would have limited it to corporate employers).

As for the second and third prongs—that the statements be made during and within the scope of the agency or employee relationship—the Second Circuit has held that "[t]he authority granted in the agency relationship *need not include authority to make damaging statements*, but simply the authority to take action about which the statements relate." *Pappas*, 963 F.2d at 538 (emphasis added).[2] Accordingly, it affirmed the admission of the statements of a person

[2] Nor, as then-Judge Breyer explained, is there anything "in Rule 801(d)(2)(D) that requires an admission be made by a management level employee." *Union Mut. Life Ins. Co. v. Chrysler Corp.*, 793 F.2d 1, 8 (1st Cir. 1986) (Breyer, J.); *Wilkinson v. Carnival Cruise Lines, Inc.*, 920 F.2d 1560, 1565 (11th Cir. 1991) (noting that it is not "necessary to show that an employee or agent declarant possesses 'speaking authority'").

responsible for removing ice from a walkway about his employer's "procedures for maintaining the walkway." *Pappas*, 963 F.2d at 536.[3] Similarly, the Second Circuit has held that a nurse's statement to a patient about purging files in a doctor's office was admissible against the doctor both because helping to maintain files was within the scope of the nurse's work and because discussing such matters with patients was within scope of her work, even if "file purging" was not. *United States v. Lauersen*, 348 F.3d 329, 340 (2d Cir. 2003). Indeed, it is well recognized that "courts typically take an unabashedly broad view of Rule 801(d)(2)(D)'s application, emphasizing that qualifying statements must simply *touch on matters that fall within* the employee or agent's general duties and responsibilities." *Wright & Miller* (emphasis added).

Because the rule does not require the speaker to be authorized to make statements at all, *Pappas*, 963 F.2d at 538, it *a fortiori* does not require that the speaker be authorized to make the specific statement at issue. *See, e.g.*, *Wright & Miller* (Rule 801(d)(2)(D) does *not* require that the employer or the specific party against whom the statement is offered "in fact[] authorized the speaker to make a statement on the subject."); *see also Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1094 (1st Cir. 1995) ("Rule 801(d)(2)(D) does not contemplate . . . that the statement be shown to have been made by the employee at the instance of her employer . . . ."); *Crawford v. Garnier*, 719 F.2d 1317, 1324 (7th Cir. 1983) (explaining that "the agent need not be specifically authorized to make the declaration" under the Rule). Accordingly, the rule "requires neither adoption nor ratification" of the statements by the party against whom they are offered. *English v. District of Columbia*, 651 F.3d 1, 7 (D.C. Cir. 2011).

Just as the party against whom the statements are offered need not *authorize* the statements, the party need not *hear* them either. *See* Fed. R. Evid. 801(d)(2)(D) (imposing no such requirement); *Neumann*, 2023 WL 8700974, at *5 (admitting email correspondence and a set of notes—none of which include or copy defendant—relating to preparation of defendant's tax returns). Moreover, under the "broad thrust of the rule," *Wright & Miller*, a declarant whose statements are offered under the exemption "need not have been personally involved" in the conduct described in the statement, *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 822 (7th Cir. 2011); *Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756, 762 (7th Cir. 2003) (noting that "an employee need only be performing the duties of his employment when he comes in contact with the particular facts at issue"); *Wright & Miller* ("Rule 801(d)(2) statements generally do not require personal knowledge."). Hence, under Rule 801(d)(2)(D), even an employee's statement that simply consisted of information that the employee read in a work file is admissible. *Union Mut. Life Ins. Co.*, 793 F.2d at 8-9.

### B. <u>Discussion</u>

At trial, the Government anticipates that the evidence will establish an agency or employment relationship between the defendant—a congressional candidate—and various staff

---

[3] Applying the "liberal treatment" owed under Rule 801(d)(2)(D), *id.* at 538, the declarant in that case was identified only as "[a] man with a shovel and a bucket" who appeared after a complaint of an icy walkway, *Pappas*, 963 F.2d at 536, and the Second Circuit reversed the exclusion of this testimony, holding that "circumstantial evidence may establish the scope, as well as the existence, of the agency relationship," *id.* at 538.

and personnel acting on behalf of her campaign, including her campaign manager, campaign treasurer, a campaign consultant, and other staff, including those responsible for campaign communications. Each of these individuals were obviously "answerable" to the candidate as to campaign matters. *Rioux*, 97 F.3d at 660. These declarants' statements—which plainly relate to the defendant's campaign and were made by the declarants while they were acting on behalf of the defendant's campaign—should be admitted under the "liberal treatment" applicable to Rule 801(d)(2)(D). *Pappas*, 963 F.2d at 538.

Below are three illustrative categories of examples:

*First*, statements by the defendant's campaign staff regarding the campaign's fundraising and financial obligations. For example:

- Attached hereto as Exhibit A,[4] in a June 2022 email chain, the defendant, campaign staff, and a media strategy firm working with the defendant's congressional campaign discuss in extensive detail a campaign fundraising platform: the campaign's "WinRed" page, including describing its status, functionality, and the work they had performed to set it up. *See, e.g.*, Ex. A at 1 ("[W]e've added to Michelle's WinRed pages" a list of features); *id.* at 3 ("I added the account details and submitted the account to WinRed for approval."). These factual statements were plainly within the scope of the speakers' agency relationships—for example, the speakers did not, set up a fundraising portal for the defendant's congressional campaign as some sort of personal hobby undertaken on their own initiative and without her approval—and highly relevant to show the progress of the campaign and the importance the defendant placed upon fundraising. Indeed, given that the personnel performing these tasks were compensated, the evidence of their work is evidence of the very campaign expenses that were funded with the charged illegal campaign contributions.[5]

- Attached hereto as Exhibit B, in late June 2022 correspondence among the defendant, co-conspirator Ryan Salame, the campaign treasurer, and a campaign

[4] The Government respectfully requests that the unredacted copies of the Exhibits attached hereto—which contain personally identifiable information ("PII") of various third parties and reference potential Government trial witnesses four-and-a-half months before trial, well before any applicable disclosure deadline—be filed under seal.

[5] The defendant's own statements are of course directly admissible as party opponent statements if offered by the Government. *See* Fed. R. Evid. 801(d)(2)(A). But as noted above, the defendant need not be a party to or included on the communications for them to be admissible under Rule 801(d)(2)(D). *See* Fed. R. Evid. 801(d)(2)(D) (imposing no such requirement); *Neumann*, 2023 WL 8700974, at *5. Additionally, such statements copying the defendant are also admissible for purposes other than for their truth, such as to prove the defendant's awareness that such statements were being made, and therefore her knowledge, understanding, and/or as context for subsequent actions. But again, the defendant need not be a party to or included on the communications for them to be admissible under Rule 801(d)(2)(D). *See* Fed. R. Evid. 801(d)(2)(D) (imposing no such requirement); *Neumann*, 2023 WL 8700974, at *5.

consultant, the treasurer informs the group that "these two landed" in describing wire transfers that are, as charged in the Indictment, illegal campaign contributions (*see* Dkt. 2 ¶¶ 19, 21, 47.b), and reports to the group the grand total fundraising numbers at the time of $797,545. As with the previous examples, these campaign professionals clearly had "the authority to take action" regarding the campaign and their statements about its funding were made in the course of their agency relationship to the defendant. *Pappas*, 963 F.2d at 538. Evidence that the charged illegal campaign contributions "landed" in the campaign account is highly relevant proof of the campaign finance charges, and the agents' tracking of available campaign funds is also important evidence of, among other things, the progress of the campaign and the defendant's motive in accepting more illegal campaign contributions to add to those total funds.

- Attached hereto as Exhibit C,[6] in an August 1, 2022 email from a campaign staffer to the defendant, Salame, and various campaign staff, including the campaign manager and treasurer, the staffer summarizes and attaches a spreadsheet containing an end of quarter finance projection for the defendant's campaign. The staffer notes, "Bottom line: **We need to collect another $20k at a minimum to crack $100k.**" (Emphasis and highlights in original). As with the previous examples, these statements were clearly within the scope of the campaign staffer's agency relationship to the defendant and this evidence is highly relevant to show, among other things, the progress of the campaign and the defendant's motive in "need[ing] to collect" additional funding.

- Attached hereto as Exhibit D, on August 25, 2022, two days after the defendant lost the primary, the president of a fundraising firm hired by the defendant's campaign asks, "Is there debt[?]," and a campaign consultant answers, "Yes." The campaign consultant was still pursuing the agency relationship in winding down the campaign's affairs and paying its "unpaid expenses" as alleged in the Indictment (Dkt. 2 ¶ 27) following the primary loss, and the existence of "debt" is powerful evidence of exactly those "unpaid expenses" (*id.*), which one of the illegal campaign contributions was in fact intended to repay (*id.* ¶¶ 28-29).

Statements of this type are admissible under Rule 801(d)(2)(D) because they are within the scope of the declarants' agency relationship and, indeed, the staffers discussed and tracked the campaign's fundraising and debts because it was part of their job. *See, e.g.*, *Pappas*, 963 F.2d at 538. No more is required under the rule.

*Second*, statements by the defendant's campaign staff regarding filing campaign forms, such as a financial disclosure form filed with the House Ethics Committee (the "House Ethics

[6] For technical reasons due to the native file format of the underlying file, which was produced to the defendant under Bates number AXFTX_001794, page two of Exhibit C does not bear a visible Bates number.

Form") and Federal Election Commission ("FEC") Form 3s, reporting the campaign's receipt and disbursements. For example:

- Attached hereto as Exhibits E and F, respectively, are June 27, 2022 and late July 2022 correspondence among the campaign treasurer, other campaign staff, Salame, and the defendant, regarding filing the House Ethics Form, discussed in the Indictment, and ultimately filed on August 1, 2022. (*See* Dkt. 2 ¶¶ 22, 23). Notwithstanding that the defendant digitally certified that the statements in the House Ethics Form were "true, complete, and correct to the best of my knowledge and belief" (*see* Dkt. 2 ¶ 23), as charged in the Indictment, the defendant subsequently made multiple statements contrary to what the defendant had certified in the House Ethics Form (*see* Dkt. 2 ¶¶ 25, 33). Although the bulk of these exhibits are non-hearsay and admissible because they are requests, directives, and statements of intent, *see, e.g.*, *United States v. Dawkins*, 999 F.3d 767, 789 (2d Cir. 2021), they are also non-hearsay and admissible for their truth under Rule 801(d)(2)(D) because they include factual assertions regarding the progress of the form (*see, e.g.*, Ex. F at 3 ("Sounds like this has been started already and just needs to be finished.")).

Statements of this type are admissible under Rule 801(d)(2)(D), since they are within the scope of the declarants' agency relationship and the forms discussed were filed on the defendant's behalf. Such statements are relevant because they, among other things: highlight that the defendant, who was a party to these communications, was aware of campaign laws; prove that the charged illegal contributions were in fact campaign contributions, since the funds were spent on campaign expenses; provide a motive for the charged offense conduct (*i.e.*, causing, accepting, and receiving illegal campaign contributions) since the campaign had expenses, including expenses in connection with filing forms; and, in some instances, the forms discussed themselves relate to fundraising (such as various FEC Form 3s), which, again, was a motive for the defendant's offense conduct. Additionally, the forms themselves, such as the House Ethics Form and FEC Form 3s, are discussed at length in the Indictment and part of the Government's proof at trial. (*See* Dkt. 2 ¶¶ 22, 23 (House Ethics Form); 17, 21, 29 (FEC Form 3s)).

*Third*, statements by the defendant's campaign staff regarding campaign events. For example:

- Attached hereto as Exhibit G, in correspondence from June 2022 among Salame and campaign staff, the president of a fundraising firm hired by the campaign wrote to Salame, "we booked and have been soliciting for your upcoming DC trip," which is a factual statement about a campaign meet and greet with a suggested donation of $2,900, $1,000, or $500.

- Attached hereto as Exhibit H, is July 2022 correspondence among Salame and campaign staff, in which the president of a fundraising firm hired by the campaign provided an updated agenda for the defendant's and Salame's July 12-13, 2022 trip to Washington, D.C. Among other factual statements about various campaign events, are references to several meetings and a happy hour, seeking among other things a "Leadership Donation" and "financial support," and a requested meeting

> with a trade association "who give$$$." The assertions that each of these campaign events had been scheduled were fully within the scope of the campaign staff's work for the campaign.

Under Rule 801(d)(2)(D), statements of this type are admissible because they are within the scope of the declarants' agency relationship and the staffers set up, discussed, and tracked the campaign's events because it was part of their job. Such statements are relevant because they, among other things, show that the defendant's campaign in fact spent the illegally contributed campaign funds on campaign expenses such as events and the need for and use of such funds was a motive for the charged offense conduct (*i.e.*, causing, accepting, and receiving illegal campaign contributions).

Particularly in light of the "liberal treatment" of such statements under Rule 801(d)(2)(D), *Pappas*, 963 F.2d at 538, statements of this type—which relate to the defendant's campaign and were made by the declarants while they were assisting the defendant's campaign—should be admitted under Rule 801(d)(2)(D), since they were made on a matter within the scope of the declarants' employment and made during the existence of the agency relationship. *See Pappas*, 963 F.2d at 537, 538; *Rioux*, 97 F.3d at 660; *Wright & Miller*.

## II. The Court Should Exclude Evidence and Argument Regarding the Collateral Consequences the Defendant May Face if Convicted

The Government writes to respond to the defendant's suggestion that she should be allowed to introduce highly inflammatory and irrelevant evidence regarding the consequences of her conviction, purportedly to show that she would not have risked those consequences and thus must not have committed the charged offenses. (Tr. 29-36). This argument, which virtually every criminal defendant could make if it were accepted, would circumvent Rule 403 and upend settled practice by allowing a flood of highly prejudicial and irrelevant evidence into every criminal trial.

As the Government explained in its motions *in limine*, the defendant should be precluded from offering evidence or argument concerning the consequences she might face if convicted. (Dkt. 133 at 22-23). Courts routinely hold that "it would be improper for the jury to hear about any potential . . . consequences of a guilty verdict" because those facts "do not bear on the charged crimes" and thus are irrelevant. *United States v. Adelekan*, 567 F. Supp. 3d 459, 471 (S.D.N.Y. 2021); *see also, e.g.*, *United States v. Perez Alarcon*, No. 25 Cr. 461 (NSR), 2026 WL 1398626, at *4 (S.D.N.Y. May 19, 2026) (collecting cases). Further, evidence or argument concerning the consequences of conviction "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Shannon v. United States*, 512 U.S. 573, 579 (1994). Thus, as the Supreme Court has held, "[i]nformation regarding the consequences of a verdict is . . . irrelevant to the jury's task." *Id.*

The defendant appears to recognize this principle, committing not "to reference before the jury any potential sentence she might face if convicted of the charges set forth in the Indictment, or otherwise ask, either explicitly or implicitly, the jury to rule in her favor as a means of avoiding particular consequences." (Dkt. 136 at 11). Yet the defendant seeks permission to offer that very same evidence, claiming "that the risk of facing particular consequences, if caught, coupled with her awareness of those risks and her efforts to avoid those risks, suggests that she lacked the

necessary criminal intent." (Dkt. 136 at 11; *see also* Tr. at 31 (seeking to introduce evidence that the defendant "would not commit the crime" because doing so would "put[] her custody of her children at issue" and "destroy[] her own reputation")). Specifically, the defendant seeks to call "campaign consultants" to testify "[t]hat the decisions that she made related to the finances of the campaign undermine the government's articulation of a criminal [intent]" and to call other "people that know" the defendant to testify that "[s]he wouldn't commit this [crime] with the threat of losing [her] bar license" and "wouldn't . . . jeopardize her . . . standing and character to the community . . . ." (Tr. at 31-33).

As an initial matter, the defendant's proposed evidence is almost certainly inadmissible to the extent elicited through testimony of the defendant's "campaign consultants" or other "people that know" the defendant. Any such testimony could only be based on conversations with the defendant, which would constitute inadmissible hearsay, *see* Fed. R. Evid. 801, or rank speculation, which would likewise render that evidence inadmissible, *see* Fed. R. Evid. 602.

Even if the defendant testifies, the defendant's proposed evidence should still be excluded, for the same reasons courts routinely prohibit defendants from presenting evidence or argument regarding the consequences of conviction: because such evidence does not actually bear on whether the defendant had the *mens rea* to commit the offense, *see, e.g.*, *Adelekan*, 567 F. Supp. 3d at 471, and to the extent there is any minimal relevance to such evidence, its probative value is substantially outweighed by an unacceptable danger of unfair prejudice, confusing the issues, and misleading the jury, *see* Fed R. Evid. 403.

Here, the defendant simply asserts that evidence regarding the "risk of facing particular consequences if caught" is probative of her mental state but fails to offer any coherent explanation of how. (Dkt. 136 at 11). Indeed, as the Court aptly recognized, any defendant can make that argument, claiming that given the defendant's awareness of the potential consequences of conviction, the defendant would not have committed the crime. (*See* Tr. at 32 ("THE COURT: Well, that is true of every criminal defendant who could [argue] if they get caught, they will face serious consequences and then make decisions to commit the crime anyway.")). Yet courts still routinely exclude this evidence, because a defendant's knowledge that she may suffer consequences if caught has no bearing on whether the defendant in fact had the *mens rea* to commit the crimes charged. (*See* Tr. at 37 (the Court explaining that "[e]very defendant risks their relationships to commit their crime, and in hindsight after they get caught, they regret it and say, well, I took a risk that was an unreasonable risk" but "[t]hat doesn't make it particularly more likely or not that you're going to commit that crime" and "it doesn't indicate that would have played a part in your decision good or bad to decide to risk" those relationships)).

Further, even if framed as relevant to the defendant's intent, any evidence regarding the risk of facing particular consequences if caught risks improperly inflaming the jury's emotions and generating improper sympathy for the defendant to the same degree that evidence of punishment would. *See, e.g.*, *United States v. Quattrone*, 441 F.3d 153, 186 (2d Cir. 2006) (unfair prejudice is to "unduly inflame the passion of the jury"); *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980) (unfair prejudice exists when there is "the tendency of the evidence to prove some adverse fact not properly in issue or unfairly to excite emotions"); *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 170 (S.D.N.Y. 2006) (risk of prejudice from "proving an adverse *immaterial* fact, or by simply exciting the emotions of the jurors") (emphasis in original). Indeed, evidence

of any consequence of *conviction* necessarily imposes extreme prejudice by drawing the jury's attention to the consequences of the very verdict they are to render, which is entirely improper for them to consider. *See, e.g.*, *United States v. Blume*, 967 F.2d 45, 49 (2d Cir. 1992) ("Federal courts usually instruct juries not to consider a verdict's consequences.").

Nor is there any support for the distinction the defendant attempts to draw—between punishment on the one hand (which she concedes is inadmissible) and other consequences of conviction (which she claims are admissible). (*See* Tr. at 29-30 ("With regard to punishment, nothing is admissible, your Honor. Consequences we believe are admissible.")). The reasons for excluding evidence of punishment, which is one potential consequence of conviction, are the same as the reasons for excluding evidence of other potential consequences of conviction. That the defendant had reasons not to commit crime generally—whether those reasons be to avoid imprisonment, to keep a professional license, to maintain standing in the community, or the myriad of other reasons that exist not to commit crimes—does not bear on any issue properly before the jury, because it says nothing about whether the defendant had the requisite intent to commit the charged offenses. Likewise, the specific consequences of conviction the defendant proposes highlighting to the jury (*i.e.*, the risk of losing custody of or time with her children) are just as likely, if not more likely, to improperly inflame the emotions of the jury and generate sympathy for the defendant as would evidence regarding punishment. For those reasons, courts routinely exclude evidence of many different consequences of conviction, including to but not limited to punishment. *See, e.g.*, *Adelekan*, 567 F. Supp 3d at 471 (precluding "evidence concerning the punishment or immigration consequences of conviction"); *Perez Alarcon*, 2026 WL 1398626, at *4 (granting unopposed motion to preclude any evidence or argument considering punishment or collateral consequences of conviction); *United States v. Scott*, No. 24 Cr. 158 (KAM), 2025 WL 1384301, at *13-14 (E.D.N.Y. May 12, 2025) (precluding any evidence or argument considering punishment or collateral consequences of conviction).

Tellingly, the defendant cites no cases from this Circuit in support of the extraordinary proposition that collateral consequence evidence is admissible to negate criminal intent. The single case the defendant cites (*see* Dkt. 136 at 11), is a 16-year-old case out of the Southern District of Mississippi, in which the court held—with no reasoning—that in a healthcare fraud case the defendant could argue to the jury that the defendant "would not risk her license for the amounts involved in the alleged crime" because such evidence "is probative of [the defendant's] intent." *United States v. Thomas*, No. 08 Cr. 170 (DPJ) (FKB), 2010 WL 4553570, at *4 (S.D. Miss. Nov. 3, 2010). Given the court's lack of reasoning, *Thomas* is unpersuasive. In any event, its reasoning was limited to the context of a garden-variety healthcare fraud where "the amounts involved" were small in comparison to the value of a medical license. *Thomas* thus has no application where, as here, the offense conduct involved almost a million dollars of illegal financing for a campaign intended to make the defendant a Member of Congress. And in any case, even *Thomas* did not go so far as the defendant here seeks, as it properly precluded, as an "improper plea for sympathy," any suggestion that the defendant would "lose her license, livelihood, family" or the like as a result of conviction. *Id.* The court explained that "[s]uggesting that Thomas will lose her license, livelihood, family, etc., is not probative of any issue properly before the jury and is instead an improper plea for sympathy. . . . Thomas may neither appeal to the jury's sympathy nor seek nullification. The evidence of her livelihood lacks any probative value when placed in this context,

and to the extent any exists, it is substantially outweighed by the risk of unfair prejudice." *Id.* The same is true here.

At bottom, the defendant is attempting to smuggle in evidence regarding the consequences of conviction by recasting that evidence as evidence relevant to her state of mind. But as collateral consequences are irrelevant to the only question the jury will have to decide—whether the charges have been proven beyond a reasonable doubt—introducing evidence of them could serve no proper purpose but to invite nullification, which is patently inappropriate. *See, e.g.*, *United States v. Thomas*, 116 F.3d 606, 615 (2d Cir. 1997) (jury nullification is "by no means a right or something that a judge should encourage or permit if it is within his authority to prevent"); *id.* at 614 ("We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent."); *United States v. Reese*, 933 F. Supp. 2d 579, 583 (S.D.N.Y. 2013) (precluding defendant from advancing arguments aimed at jury nullification and the overall propriety of the government's investigation).

Accordingly, the evidence described above, any similar evidence, and any argument on the same, should be precluded pursuant to Rules 401 and 403.

## CONCLUSION

For the foregoing reasons, as well as the reasons cited in the Government's previous submissions, the Court should deny the defendant's motions *in limine* and grant the Government's motions in limine.

Respectfully submitted,

SEAN S. BUCKLEY
Attorney for the United States, Acting Under
Authority Conferred by 28 U.S.C. § 515

By: s/

David R. Felton
Paul M. Monteleoni
Stephanie Simon
Assistant United States Attorneys
(212) 637-2299 / 2219 / 2581

cc: All Counsel of Record (by ECF and email)